INTRODUCTION ........ 6

JURISDICTION AND VENUE ........ 10

THE PARTIES ........ 11

PROCEDURAL HISTORY FROM CONVICTION TO EXONERATION ........ 13

Statement of the Case ........ 16

The Events of March 16, 1989 ........ 17

The Events of March 17-18, 1989 ........ 18

The People Avoid Judicial Review of the Only Identifications of Carlton Roman ........ 26

Hollis Laylor is Indicted ........ 27

ADA Lomuscio's Sandoval Representation, Belated Alibi Rebuttal Notice, and First False Allegation of Threats to a Witness ........ 27

Trial ........ 29

ADA Lomuscio's Opening Statement ........ 29

Paul Anderson and Jomo Kenyatta Fail to Support ADA Lomuscio's Representation and are Inconsistent on Motive ........ 29

Paul Anderson's Trial Account of March 16th ........ 31

Paul Anderson's Initial Descriptions of the Perpetrators are Suppressed ........ 33

Paul Anderson Lies About Having Been Shot by Lloyd Witter ........ 34

Jomo Kenyatta's Trial Account of March 16th ........ 34

ADA Lomuscio Makes More Unsupported Allegations of Witness Intimidation........ 35

Jomo Kenyatta Brazenly Lies About His Criminal Record and ADA Lomuscio is Charged with Withholding Valuable Information ........ 36

Jomo Kenyatta and Detective Pepey are Inconsistent on Kenyatta's Manufactured Identifications ........ 38

Detective Pepey Introduces a False Unnoticed Statement and Lies About Paul Anderson's Identification of Carlton Roman ........ 40

ADA Lomuscio Permits Numerous Other Instances of False Testimony ........ 41

The Defense Case ........ 42

ADA Lomuscio Falsely Claims to Have Evidence That Carlton Roman Was a Long Time Drug Dealer........ 47

ADA Lomuscio Declines to Call Andrea Witter and Opposes a Missing Witness Charge ........ 49

Intent on Obtaining a Conviction by Any Means and Operating in a Climate of Impunity, ADA Lomuscio Repeatedly Ignores the Court and Her Prosecutorial Duties, and Delivers an Egregious Summation ........ 50

Carlton Roman Maintains Innocence at Sentencing ........ 52

ADA Lomuscio is Promoted and Given a Raise........ 53

The People's Case Falls Apart During the Prosecution of Hollis Laylor........ 53

Paul Anderson Stops Cooperating ........ 54

Jomo Kenyatta Claims a Sudden and Medically Inexplicable Memory Loss ........ 57

ADA Lomuscio is Demoted and Encouraged to Resign ........ 58

Adair Johnson is Sentenced to Life in Prison ........ 58

The People Lose Carlton Roman's File ........ 58

Paul Anderson Admits to Falsely Accusing Carlton Roman ........ 60

The CIU Investigation ........ 60

Exoneration ........ 67

Post-Exoneration ........ 69

CAUSES OF ACTION ........ 74

FIRST CAUSE OF ACTION ........ 74

42 U.S.C. § 1983. Malicious Prosecution in Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments. Defendants Pepey, Palermo, Loguercio, Fiorenza, O'Brian, Byrne, and Does #1-10. ........ 74

SECOND CAUSE OF ACTION ........ 75

42 U.S.C. § 1983 Evidence Fabrication in Violation of the Fourth, Fifth, Sixth and Fourteenth Amendments. Defendants Pepey, Palermo, Loguercio, Fiorenza, Lane, O'Brian, Byrne, and Does #1-10. ........ 75

THIRD CAUSE OF ACTION ........ 79

42 U.S.C. § 1983 Denial of Due Process, Suppression of Favorable Evidence in Violation of the Fifth, Sixth, and Fourteenth Amendments. Against All Defendants.. 79

FOURTH CAUSE OF ACTION ........ 82

42 U.S.C. § 1983 and Monell. Municipal Liability for the Conduct of Prosecutors in the DA's Office. Defendant City of New York. ........ 82

Prosecutor A ........ 112

Prosecutor B ........ 114

Prosecutor D ........ 114

Prosecutor K ........ 115

Prosecutor L ........ 116

Prosecutor C ........ 116

FIFTH CAUSE OF ACTION ........ 137

42 U.S.C. § 1983 and Monell. Municipal Liability for the Conduct of NYPD Officers. Defendant City of New York. ........ 137

SIXTH CAUSE OF ACTION ........ 149

42 U.S.C. § 1983 Civil Conspiracy; All Individual Defendants. ........ 149

SEVENTH CAUSE OF ACTION ........ 150

False Arrest Under 42 U.S.C. § 1983. Against Defendant Pepey and Does #1-10. ... 150

EIGHTH CAUSE OF ACTION ........ 151

False Arrest Under State Law. Against Defendant Pepey, Does #1-10, and the City of New York. ........ 151

NINTH CAUSE OF ACTION ........ 152

State Law Malicious Prosecution. Defendants Pepey, Palermo, Loguercio, Lane, Fiorenza, Byrne, O'Brien, and Does #1-10 ........ 152

TENTH CAUSE OF ACTION ........ 153

State Law False Imprisonment. Against All Defendants. ........ 153

ELEVENTH CAUSE OF ACTION ........ 154

State Law Negligent Infliction of Emotional Distress. Against All Defendants. ........ 154

TWELFTH CAUSE OF ACTION ........ 155

State Law Negligent Hiring, Training, and Supervision. Against Defendant City of New York Based on Misconduct by Employees of the DA's Office. ........ 155

THIRTEENTH CAUSE OF ACTION ........ 156

State Law Negligent Hiring, Training, and Supervision. Against Defendant City of New York Based on Misconduct by Employees of the NYPD. ........ 156

DEMAND FOR DAMAGES ........ 157

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

CARLTON ROMAN, :

Plaintiff, :

- against - :

THE CITY OF NEW YORK; CATHERINE LOMUSCIO; FRANCESCO CATARISANO; ROBERT MASTERS; RICHARD SCHAEFFER; DETECTIVE WILLIAM PEPEY, DETECTIVE JOHN LOGUERCIO, DETECTIVE GERARD FIORENZA, DETECTIVE JOSEPH PALERMO, LIEUTENANT JAMES LANE, POLICE OFFICER PATRICK O'BRIAN, POLICE OFFICER DENIS BYRNE; and DOES #1-10 being unknown employees of the City of New York, in their individual and official capacities,

Defendants.
---------------------------------------------------------x

**AMENDED COMPLAINT**

Jury Trial Demanded

Plaintiff CARLTON ROMAN, by his attorneys, LAW OFFICES OF JAMES HENNING & ASSOCIATES, PLLC, respectfully alleges, upon information and belief, as follows:

## <u>INTRODUCTION</u>

1) In 1989, Carlton Roman was a recent college graduate and honors student with no criminal record, a young daughter, and a loving partner. Carlton's life changed forever on March 16, 1989, when he was awakened by the shocking news that his good friend Lloyd Witter had been murdered. Within hours, the tragedy of Witter's murder was inexcusably compounded when Carlton was wrongfully arrested based on a groundless accusation and charged with the crime.

2) William Pepey, a corrupt detective, arrested Carlton and searched his vehicle without probable cause. Unsurprisingly, no incriminating evidence was found on Carlton or in his vehicle. Once Detective Pepey had Carlton in custody, he orchestrated a fraudulent identification through an inherently unreliable show-up procedure. Pepey buried evidence that the identifying witness, Paul Anderson, had already given Detective John Loguercio extremely detailed descriptions of four (4) unidentified perpetrators, none of which resembled Carlton, whom Anderson knew. Pepey orchestrated a second fabricated identification when he visited hospitalized and non-verbal shooting victim Jomo Kenyatta and sought to have him corroborate Anderson's identification through an aberrant procedure with no basis in NYPD protocol.

3) No physical or biological evidence, nor any confession, connected Carlton to the crimes charged. He steadfastly maintained his innocence, was granted bail after being indicted based on false and unreliable evidence, and remained at liberty for well over a year. He repeatedly appeared in court while awaiting dismissal of the false charges or an opportunity to vindicate himself at trial.

4) Building on the egregious police misconduct, Queens County prosecutors failed to investigate Carlton's alibi and concealed exculpatory evidence that would have undermined the identification evidence and a false statement attributed to Carlton, which was the *only* evidence against Carlton at trial. Through misrepresentation and omission, Queens County prosecutors precluded any judicial review of the pre-trial statements and identifications manufactured by Detective Pepey. In addition, they concealed the descriptions given to Detective Loguercio by Anderson on the night of the shooting and ignored or suppressed evidence demonstrating that the only witnesses against Carlton were unreliable criminals.

5) The trial prosecutor, Catherine Lomuscio, knowingly made materially false and misleading statements to the Court and jury bolstering the testimony of Anderson and Kenyatta, and suborned perjury from both the civilian and police witnesses.

6) Despite a pre-trial admission that she knew of no prior convictions or uncharged bad acts by Carlton, at trial ADA Lomuscio repeatedly claimed to have evidence that he was a narcotics dealer and injected baseless allegations of witness intimidation throughout the proceedings. Lomuscio further denigrated the defense by arguing in summation that Carlton had failed to present a "real" alibi and had fabricated his alibi defense and his own testimony. By contrast, despite knowing or having reason to know that both Paul Anderson and Jomo Kenyatta were unreliable criminals involved in violence and the narcotics trade, Lomuscio made every effort to conceal their criminality and argued that they had no motive to lie in summation. Lomuscio also erroneously led the jury to believe that Anderson's account remained consistent with his first statement(s) to police and took affirmative steps to suppress Detective Loguercio's involvement in the case. In addition, Lomuscio permitted Detective Pepey to attribute an unnoticed, uncorroborated, and utterly false statement to Carlton in front of the jury and repeatedly referenced it during examinations and argument.

7) The actions of ADA Lomuscio and her colleagues in Carlton's case were born of a culture of misconduct and impunity, rampant in the Queens County District Attorney's Office (hereinafter, "QDA") in the 1980's and 1990's as a product of its woefully deficient training and supervision policies and reckless disregard for the constitutional rights of criminal suspects and defendants, which have, to date, resulted in the reversal or vacatur of numerous criminal convictions for prosecutorial misconduct. Indeed, Carlton's conviction is not the only conviction obtained by Lomuscio to have been reversed or vacated. Before Carlton was

even brought to trial, *at least* one defendant had his conviction reversed based on Lomuscio's misconduct.

8) Similarly, the police investigation into the shooting was conducted during a period of unbridled corruption within the ranks of the NYPD. Misconduct by rogue officers such as Detective Pepey was routine in the years before and after Carlton's arrest and prosecution as a result of the Department's indifference to longstanding recruitment, training, supervision, and disciplinary deficiencies that regularly affected the constitutional rights of criminal suspects and defendants. NYPD leadership permitted these deficiencies, and ignored, concealed, or tacitly encouraged the misconduct and constitutional violations that resulted from them. Indeed, it was well-recognized at the time of Carlton's arrest and prosecution that even officers who did not directly engage in misconduct nevertheless ignored and refused to report misconduct by other officers because of a *de facto* "code of silence" policy within the ranks of the NYPD.

9) Carlton spent over thirty-one (31) years fighting from behind bars to prove his innocence. He was finally vindicated in 2021, when the QDA agreed to join a motion to vacate his conviction and dismiss the underlying indictment based on evidence compiled by the Conviction Integrity Unit (hereinafter, "CIU").

10) On the day he was exonerated, Carlton said that he had been "in the worst place [he] knew for 31 years" and that it seemed as though there had been an indifference to whether he was innocent or guilty. Exhibiting decency and humanity that had not been shown to him, Carlton said that he was not angry that a mistake was made, but also not pleased that it took 31 years to fix it. Carlton was correct that police and prosecutors were indifferent to his innocence, and this is precisely why he was incorrect in referring to his wrongful conviction and

incarceration as "a mistake." He spent over three decades in the worst place he knew because of the misconduct and indifference of law enforcement officials who did not care about his innocence. In vacating his conviction and dismissing the underlying indictment, Justice Michelle Johnson said that what happened to Carlton, "shouldn't happen to anyone."

11) Carlton cannot get back the years of his life that were stolen from him by police and other City officials ironically entrusted to protect him and serve the ends of justice. Neither his life, nor the truth, mattered to them. He brings the present action to seek monetary compensation for the extraordinary damages he has suffered, exemplary damages to deter similar misconduct from being committed by the City's law enforcement officials in the future, and accountability for the official misconduct and abuses of power that led to his wrongful arrest, prosecution, conviction, and incarceration, and robbed him of over thirty-one years of his life.

## JURISDICTION AND VENUE

12) This action arises under 42 U.S.C. §§ 1983 and 1988, and Monell v. Department of Social Services, 436 U.S. 658 (1978).

13) This Court may exercise supplemental jurisdiction over the State law causes of action herein.

14) Venue is proper under 28 U.S.C. § 1391.

15) On or about September 15, 2021, Plaintiff served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law § 50-e. A hearing pursuant to N.Y. Gen. Mun. Law § 50-h was held on December 6, 2021.

16) Plaintiff has duly complied with all the conditions precedent to the commencement of this action.

## THE PARTIES

17) Plaintiff, CARLTON ROMAN, is a resident of the State of New York and of the United States, and resides in QUEENS, New York.

18) Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and a resident of the Eastern District of New York. Queens County is a subdivision of the City.

19) Defendant CATHERINE LOMUSCIO, now retired, was at all relevant times an assistant district attorney employed by the QDA, acting within the scope of her authority and under color of State law, unless specified herein. She is named here in her individual and official capacities.

20) Defendant FRANCESCO CATARISANO was at all relevant times an assistant district attorney employed by the QDA, acting within the scope of his authority and under color of State law, unless specified herein. He is named here in his individual and official capacities.

21) Defendant ROBERT MASTERS was at all relevant times an assistant district attorney employed by the QDA, acting within the scope of his authority and under color of State law, unless specified herein. He is named here in his individual and official capacities.

22) Defendant RICHARD SCHAEFFER was at all relevant times an assistant district attorney employed by the QDA, acting within the scope of his authority and under color of State law, unless specified herein. He is named here in his individual and official capacities.

23) Defendant DETECTIVE WILLIAM PEPEY (Shield No.: 3344), now retired, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless specified herein. He is named here in his individual and official capacities.

24) Defendant DETECTIVE JOHN LOGUERCIO (Shield No.: 3541), now retired, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless specified herein. He is named here in his individual and official capacities.

25) Defendant DETECTIVE GERARD FIORENZA (Shield No.: 1550), now retired, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless specified herein. He is named here in his individual and official capacities.

26) Defendant DETECTIVE JOSEPH PALERMO (Shield No.: 2105), now retired, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless specified herein. He is named here in his individual and official capacities.

27) Defendant LIEUTENANT JAMES LANE (Tax ID: 854819), now retired, was at all relevant times a lieutenant employed by the NYPD, acting within the scope of his authority and under color of State law, unless specified herein. He is named here in his individual and official capacities.

28) Defendant POLICE OFFICER PATRICK O'BRIAN (Shield No.: 15825), now retired, was at all relevant times an officer employed by the NYPD, acting within the scope of his authority and under color of State law, unless specified herein. He is named here in his individual and official capacities.

29) Defendant POLICE OFFICER DENIS BYRNE (Shield No.: 31984), now retired, was at all relevant times an officer employed by the NYPD, acting within the scope of his authority and

under color of State law, unless specified herein. He is named here in his individual and official capacities.

30) Defendants DOE OFFICERS AND ADAs #1-10, whose actual names the Plaintiff has been unable to ascertain despite reasonable efforts to do so but who are sued herein by the fictitious designation of "Doe," represent those officers and ADAs employed by the City and acting under color of law and in their individual and official capacities, unless specified herein.

31) The New York City Police Department ("NYPD") is an agency of the City.

32) Employees of the NYPD are agents and employees of the City.

33) The City is legally responsible for torts that NYPD employees commit within the scope of their employment or under color of law.

34) The DA's Office is an agency of the City.

35) The District Attorney and other employees of the DA's Office are agents and employees of the City.

36) The City is legally responsible for torts that employees of the DA's Office commit within the scope of their employment and/or under color of law.

## PROCEDURAL HISTORY FROM CONVICTION TO EXONERATION

37) On October 17, 1990, after a trial by jury, Carlton Roman was convicted of one count of Murder in the Second Degree, one count of Attempted Murder in the Second Degree, two counts of Burglary in the First Degree, one count of Assault in the First Degree, and one count of Criminal Possession of a Weapon in the Second Degree.

38) On November 20, 1990 (as modified by the Appellate Division, Second Department, on October 4, 1999), Roman was sentenced to a cumulative term of forty-three and one-third (43 1/3) years to life in prison.

39) In April 1995, Roman filed a C.P.L. § 440.10 motion on grounds of newly discovered evidence. At Roman's trial, Paul Anderson, one of two civilian witnesses for the People, testified that he had never been shot or treated at a hospital in the United States. In support of his motion, Roman submitted records demonstrating that Anderson was admitted to Queens Hospital Center at 1 am on November 24, 1988, with a gunshot wound to the foot. Anderson was accompanied by Lloyd Witter, whom Anderson listed as his next of kin. Roman also submitted the sworn affidavit of Gregory Craig stating that Anderson was shot by Witter. Roman's motion was denied without a hearing in August 1995. The Appellate Division denied leave to appeal.

40) After contending that the verdict was against the weight of the evidence, Roman's appellate counsel asserted as his foremost claim that the trial prosecutor violated the Sandoval and Ventimiglia rules by her introduction and use of uncharged crimes. In opposition, the People asserted that both aspects of the claim were unpreserved for appeal because Roman's trial counsel had failed to properly object. The Appellate Division, Second Department, affirmed without specifically addressing the issue. People v. Roman, 265 A.D.2d 349 (1999). In opposing Roman's application for leave to the Court of Appeals, the People again asserted that the Ventimiglia claim was unpreserved, and the Court of Appeals denied leave, 94 N.Y.2d 952 (2000), and Roman's motion for reconsideration, 95 N.Y.2d 870.

41) In July 2001, Roman filed a second C.P.L. § 440.10 motion arguing ineffective assistance of counsel. Roman's motion was denied without a hearing on April 11, 2002. The Appellate Division, Second Department, denied leave to appeal on July 17, 2002.

42) In September 2002, Roman, acting *pro se*, filed a petition for a writ of error *coram nobis* in the Appellate Division, Second Department. On December 30, 2002, the Appellate Division ordered that Roman's petition be held in abeyance, and that counsel be appointed to file a brief on the question of whether Roman "was improperly cross-examined by the prosecutor regarding prior bad acts in violation of C.P.L. 240.43." People v. Roman, 300 A.D.2d 682 (2002). On June 1, 2004, the Appellate Division denied Roman's petition. People v. Roman, 8 A.D.3d 301 (2004). The Court of Appeals denied leave.

43) In October 2004, Roman filed a petition for a writ of *habeas corpus*. Roman's petition was denied by a January 30, 2007, order of the Honorable Carol Bagley Amon. The Second Circuit Court of Appeals denied Roman's motion for a Certificate of Appealability on November 30, 2007, and his motion for reconsideration on May 13, 2009.

44) In April 2015, the People certified that their prosecution file for Roman had been lost.

45) In September 2017, Roman filed a third C.P.L. § 440.10 motion arguing, *inter alia*, ineffective assistance of counsel, Brady violations, and newly discovered evidence. He supplemented his motion after the QDA revealed additional evidence while the motion was pending. Roman's motion was denied without a hearing in August 2018.

46) In September 2019, Paul Anderson recanted his testimony against Roman.

47) In April 2020, the CIU of the QDA agreed to reinvestigate Roman's conviction.

48) On August 9, 2021, the People joined Roman's fourth C.P.L. § 440.10 motion to vacate his conviction on grounds of newly discovered evidence and to dismiss the underlying

indictment in the interest of justice. Justice Michelle Johnson granted the motion in its entirety and said that "what most particularly persuaded" her was the revelation that Paul Anderson, the "only one to walk away unscathed" from the shooting for which Roman was convicted, had previously been shot by the decedent, Lloyd Witter. Justice Johnson found this to be "not merely impeachment evidence" but, rather, "evidence of motive and opportunity."

49) The conviction was terminated in favor of Roman.

50) Pursuant to C.P.L. § 160.60, the arrest and prosecution are now a nullity.

51) Roman was imprisoned for nearly thirty-one (31) years before his exoneration.

**Statement of the Case**

52) The following witnesses are referred to in the transcript and case materials variously by the aliases listed here:

- **Lloyd Witter**—deceased victim; a/k/a/ "Jimbo."
- **"Jomo Kenyatta"**—shooting victim and trial witness; a/k/a "Bob," Anthony Thomas, Antonio Tomas, Lansford Beckford, Lasford Bedford, Jomo Kenya, "Skunk."[1]
- **Adair Johnson**—Kenyatta's half-brother; a/k/a "Tiger."
- **Paul Anderson**—the shooting took place at his residence and he testified at Roman's trial; a/k/a "Scaggy."
- **Carlton Roman**—Plaintiff; a/k/a "Marshal."
- **Hollis Laylor**—deceased co-defendant, unsuccessfully prosecuted twice before the QDA dismissed all charges in April 1994; a/k/a "Skinny," "Slim-Man."
- **"Bigger" and "Richie"**—alleged accomplices to Roman and Laylor, never apprehended or conclusively identified.

[1] Upon information and belief, Jomo Kenyatta was not this individual's birth name, and he apparently used variations of the aliases listed. The QDA has indicated that Kenyatta was known by, and arrested under, additional aliases unknown to the undersigned.

**The Events of March 16, 1989**

53) Just after 7 pm on March 16, 1989, emergency services received numerous calls reporting gunshots, a gunman firing shots in the street, and a man in handcuffs running near 168th Street between 110th and 111th Avenues in Queens.

54) Responding police officers found a black male, later identified as Lloyd "Jimbo" Witter, lying in the street in front of 110-58 168th Street and bleeding profusely from apparent gunshot wounds. Another black male, later identified as Paul "Scaggy" Anderson, was standing over Witter, handcuffed and supposedly incoherent but uninjured. Police officers followed a trail of blood from where Witter was lying to a house at 110-41 168th Street, where they observed another black male, later identified as "Jomo 'Bob' Kenyatta," slumped against the interior door to the house and bleeding from apparent gunshot wounds.

55) Kenyatta and Witter were transported from the scene to Mary Immaculate Hospital by ambulances without having conveyed any information to police. Anderson was transported to the 113th Precinct for questioning at about 8 pm.

56) The Crime Scene Unit responded at 9:10 pm and processed the scene until about 12:30 am. No fingerprints of value were recovered.

57) Upon information and belief, the CIU concluded that three (3) guns were used. A pair of glasses were found on the stoop but never linked to anyone. Police found a wallet in the street next to Witter, but it was destroyed before Roman's trial. Kenyatta had been shot repeatedly, including in the head. Although he would later testify that Roman pursued him up the interior stairs and shot him on the stairs, where he (Kenyatta) claimed to have lost consciousness, CSU photos clearly demonstrate that no blood was present on the stairs.

Although Kenyatta later testified that he observed the perpetrators fleeing through a window on the stairs before he lost consciousness, the CSU photos prove this claim was impossible.

58) Detective John Loguercio of the 113th Precinct was assigned to lead the investigation into the shooting. Detective Loguercio took the first statement from Paul Anderson. Anderson said that four unidentified males armed with guns entered his residence at 110-41 168th Street at 2 pm, bound and handcuffed him, and held him against his will until Lloyd Witter and Jomo Kenyatta arrived at about 6:30 pm. Anderson then heard shots and fled his residence. Anderson gave the following descriptions of the perpetrators:

1. The "ringleader," a medium-skinned black male who was "stocky," 24-years-old, between 5'2"-5'3", "spoke Jamaican," walked with a limp in his right foot, and carried an automatic weapon;
2. A very slim light-skinned black male, 25-years-old, 6 feet tall, with a "cameo" style haircut, wearing dark jeans and a dark sweater;
3. A black male, 22-23 years old, standing 5'4" and weighing 150 lbs., with a "cameo" style haircut and carrying a large "carbine" gun; and,
4. A very fat black male of unknown age, 5 feet tall with a part in the right side of his hair and carrying an Uzi.

59) At 10:30 pm, Anderson gave Detective Loguercio written permission to remove "contraband or evidence which would assist in the investigation" from his residence.

**The Events of March 17-18, 1989**

60) Lloyd Witter died from his wounds at 12:45 am on March 17, 1989. Police informed his widow, Andrea Witter, at 2:30 am.

61) Detective William Pepey of the 113th Precinct started his shift at 8 am on the 17th. When he arrived for work, Pepey was assigned to take over for Detective Loguercio and lead the investigation into the shooting. Pepey was not involved in the investigation before 8 am on the 17th.

62) Shortly after arriving at the precinct, Detective Pepey received a call from Andrea Witter. Mrs. Witter reportedly told Pepey that the man who shot her husband was on the street outside of her house.

63) Detective Pepey responded to Andrea Witter's home, at 112-35 Francis Lewis Blvd., at about 9:30 am. Mrs. Witter was out in the street, pointed out a man down the block, and said "that is Marshal, that is the man that shot my husband." By his own admission, Pepey placed "Marshal," later identified as Carlton Roman, under arrest based *solely* on the statement of Mrs. Witter.

64) There is no reliable indication that Andrea Witter used Carlton Roman's legal name.

65) Detective Pepey later testified that he had never heard the names "Marshal" or Carlton Roman before speaking with Andrea Witter on the 17th, and had never spoken with Paul Anderson before Roman's arrest. Pepey acknowledged that Roman did not attempt to run from or fight with the police and complied when handcuffed. Roman's car was searched after his arrest, but no weapons, narcotics, or contraband of any sort were found.

66) After arresting Roman, Detective Pepey transported him to the 113th Precinct and placed him in a cell. On the way, officers told Roman to "shut up" and at least on threatened him with physical harm. Roman was 26 years old, stood 5'8", weighed 175 lbs. and had short hair that was not cut in a "cameo" style. He had never been arrested and had no criminal record.

67) According to a DD5 composed by Detective Pepey, he interviewed Andrea Witter at the 113th Precinct beginning at 10 am. Mrs. Witter stated that the last time she saw or heard from her husband was at 4:30 pm on the 16th, when he left their home with Jomo Kenyatta. At 10 pm on the 16th, there was a knock at her door and when she looked out of her window, she saw Paul Anderson. When she answered the door Anderson was gone, so she walked to his

house and he told her that "Marshall had cuffed him with Slim-man (Skinny) & two other guys" and that he was in the basement when he heard gunshots, escaped, and called the police.

68) Thus, according to Detective Pepey's DD5, Andrea Witter, who had two children aged 11 months and 4-years-old, reportedly claimed to have walked 2.6 miles in 40-degree weather to meet with Paul Anderson (despite the fact that Anderson was then-being questioned by police at the 113th Precinct), at an active and cordoned off crime scene that was being processed by CSU.

69) Mrs. Witter reportedly further stated that at 8 am on the 17th, she received a call from "Marshall," who asked her what happened to Jimbo and she "played dumb" and told him that someone had shot her husband. Marshall said that someone had called his mother's house and told him what happened, and that he would be right over, so Mrs. Witter called the 113th Precinct. When police arrived, she pointed out Marshall and asked him why he killed her husband. According to Detective Pepey's DD5, Marshall responded, "[I] did not do it…when [I] got to the house I saw them there & left." Upon information and belief, Mrs. Witter never corroborated the substance of Pepey's DD5, which was later introduced at Roman's trial.

70) After placing Carlton Roman under arrest and questioning Andrea Witter, Detective Pepey orchestrated a fabricated identification to support his warrantless arrest of Roman. *Without first questioning Paul Anderson*, Pepey "conducted a show up" procedure at 1 pm at the 113th Precinct. Anderson viewed Roman, and only Roman, and Pepey induced Anderson to falsely identify Roman as "the perp." There is no indication that any other officers participated in this procedure.

71) Pepey questioned Anderson for the first time *after* the show up procedure. In a two-page statement written for Anderson by Pepey beginning at 2 pm, Anderson supposedly told Pepey that "Marshall," "Skinny A.K.A. Slim Man," and two other unidentified males were responsible for the shooting. The statement was signed by Anderson and Detectives Pepey and Joseph Palermo.

72) In pertinent part, Anderson reportedly stated that he was introduced to Marshall by Jimbo about four (4) weeks earlier at his residence, and that he had met Skinny when Marshall brought him the second time he visited the residence. Anderson said that between 2-2:30 pm on the 16th, Marshall, Skinny, and the two unidentified males forced their way into his residence at gunpoint. Marshall and Skinny asked where Jimbo was and said they were going to kill him even if they had to wait until the next day. The intruders then handcuffed and gagged Anderson, took $98.00 from his wallet, and placed him in the basement. At some time between 6 and 6:30 pm, Anderson heard the doorbell ring and the front door open, followed by about 10-11 gunshots and people running out of the back of the house. Anderson got up and fled through the side door and towards the front of the house, where he followed a trail of blood to find Lloyd Witter lying in the street. He screamed for help and for someone to call the police, then ran into the backyard to hide and wait for the police. When the police arrived, Anderson "came out and told [them] what happened." Anderson made no mention of a motive or plans to move from the residence. There is no reliable evidence that Anderson ever used Carlton Roman's legal name before trial.

73) Thus, in a marked departure from his initial account, Anderson now reportedly claimed that two of the intruders were known to him. Furthermore, these intruders made no attempt to conceal their identities, told Anderson their plan to commit murder in his home, bound and

confined him there, and then inexplicably left him unscathed after following through with their plan.

74) At some unspecified time on March 17th, Anderson told Detective Pepey that he was "in [his] house" when he got a call from "Skinny," who heard that Jimbo had been shot and "wanted to know if [Anderson] knew what was going on." Anderson told Skinny that he didn't know, and Skinny responded that he would make some calls and "let [Anderson] know what happened." Thus, Anderson was conversing freely about the crime with one of the men he claimed had held him hostage and committed murder in his residence the day before and their reported conversation inexplicably seemed to indicate that neither knew what happened. Pepey failed to document this information in a DD5.

75) At some unspecified time on March 17th, Detective Pepey interviewed Adair "Tiger" Johnson, who identified himself as the brother of "Beckford Lasford." Pepey's memo book indicates that Johnson reported an alleged conversation he had with "Marshall" about "Bob" having borrowed a gun from "Skinny" and refusing to return it. In addition, Johnson claimed Marshall told "Andrea" that Bob and Jimbo were taking over the drug operation and pushing him out. Pepey's memo book entries demonstrate that he knew "Lansford Beckford"/"Beckford Lasford" and "Jomo Kenyatta" were the same person. There is no reliable indication that Johnson used Carlton Roman's legal name. Pepey failed to document this information in a DD5.

76) At some point between his March 17th and March 18th interactions with Paul Anderson, Detective Pepey reportedly spoke with a "Mrs. Kenyatta," the "mother" of "Jomo," who said that *Andrea Witter told her* that "Bigger & Richie" were in a car outside Anderson's residence at the time of the shooting. Pepey failed to document this information in a DD5.

Pepey's memo book indicates that he planned to ask Mrs. Witter about the source of her information, but there is no indication that he did so or that, if he did, he documented it.

77) Roman was arraigned on March 18th.

78) Paul Anderson returned to the 113th Precinct on March 18th. Detective Pepey fed Anderson information he had purportedly received from "Mrs. Kenyatta" and Adair Johnson, and Anderson revised his fabricated story accordingly. Anderson now claimed that he also knew the two remaining perpetrators, a pair of brothers he identified only as "Bigger & Richie," but had been afraid to name them the day before because "they are crazy & are killers." Although Anderson had said on the 17th that he had only known Marshall for about four (4) weeks and had been introduced to Slim-man by Marshall during that time, he claimed that Slim-man had introduced him to Bigger and Richie about three (3) months earlier. Pepey and/or Anderson also fabricated a motive for the shooting. Anderson reportedly stated that all four of the perpetrators he had now identified were in the drug business and that 2-3 weeks earlier, Marshall and Slim-man had a drug deal with about 36 pounds of marijuana but did not tell Jimbo and Bob. Jimbo "wanted a cut of the action" but Marshall told him no "it was not true," causing them to argue and start to "split up." There is no indication that any officer other than Pepey was present for this statement by Anderson.

79) On March 21st, Paul Anderson was present at the 113th Precinct with Detective Pepey and augmented his account yet again. Anderson now stated that he was introduced to Slim-man by Marshall at some time in January of 1989. Pepey then showed Anderson a single, undated photo of Hollis Laylor wearing a gold chain and manufactured a fabricated identification of Laylor (Slim-man) as one of the men who forced their way into his residence. There is no indication that any officer other than Pepey was present for this statement by Anderson.

80) On March 22nd, Roman was indicted after a grand jury presentation that was impaired when an unknown ADA elicited false, inaccurate, and/or misleading testimony from Officers Denis Byrne and Patrick O'Brian, Detective Pepey, and Paul Anderson. Upon information and belief, Pepey induced Anderson to testify falsely and attributed a false statement to Roman. The presentation was further impaired by the suppression of Anderson's initial statements to Detective Loguercio, evidence that Anderson's residence was used for drug trafficking and that he had recently been shot by Lloyd Witter, and evidence that "Jomo Kenyatta" was a violent and feared drug dealer who used numerous aliases and had been convicted of, arrested for, or was suspected in a number of violent crimes.

81) On March 23rd Roman posted bail. Upon information and belief, he was released on bail at some point between March 23rd and April 13th.

82) On March 28th the People served a demand for alibi notice upon Roman.

83) On April 9th Detective Pepey spoke with Anthony Chung in an attempt to locate Hollis Laylor. Pepey's DD5 provides no information regarding how Chung came to his attention. However, in 2019 Paul Anderson revealed that Chung was present for the shooting.

84) On April 13th Detective Pepey visited the hospitalized and reportedly non-verbal Jomo Kenyatta and orchestrated fabricated identifications through an aberrant "letterboard" procedure. Upon information and belief, the procedure has no basis in NYPD protocol. According to Pepey, he asked Kenyatta if he knew who shot him and provided him with a card containing the letters of the alphabet. Pepey reported that Kenyatta *"spelled" the names* "Skinny," "Marshall," and "Richie."

85) Pepey reported that he then asked Kenyatta how long he had known these people and "he replied over one year." Pepey's DD5 did not indicate how he elicited this information or if it was spelled out.

86) Pepey reported that he then asked Kenyatta who Skinny's girlfriend was and Kenyatta "pointed out the name Marie." The detective then *showed Kenyatta a single picture of Carlton Roman* and asked him "if this was Marshall the guy that shot [him]," and Kenyatta responded by nodding his head "as a yes answer." Pepey did not preserve the letterboard he used with Kenyatta. His memo book entry for the April 13th procedure, but not his DD5, includes the name "Tiger." There is no indication that any other police officers participated in the April 13th procedure with Kenyatta.

87) On May 1st Pepey visited Kenyatta in the hospital again. Now Kenyatta reportedly told Pepey that Skinny shot him first and then Marshall shot him and *he fell to the floor*. In contrast with his earlier documented statement to Pepey, Kenyatta now reportedly stated that *both* "Richie & Bigger" were also in the house when he was shot and that he had known Marshall for over a year and Skinny for about two weeks. Once again, Kenyatta offered the name of Skinny's girlfriend, whom he now called, "Maria," and said that she lived somewhere in Hempstead, Long Island. Pepey then showed Kenyatta *a single photo of Roman for the second time in less than a month* (it is unclear if this was the same photograph shown on the 13th) and a copy of Hollis Laylor's high school yearbook photo. There is no indication that any other police officers participated in the May 1st procedure with Kenyatta. There is no reliable indication that Kenyatta used Carlton Roman's legal name before trial.

88) Detective Pepey's memo book indicates that in mid-May of 1989, he inquired about a pattern of crimes in the 103rd, 105th, and 113th Precincts in relation to the instant matter and

requested complaint reports. Upon information and belief, this information was never disclosed to Carlton Roman.

The People Avoid Judicial Review of the Only Identifications of Carlton Roman

89) On June 14, 1989, Hyman Greenberg, Roman's counsel, submitted a motion stating *inter alia,* that: the People had not served notice of any identification(s) made by Jomo Kenyatta; the People's voluntarily disclosure form indicated that Roman was known to the (single) complaining witness "presumably Paul Anderson"; the People had failed to set forth what procedures were used to test Anderson's identification of Roman; and, that a Wade hearing was necessary to examine Anderson's identification of Roman. Counsel further contended that *if* Kenyatta had identified Roman, his identification should also be evaluated at a Wade hearing because a person in Kenyatta's condition was particularly susceptible to suggestion.

90) On July 5th the People, by ADA Eugene Kelly, responded to Greenberg's motion and misleadingly represented that the complaining witness (singular) and Roman were known to each other before the incident, and that a confirmatory identification was conducted whereby *the eyewitness* (singular) *confirmed* that Roman was *the perpetrator* (singular) in this case. Accordingly, the People argued that a Wade hearing should be denied. At the time, Jomo Kenyatta had reportedly made statements and four (4) identifications during a pair of unsupervised encounters with Detective Pepey and was hospitalized under the alias "Anthony Thomas."

91) On July 12th Judge John Leahy denied the motion for a Wade hearing based upon the People's false contention that Roman had only been identified by a single witness. Thus, the People avoided any judicial review of the suggestive and unreliable procedures used to elicit the only identifications of Roman by making blatant misrepresentations to the Court.

**After Demanding Notice, the People Fail to Investigate Carlton Roman's Alibi**

92) On August 7, 1989, in response to a demand by the People, counsel for Roman provided the names, addresses, and summaries of the prospective testimonies of alibi witnesses Fern Robinson and Delroy Ainsley Walker.

93) On October 23rd Robinson and Walker provided sworn statements under questioning by ADA Francesco Catarisano at the QDA. ADA Catarisano's questions included inquiries concerning what Robinson and Walker had told Roman's attorney. Catarisano wrote the statements for Robinson and Walker. The People made no apparent effort to investigate Roman's alibi and evidently used the statements taken by Catarisano solely for impeachment purposes at trial.

94) In November 1989, ADA Catherine Lomuscio was assigned to prosecute Roman. Upon information and belief, at least four (4) ADAs were assigned to the case before Lomuscio.

**Hollis Laylor is Indicted**

95) On September 5, 1990, Hollis Laylor was arrested at his residence in Queens. Laylor denied any involvement in the shooting to Detective Pepey. On the same date, Pepey again displayed a single photo of Laylor to Jomo Kenyatta to reinforce the fabricated identification he had previously manufactured.

ADA Lomuscio's Sandoval Representation, Belated Alibi Rebuttal Notice, and First **False Allegation of Threats to a Witness**

96) Jury selection in the matter of People v. Carlton Roman, Ind. No.: 1440/89, commenced on September 24, 1990. Over an objection by Mr. Greenberg, ADA Lomuscio was permitted to belatedly notice Andrea Witter and Detective Pepey as alibi rebuttal witnesses. Lomuscio claimed there was good cause to permit the belated notice because the alibi rebuttal

information Witter and Pepey would testify to "was just recently learned." In truth, Lomuscio knew or had reason to know that any such testimony these witnesses could offer concerned information known to police and prosecutors as early as the morning of March 17, 1989.

97) ADA Lomuscio also provided the first demonstration of her lackadaisical approach to discovery in relation to the backgrounds of the People's witnesses when Mr. Greenberg inquired about Paul Anderson's criminal history in Jamaica, West Indies, and she replied that she had no access to files in that country and no means of getting such information.

98) On September 25th, the Court granted a mistrial after a juror was overheard making remarks indicating a bias against Roman and Roman's mother testified before the Court. Before selecting another jury, *ADA Lomuscio agreed that a Sandoval hearing was unnecessary because* ***she knew of no immoral acts by Roman that she would cross-examine him about.***

99) At the close of proceedings on the 25th, ADA Lomuscio requested that Roman be remanded because she contended the mistrial was due to his "intimidation of a juror." In addition, Lomuscio claimed that Paul Anderson, who was in her office, told her that two weeks earlier an unidentified black male from New York had gone to Jamaica looking for him and told unnamed friends and relatives that he was not going to leave the island until he killed Anderson. Lomuscio claimed that Anderson had also received threatening phone calls and was "under constant police protection in a safe house." The Court asked Lomuscio if she could present any proof other than her own statements and, when she was unable to, denied her application. There is no indication that the alleged threats to Anderson were ever substantiated or even seriously investigated.

## Trial

100) The People's second attempt to prosecute Carlton Roman commenced on September 26, 1990. Their case against Roman was based entirely on the testimonies of Paul Anderson, Jomo Kenyatta, and Detective Pepey.

## ADA Lomuscio's Opening Statement

101) Despite her earlier admission that she knew of no prior bad acts by Roman, in her opening statement ADA Lomuscio alleged that Roman, Lloyd Witter, and Slim man, were in the business of selling drugs together. In response to a defense motion for a mistrial, Lomuscio claimed her allegation concerned the motive for the shooting and would be supported by testimony from the People's witnesses.

102) Despite the fact that Detective Loguercio was assigned to the case from the beginning of the investigation, and for almost a full day before being replaced by Detective Pepey, and that Loguercio took the first witness statement, Lomuscio told the jurors they would hear from *the* detective (singular) "who investigated this case, and took statements from the eyewitnesses…"

## Paul Anderson and Jomo Kenyatta Fail to Support ADA Lomuscio's Representation and are Inconsistent on Motive

103) During her direct-examination of Paul Anderson, ADA Lomuscio elicited that on the evening of March 15, 1989, Richie, Bigger, Slim man, Marshal, Bob, Jimbo, and Anderson were on the top floor of Anderson's residence bagging up crack. Confronted with the fact that she was attempting to elicit uncharged crimes, Lomuscio claimed it was necessary because it concerned "the motive for the entire shooting." The Court permitted her to elicit the testimony based on her representation that she could prove it was the motive for the shooting.

Yet, in summation, Lomuscio argued that "what happened the night before [the shooting] is not necessary to the crime to make out what happened…"

104) Immediately afterward, Anderson testified that Bob, Jimbo, Marshal, and Skinny had been involved in a "fuss" over *a gun*. Anderson then said this "fuss" involved Bob and Jimbo taking a gun from Marshal. However, on cross-examination Anderson said that Bob, Jimbo, Marshal, *and Skinny* had argued over a gun and "turf," and that he did not see the gun because he was downstairs. According to Anderson, he was planning to move out of the residence the following day and discussed these plans, including that Bob and Jimbo were coming over to help, in front of everyone present. Anderson denied any involvement in narcotics and claimed he *first* learned the others were involved in such activity because of the supposed "fuss" on the 15th.

105) Jomo Kenyatta completely omitted himself from the supposed argument at Anderson's residence on the evening of the 15th *and the alleged bagging up of crack.* Like Anderson, Kenyatta denied involvement in narcotics and said he had *never* seen a gun at Anderson's residence. Unlike Anderson, Kenyatta testified that the group of men at Anderson's residence on the 15th were *watching a video* when Hollis (whose name he said was "Hollis Lallay") and Carlton began arguing with Lloyd Witter about "drugs." Kenyatta testified that *Hollis* became "vexed" and went into another room to speak with Witter. Furthermore, Kenyatta denied there were plans for him and Witter to return to Anderson's residence on the 16th and testified that Witter asked to be taken to Anderson's residence on the $16^{th,}$ but he (Kenyatta) didn't know why.

**Paul Anderson's Trial Account of March 16th**

106) Paul Anderson testified that the house at 110-41 168th Street belonged to his aunt and that he had lived there for about eight months along with a pair of tenants he identified only as "Joy and Tony" whom he collected rent from. Upon information and belief, neither police nor prosecutors ever identified or interviewed either of these individuals (if they existed), nor did they review property records that established Anderson's residence was actually owned by his sister Veronica Anderson. Finally, police had been notified in writing by Anderson's neighbors that his residence was an apparent drug trafficking location, and reports composed by Detective Pepey reflect that he was aware of this information.

107) Anderson testified that he was cleaning his house at 2 pm on the 16th when the doorbell rang. When he opened the door, he was met by Marshal, who ushered him inside at gunpoint. They were followed by Slim Man, Bigger, and Richie. The intruders handcuffed Anderson in the living room and told him they wanted Jimbo *and* Bob. Then, they brought him to the basement where they tied his feet with telephone wire and gagged him with a cloth. Although Anderson was immobilized in the basement, he somehow recounted conversations and actions taken by the alleged perpetrators on the floors above.

108) Anderson claimed to have been confined in the basement for about four (4) hours before he heard the doorbell ring followed by a lot of shots and footsteps. Anderson said that "[a]fter everything calmed down" he fled the residence for help but *before he could ask someone to call the police, the police, ambulances, and news crews were on the scene.*

109) Anderson testified that "after a long period of time" Detective Pepey would escort him back to his residence to "collect mail." Anderson would later admit to the CIU that he regularly received packages of drugs at the house.

110) Although Anderson testified that he was already planning to move out of the residence on the day after the shooting, he also claimed to have moved out because of threatening phone calls. According to Anderson, he moved to Jamaica the day after receiving a threatening call. Initially, he said he returned to Jamaica about two (2) months after the shooting, then immediately claimed that he moved in June 1989. A bargain and sale deed reflects that Veronica Anderson granted the premises to Annette Henry and Joan Haywood on June 29, 1989, "in consideration of *ten dollars* and other valuable consideration." (Emphasis added).

111) ADA Lomuscio opposed a defense application for the address Anderson gave to Detective Pepey on "the grounds of the safety of the witness and his family" because she claimed there was "already evidence" Anderson had been threatened both in the United States and Jamaica.

112) ADA Lomuscio permitted Paul Anderson to falsely testify that he accompanied the police to notify Andrea Witter of her husband's shooting and gave police the names Marshal, Slim Man, Bigger, and Richie on the night of the 16th. Anderson was also permitted to falsely testify that he was questioned by Detective Pepey at the precinct on the night of the 16th. Lomuscio knew or had reason to know that this testimony was false. Pepey would later testify that: he worked an 8 am to 4 pm shift on March 17, 1989; the first person he spoke with in relation to the instant matter was Andrea Witter on the morning of the 17th; and he first spoke to Anderson after speaking with Mrs. Witter.

113) At the close of proceedings on the 26th, Roman was remanded on a motion by ADA Lomuscio.

114) When the Court assigned counsel to Paul Anderson, counsel represented that Anderson said he did not want or need an attorney and "resent[ed] any possible implication that one

should be appointed in [sic] his behalf." Despite knowing that drugs were being sold from Anderson's residence before trial, ADA Lomuscio stated that she had not granted Anderson immunity because "[h]e [hadn't] done *anything* wrong to grant him immunity."

**Paul Anderson's Initial Descriptions of the Perpetrators are Suppressed**

115) Beginning with her opening statement, ADA Lomuscio misled the defense, the Court, and the jury about Detective John Loguercio's involvement in the case.

116) Paul Anderson described four unidentified perpetrators to Detective Loguercio on the night of the shooting, none of whom resembled Carlton Roman, whom Anderson knew. However, this information was hidden from the jury by Anderson, Detective Pepey, and ADA Lomuscio.

117) Indeed, ADA Lomuscio refused to even identify Detective Loguercio to Mr. Greenberg at trial. When Officer Denis Byrne testified, he repeatedly claimed to be unable to recall Loguercio's name. When Greenberg asked Lomuscio to provide it, she told the Court she was "walking out," that *she did not feel she had to "supply him with* ***anything****"* and, "[i]f he doesn't do his homework, [she would] not do it for him."

118) ADA Lomuscio permitted Paul Anderson to falsely testify that he named all four of the individuals he was accusing by the time of trial *to Detective Pepey* on the evening of the shooting, although she was undoubtedly aware that Pepey was not involved in the investigation at the time. Therefore, the jury that convicted Roman was falsely led to believe that Anderson consistently identified Roman from his very first statement to police, and that his first statement was made to Pepey.

## Paul Anderson Lies About Having Been Shot by Lloyd Witter

119) Paul Anderson was the People's first witness at trial. On cross-examination, Anderson denied having ever been shot or treated at a hospital in the United States. Before concluding his cross-examination of Anderson, Mr. Greenberg told the Court he had information that Anderson had been shot in the leg by Lloyd Witter. He applied to examine Anderson's leg for evidence of a bullet wound. Greenberg stated, "[a]s the Court knows our defense is that this man did the shooting. And if, in fact, we show that he had been shot by Jimbo, now the deceased, on a prior occasion that would give him motive to have completed this homicide."

120) ADA Lomuscio opposed Greenberg's application, contending that it was not supported by any offer of proof such as a hospital record. Despite claiming it was necessary to introduce uncharged crimes in her opening statement to establish motive, Lomuscio argued that *this* was a collateral matter. Greenberg replied that such evidence was not collateral because *part* of Roman's defense was that Anderson had been involved in the shooting and *proof that he had previously been shot by the decedent would support a motive for him to have been involved.*

121) Mr. Greenberg contended that hospital records were unavailable to him. ADA Lomuscio responded that they were available by subpoena. The Court found Greenberg's application was not supported by a sufficient offer of proof.

## Jomo Kenyatta's Trial Account of March 16th

122) "Jomo Kenyatta" testified under the name "Anthony Thomas" and said that at some unspecified time on March 16, 1989, Lloyd Witter came to his (Kenyatta's) mother's house in Brooklyn and asked Kenyatta to take him home and then to Paul Anderson's residence. Kenyatta testified that he did not know why Witter wanted to go to Anderson's residence. He

claimed they arrived there at "[a]bout six after six in the evening" and proceeded right to the door.

123) Kenyatta said that Witter rang Anderson's doorbell, someone looked through the window, the door opened, and he followed Witter inside. Once they stepped in, someone closed the door behind them, and Kenyatta heard "a lot of gunshots." Kenyatta claimed to have seen Carlton and Hollis firing guns and Witter "hold his belly and [go] down." Kenyatta claimed he attempted to run up the interior stairs but *did not reach the top* because Carlton pursued and shot him until he laid down and played dead. Kenyatta testified that before he lost consciousness, he was able to lift his head, look out of a window on the staircase, and observe "Carlton, Hollis, Bigger and Richie running."

124) Like Anderson, Kenyatta testified that the shooting happened approximately an hour earlier than documentary evidence establishes it did.

**ADA Lomuscio Makes More Unsupported Allegations of Witness Intimidation**

125) At the beginning of proceedings on October 4th ADA Lomuscio claimed that at 9:30 am that day, Jomo Kenyatta's (unidentified) fiancé had received a phone call at Kenyatta's household from "a male black with a West Indian accent" who "asked to speak to the guy in the wheelchair." The unidentified fiancé gave the phone to Kenyatta and listened as the caller stated that Kenyatta "must not go to Court again…while he may have police protection going to Court, he does not have police protection at home." The caller purportedly also said that Kenyatta "better not come to Court, because he is sinking his other brother" and then hung up when Kenyatta asked his identity. On cross-examination, Lomuscio objected to a line of questioning concerning Kenyatta's brother as irrelevant.

126) ADA Lomuscio claimed that Kenyatta called both Detective Pepey and her Office, and that she notified the police department and the "District Attorney's Squad." She claimed to have been delayed that morning because she "was making arrangements for the protection of [Kenyatta]." She contended that a friend or family member of Roman had made the alleged call to Kenyatta because very few people outside of Roman, his attorney, and his family, knew that Kenyatta was expected back in court.

127) There is no evidence that this supposed call ever actually occurred or the alleged threat to Kenyatta was ever investigated.

**Jomo Kenyatta Brazenly Lies About His Criminal Record and ADA Lomuscio is Charged with Withholding Valuable Information**

128) Before cross-examination, ADA Lomuscio provided "all the information [she had]" about Jomo Kenyatta's criminal history to Mr. Greenberg. Lomuscio indicated that the extent of her information was what Kenyatta told her, which she had no way of verifying, and stated that she believed she had done "everything" she was "obligated to do under the law." The information provided by Lomuscio concerned a single arrest for reckless driving. Before the trial, Lomuscio claimed that Kenyatta had no record at all.

129) Kenyatta testified that he was 28 years old, and that his birth name was Jomo Kenyatta, but he had gone by the name Anthony Thomas since being adopted 8 or 9 years earlier by "Mavis Thomas and Noel Thomas." He denied ever using the name Antonio Tomas. When Mr. Greenberg asked whether Kenyatta was ever known as "Lasford Beckford," ADA Lomuscio objected and claimed there was no good faith basis for the question. Greenberg represented that his investigator had learned of four (4) different aliases used by Kenyatta. When Lomuscio *accused Greenberg* of "hiding" the names, he responded that she had been

suppressing information about Kenyatta and that he had information indicating Kenyatta had a prior criminal case in Queens County and the name of the lawyer who represented him.

130) Kenyatta testified that he had never been convicted of a crime aside from a 1988 conviction for reckless driving in Brooklyn and had never been arrested anywhere else in the world. In response to questions by Mr. Greenberg, Kenyatta explicitly denied having been arrested or found guilty of a crime in Queens County or having any open warrants.

131) During cross-examination, the Court assigned counsel to Kenyatta. However, counsel reported that Kenyatta denied any involvement with narcotics, was willing to answer any questions posed and, just as Paul Anderson had done earlier, insisted he did not need representation.

132) Mr. Greenberg asked whether Kenyatta had ever been held on Riker's Island or charged with attempted murder. When ADA Lomuscio objected and requested a good faith basis, Greenberg said that he had uncovered information that Kenyatta had been charged with attempted murder, held on Riker's Island, and represented by an attorney named Jonathan Rains. Greenberg then informed the Court that Jomo Kenyatta, under the name "Antonio Tomas," had been represented by Rains for a Queens County criminal matter before Judge Groh. *Lomuscio contended that Greenberg had time to check into this information as part of "his job to investigate,"* that Kenyatta could not be impeached on the issue any further since it was a collateral matter, and that Greenberg should not be permitted to recall him.

133) The Court was "amazed at [ADA Lomuscio's] argument," and said that Mr. Greenberg had "every right in the world to look into this matter," and that it thought "as a competent Assistant District Attorney, [Lomuscio] should assist to find out the truth…" *The Court then "charged" Lomuscio "with withholding valuable information."*

134) Jomo Kenyatta, *under the name Antonio Tomas*, was charged with attempted murder and other crimes in Queens County under indictment 4939 of 1986 and ultimately pled guilty to a felony in August 1987.

135) As explained *infra*, this and other evidence of Kenyatta's criminality was housed in the files of the QDA and available to ADA Lomuscio.

136) On October 9th, ADA Lomuscio agreed that Kenyatta had been convicted of a crime in Queens County and, indeed, had spoken with the attorney who represented him, but again contended that Mr. Greenberg should not be permitted to recall Kenyatta.

137) Upon being recalled, Kenyatta admitted to having been charged with attempted murder and possession of a weapon, and to having pled guilty to attempted criminal possession of a weapon in 1987. However, he continued to deny having been known as Antonio Tomas, the name he was prosecuted under, and ADA Lomuscio declined to correct his testimony

**Jomo Kenyatta and Detective Pepey are Inconsistent on Kenyatta's Manufactured Identifications**

138) In contrast with Detective Pepey's DD5 concerning the April 13th hospital bed identification procedure, Jomo Kenyatta testified that when Pepey showed him the letterboard, he pointed to the *letters* "*H*," "*C*," and "M" to indicate Hollis, Carlton, and Hollis's girlfriend. That is, Kenyatta completely omitted the identification of "Richie" that Pepey attributed to him, claimed to have pointed to only three (3) letters to identify three (2) people (one of whom was not even an alleged perpetrator), as opposed to spelling four (4) entire names as reported by Pepey, and said he had identified Roman and Hollis Laylor by their legal names rather than the nicknames "Marshal" and "Skinny" as Pepey's DD5 reported.

139) Furthermore, Kenyatta testified that when Detective Pepey visited him on May 1st and asked who shot him, he told him "Carlton and Hollis." Thus, Kenyatta was again inconsistent with Pepey's DD5 on the subject in that he made no mention of his supposed identifications of Bigger and Richie and *again* claimed to have identified Roman and Laylor by their legal names. Kenyatta also made no mention of having again offered the name of Laylor's girlfriend as Pepey had reported.

140) Detective Pepey testified that on April 13th Kenyatta *spelled out* the *names Marshal, Skinny*, and *Richie* when asked if he knew who shot him. Pepey claimed he then asked if Kenyatta knew where they were or how he could find them, and Kenyatta "spelled out the name of a girlfriend of one of them, and he spelled out Maria."

141) According to Pepey, when he visited Kenyatta on May 1st, he "asked him again who shot him and at that time he told [him] Marshal." Thus, Pepey and Kenyatta were also inconsistent about whether Kenyatta used legal names or nicknames on May 1st.

142) When asked at trial who visited him in the hospital, the only people Kenyatta named were Paul Anderson and Detective Pepey.

143) Kenyatta testified that he knew another Carlton, aside from Carlton Roman, who had lent him a car. During testimony about people who were present at Paul Anderson's residence while he was there, Kenyatta said he only knew them by aliases. When defense counsel asked what their aliases were, Kenyatta testified "[y]our name is Carlton Simmons and they call you *Head*, that is an example." Beginning in 2019, Anderson revealed that Anthony "Chungy" Chung was present during the shooting. Chung was questioned by Detective Pepey in April 1989, just days before Pepey first met with Kenyatta

**Detective Pepey Introduces a False Unnoticed Statement and Lies About Paul Anderson's Identification of Carlton Roman**

144) The People failed to provide notice, as required by C.P.L. § 710.30(1)(a), that they intended to introduce a statement allegedly made by Carlton Roman.

145) Detective Pepey's DD5 concerning his March 17, 1989, interview of Andrea Witter reported that when she pointed "Marshall" out to police and asked why he killed her husband, he responded "*that he did not do it*…when [he] got to the house [he] saw them there & left." (Emphasis added).

146) However, on direct-examination Detective Pepey distorted his own documented account of the statement allegedly made by Roman. In contrast with his DD5, Pepey testified that when Mrs. Witter asked Roman "why did you kill my husband?" he responded only with, "[w]hen I got there it was done."

147) Detective Pepey attributed a fabricated and unnoticed statement to Roman in front of the jury. Despite knowing or having reason to know that Roman had not made the statement, ADA Lomuscio failed to correct Pepey's testimony and repeatedly referenced the statement in questioning and argument before the jury. Notably, although Andrea Witter was also present for the supposed statement and Lomuscio had served notice of intent to call her as a witness, she inexplicably declined to do so and opposed a defense request for a missing witness charge for Witter. During the CIU investigation, Witter corroborated Roman's testimony that the statement was not made as Pepey testified it was.

148) Detective Pepey's own memo book demonstrates that Paul Anderson's show-up identification of Carlton Roman occurred at 1 pm on March 17, 1989, an hour before he even started writing Anderson's statement at 2 pm, purportedly as Anderson made it. However,

Pepey falsely told the jury that he exhibited Roman to Anderson only *after* taking the statement in which Anderson identified Roman by nickname. Despite knowing or having reason to know that Pepey's testimony was false, ADA Lomuscio failed to correct it and explicitly argued Anderson's statement was consistent and reliable.

**ADA Lomuscio Permits Numerous Other Instances of False Testimony**

149) In addition to Paul Anderson's testimony about providing the police with the names of four alleged perpetrators and being questioned by Detective Pepey on the night of the shooting, Pepey's testimony concerning the timing of Anderson's identification of Roman and the statement attributed to Roman, and Jomo Kenyatta's testimony about his criminal record, birth name, and aliases, ADA Lomuscio permitted a number of other instances of demonstrably false testimony to go uncorrected. Lomuscio knew or had reason to know of the falsity of this testimony but failed to discharge her ethical and prosecutorial duties.

150) For instance, in summation ADA Lomuscio acknowledged that Anderson and Kenyatta had not testified truthfully about their knowledge of drug activity at Anderson's residence. In 2022, Lomuscio testified that she *was aware* drugs were being sold from Anderson's residence *before trial* from several sources including *both* Anderson and Kenyatta.

151) Indeed, even Anderson's testimony about who owned his residence would have been proven false to anyone who investigated it, since property records listed his sister Veronica Anderson as the owner.

152) 911 recordings establish that the first calls to emergency services *reporting* the shooting were received at 7:07 pm. Nevertheless, ADA Lomuscio permitted responding Officers Patrick O'Brian and Denis Byrne to testify that they *arrived* on the scene at 6:30 pm, and Anderson and Kenyatta to testify that the shooting *occurred* at approximately 6 pm.

**The Defense Case**

153) Despite not having been involved in the investigation at the time, Detective Pepey composed a memorandum to his supervisor, Lieutenant James Lane, purporting to detail the status of the police investigation into the shooting on or about the early morning (pre-dawn) hours of March 17, 1989. Upon information and belief, the memorandum was belatedly composed by Pepey to erroneously support the People's false and inconsistent evidence at trial. Initially, the memorandum purports to detail investigative work conducted or directed *by Pepey* on the evening of March 16, 1989, before he began working on the case (according to his own testimony). Pepey knowingly reported the following false and/or baseless information in the memorandum:

- That Paul Anderson identified Carlton Roman and Hollis Laylor on the evening of March 16th.
- That Andrea Witter took "us" (the police including Pepey) to Roman's mother's house and Anderson took "us" (the police including Pepey) to Laylor's house, and that police visited both locations "several times during the night [of March 16th] but did not see any auto they possess, and no apparent signs of life so [they] did not go in."
- That Pepey was at the hospital at 2:30 am on March 17th for an identification of Lloyd Witter while Jomo Kenyatta was still being treated.

154) ADA Lomuscio knew or should have known Detective Pepey's memorandum was unreliable and the information therein fabricated. However, she disclosed it to defense counsel and allowed him to call Lieutenant Lane to the stand to give misleading testimony about the contents.

155) Lane claimed to be unable to recall if he had ever seen the memorandum and not to know who wrote it. He testified that he supervised the investigation into the shooting and that the document was "apparently" a memorandum to him, but that he received "thousands" of such memoranda yearly because he usually asked a detective "*in the beginning of the case*" to fill

him in about what was going on in the case. Lane said that Lomuscio contacted him a week before his testimony to inform him that he would likely be called as a witness. In a departure from his initial testimony, Lane acknowledged that he *had* seen the memorandum *about a week or so earlier when Detective Pepey faxed him a copy*. Lane claimed that his initial testimony was meant to indicate that he had never seen the exact piece of paper defense counsel had shown him but, rather, a photocopy.

156) Ainsley Walker, Carlton Roman's teenaged cousin, lived at Roman's mother's house. He was home on the afternoon of March 16, 1989, when Roman visited to see whether he had received any mail there. Walker was facing a clock at the time and remembered that it had been 3 pm. Roman stayed for about 15-20 minutes and mentioned that he was going to the supermarket on his way home. Walker did not notice anything unusual about Roman.

157) On the morning of the 17th, someone named "Zoom" called and spoke with Chris Philips, Roman's stepbrother who also lived at Roman's mother's house. Zoom said that Lloyd Witter had been killed and Philips called Roman to tell him. Shortly thereafter, police cars arrived at the house. Roman was in the back of one. When Walker learned Roman had been arrested for killing Witter the previous day, he told Roman's mother and Mr. Greenberg that he was with Roman the previous afternoon. ADA Lomuscio repeatedly attempted to impeach Walker with minor inconsistencies between his testimony and the statement written for him by ADA Catarisano at the QDA in October 1989, as well as his purported failure to report Roman's alibi earlier.

158) *Over sixty-five* (65) defense objections were sustained during ADA Lomuscio's examination of Walker.

159) Fern Robinson lived with Roman, and they had a 2 ½ year old daughter. Roman left their apartment at about 8 am on the morning of March 16, 1989, and returned at about 9:30 or 9:45 am. He left again around 1:30 pm and returned at around 3:30 or 3:45. Robinson believed he went to get some mail and visit the grocery store. Roman remained at the apartment for the rest of the night watching TV, eating dinner, and playing with their daughter Nadine and Robinson's niece Tamara. At around 6 pm Charmaine Woodburne, Tamara's mother, came by to pick up her daughter.

160) On the 17th, Roman received a call at about 7:30 am. He immediately made a call and then left the apartment in a hurry, telling Robinson he would explain when he returned. Robinson soon learned Roman had been arrested for the murder of his friend Lloyd Witter.

161) As she had with Ainsley Walker, ADA Lomuscio attempted to impeach Robinson with minor inconsistencies between her testimony and the statement written for her by ADA Catarisano at the QDA in October 1989 (such as what television programs she watched on March 16th), and her purported failure to report Roman's alibi earlier. Lomuscio also repeatedly suggested that Roman supported himself and Robinson by selling drugs.

162) In front of the jury, Lomuscio asked Robinson whether Roman had paid one hundred thousand dollars in bail and then, when defense counsel objected and requested a mistrial on the basis that the questioning was improper and prejudicial, falsely claimed that Robinson "volunteered that information...unresponsive to any question." When Lomuscio's representation was proven false by reference to the record, and she was told the question was improper and advised to "watch [her]self" by the Court, she responded that she believed she had acted in good faith. Another defense objection was sustained when Lomuscio subsequently asked Robinson whether Roman drove a twenty-five-thousand-dollar car. In an

apparent effort to support the false proposition that Roman was identified on the night of the shooting, Lomuscio asked Robinson whether police had come to her house on the evening of March 16, 1989, something she knew or had reason to know never happened.

163) *Over thirty* (30) defense objections were sustained during ADA Lomuscio's examination of Robinson. At one point, Lomuscio asked Robinson about the unnoticed statement Detective Pepey had attributed to Roman, which no one even claimed Robinson was present for, and a defense objection was sustained. Although the Court directed Lomuscio not to do so again, she began her *very next question* by addressing Robinson with: "[w]hen Carlton Roman told Andrea Witter that he was at the crime scene…" before another objection was sustained and the Court curtailed the line of questioning.

164) The defense called Professor Larry Cohen, Steveroy Grant, and Gilmore Lawson as character witnesses.

165) ADA Lomuscio asked to delay Lawson's testimony so she could investigate his record and agreed to provide Mr. Greenberg with a copy of the record. When Lomuscio obtained the record, she acknowledged that she "probably did" agree to make it available to Greenberg but argued that she was not required to. When the Court stated that Lomuscio was "doing everything possible to delay this trial," she responded, "[a]bsolutely not. I have vacation plans next week. I am the last person who wants to delay. I have nonrefundable tickets for October 18th, so I am not delaying this in any way." However, when the Court asked whether she was refusing to provide the document as promised she responded in the affirmative. Although the Court said the record demonstrated that Lomuscio had promised the document, she continued to argue that she was not legally required to provide it. The Court told Lomuscio, "I am amazed at you, I am just amazed. Especially since you are an Assistant

District Attorney representing the State of New York, that you refuse to honor your word" and ordered her to disclose the document in the interest of justice without further argument. When Greenberg, who was 70 years old, said that he was unable to read the document as disclosed and asked Lomuscio to clarify it, she told him to "get a pair of glasses."

166) Carlton Roman denied having been at Paul Anderson's residence on March 15, 1989, or at any time during the alleged intrusion and shooting on the 16th. Roman repeatedly testified that he never had an argument with Lloyd Witter, never used or distributed narcotics, and never had a gun. Nevertheless, ADA Lomuscio asked Roman whether he bought a gun on the morning of the shooting, if he had ever seen Ainsley Walker with a gun, and whether Walker disposed of the murder weapon for him.

167) Roman had been in Jamaica assisting with hurricane relief from December 1988 through January 31st or February 1st of 1989.

168) On the morning of March 17, 1989, Roman and Fern Robinson were awakened by a phone call from Roman's stepbrother, who had learned from Lloyd Witter's cousin, "Zoom," that Witter had been killed and Jomo Kenyatta hospitalized. Roman immediately called Witter's house and spoke to Andrea Witter, who confirmed the news. Roman told her he would be right over to her house. He left quickly, telling Robinson he would explain when he returned, and drove to Witter's house. When Roman knocked at Witter's door, no one answered, so he went across the street to call the house from a payphone. As he was calling, several police cars pulled up and Andrea Witter appeared and pointed to him. As Roman crossed the street and approached them, he heard Andrea tell the police he killed her husband. Roman told her he had not. On cross-examination, ADA Lomuscio *told Roman*, "[w]ell, you told them more than that," referring to the unnoticed statement attributed to him

by Detective Pepey. Lomuscio repeatedly referenced the alleged statement in front of the jury and Roman repeatedly denied making it.

169) Roman explained that he was unable to raise bail himself, and that the funds came from his mother—who put up her house as collateral—his mother's friends, and his stepfather. His mother had also cosigned for his car. When Roman testified that a bail hearing was held, ADA Lomuscio asked if "they had a hearing to determine whether the money came from drugs or not?" When Lomuscio was confronted with documentary evidence demonstrating that the bail she had been claiming Roman paid was inaccurate, she opposed its admission into evidence.

170) Despite knowing that the QDA had solicited and taken statements from Roman's alibi witnesses approximately a year earlier, ADA Lomuscio attempted to impeach Roman by implying his alibi was a recent fabrication concocted after he retained counsel. She also implied that he had tailored his account to correspond with the testimony he was present for before taking the stand.

171) During ADA Lomuscio's examination of Roman, the Court sustained *over thirty* (30) defense objections and, on a few occasions, interrupted on its own accord to instruct the jury to disregard Lomuscio's questions.

**ADA Lomuscio Falsely Claims to Have Evidence That Carlton Roman Was a Long Time Drug Dealer**

172) ADA Lomuscio repeatedly asked Roman's witnesses whether they had ever seen him with an automatic weapon, or what they knew or would think about his alleged involvement with guns or the distribution of narcotics. When confronted with the disparity between her questioning and her acknowledgement that no Sandoval hearing was required for Roman,

Lomuscio responded that her Sandoval statement was not an indication that she "didn't have anything on [Roman]." Rather, she claimed to have meant only that she knew of no *convictions* she could ask Roman about if he took the stand and that her representation was *a strategic move intended to "get [Roman] on the stand."*

173) In support of her questioning, ADA Lomuscio claimed to have spoken with "a number of witnesses…involved in this case" who informed her Roman was "a long-time seller and distributor of crack in Queens County." When the Court asked whether she could substantiate this claim or name the witnesses, Lomuscio responded that she did not think she was required to, and the Court said it would take her word as an Assistant District Attorney.

174) In truth, ADA Lomuscio was unable to respond because she had received no such information. In November 2022, Lomuscio gave sworn testimony that she did *not* have information that Roman was a "long-time" drug dealer, and that the only information she supposedly did have about Roman dealing drugs came from Paul Anderson, Jomo Kenyatta, and Detective Pepey.

175) Lomuscio asked Professor Cohen whether he had ever heard that Roman distributed crack cocaine in Queens County in 1983. Roman first came to the United States in late October 1981 and had completed his degree by January 1986. Upon information and belief, crack cocaine was first introduced to New York in or around 1984. At the time of the shooting, Roman had known Lloyd Witter for about 3-4 years. The only civilian witnesses Lomuscio indisputably spoke with, Paul Anderson and Jomo Kenyatta, claimed (at trial) to have known Roman for 6 months and 3 years, respectively (although both had been inconsistent on the subject). Furthermore, Anderson claimed to have first learned of Roman's

alleged involvement with narcotics on March 15, 1989, and Kenyatta denied knowledge of narcotics activity.

176) ADA Lomuscio also repeatedly asked Roman whether he sold drugs or had people selling drugs for him. Without any documentary or testimonial evidence in support, Lomuscio asked whether Roman had several individuals selling drugs for him at locations in Queens in the early part of March 1989 who had been arrested and, as a result, were no longer able to work for him. When both defense counsel and the Court asked Lomuscio for an offer of proof to support her questioning, she opposed the request and said she had "spoken to various individuals, civilians involved in knowing the defendant, and also law personnel, and [her] conversations led to [her] to believe that he was involved in the sale and distribution of cocaine." This was a false representation. There was never any credible evidence that Roman was involved in the sale of cocaine.

ADA Lomuscio Declines to Call Andrea Witter and Opposes a Missing Witness Charge

177) Despite repeatedly relying on unnoticed statements attributed to Roman that were allegedly made in Andrea Witter's presence and, indeed, having belatedly noticed Witter as an alibi rebuttal witness for "good cause," ADA Lomuscio declined to call Witter to the stand. At the close of evidence, Lomuscio opposed a defense application for a missing witness charge for Witter. By contrast, Lomuscio requested a missing witness charge for Charmaine Woodburne.

178) In summation, Lomuscio attempted to appeal to the jurors' sympathy, arguing that Witter "didn't have to" testify because "[p]eople grieve in different ways, and for some people, it is too upsetting," and urged the jury not to consider her unexplained absence. Although she declined to call Witter to testify under oath, ostensibly to avoid upsetting her and allow her to

grieve, on October 18, 1990, Lomuscio contacted Witter to request her presence at Roman's sentencing.

**Intent on Obtaining a Conviction by Any Means and Operating in a Climate of Impunity, ADA Lomuscio Repeatedly Ignores the Court and Her Prosecutorial Duties, and Delivers an Egregious Summation**

179) In summation, ADA Lomuscio repeatedly denigrated the defense and made baseless arguments. Lomuscio repeatedly said that Carlton Roman did not have a "real" alibi because, "[a]ll he did was submit the testimony of two relatives." She explicitly argued that Roman's alibi witnesses had perjured themselves. By contrast, she vouched for Jomo Kenyatta and Paul Anderson by arguing that they had *no motives to lie*. Lomuscio contended that Kenyatta had *not* lied about his criminal record because "[i]n his mind as a lay person" his attempted murder case "was dismissed" although he had pled guilty to a felony. When the Court directed the jury to disregard her remarks, Lomuscio continued by asking the jury "if [Kenyatta] was going to lie or hide to you [sic], wouldn't he lie and try to hide [his entire criminal record]? That makes sense. And I submit that certainly was not his intention…" Once again appealing to sympathy, Lomuscio implied that Kenyatta's perjury was a result of medical issues from having been shot and said, "*I don't think* that the defendant should benefit from the damage that has been done to the witness's brain, due to the two bullets that he took in the head."

180) Lomuscio erroneously claimed that "Jomo Kenyatta" was Kenyatta's birth name, that Anderson had come to trial voluntarily to tell the truth and "no one could have forced him…" and that there was "no ID issue" because Anderson and Kenyatta knew Roman "for months, at least."

181) Capitalizing on her suppression of Detective Loguercio's role in the investigation and the descriptions Paul Anderson gave to Loguercio on the night of the shooting, ADA Lomuscio erroneously claimed that Anderson gave police "a statement" (singular) that the jury had before them (the March 17th statement Detective Pepey wrote for Anderson had been placed into evidence), and urged the jurors to ask themselves, "if [the March 17th statement] is essentially the same as what he testified to before you almost a year-and-a-half later."

182) Despite vouching for the truthfulness of both Anderson and Kenyatta and not having corrected any of their testimony, Lomuscio also told the jury, "I will not stand up here and tell you that [Anderson and Kenyatta] told you everything about the drug dealings that were going on in [Anderson's] house. I will not insult your intelligence…[f]or obvious reasons, I submit to you that every witness minimized what they saw, what they did and heard with respect to drugs, for very obvious reasons, and I think it is obvious to everyone."

183) Lomuscio argued that Professor Cohen's testimony "was worthless and a waste of everyone's time," and that Steveroy Grant and Gilmore Lawson only knew Roman before he "went into the world of drugs and drug-selling."

184) Lomuscio said Roman "was the coolest, calmest witness of all the witnesses that have testified" and that his testimony "was rehearsed." She suggested that "[t]here's a number of ways you can play a crime when you are the defendant…the defendant elected to play cool, just like he did on the witness stand…[a]nd maybe he can carry it off. Maybe in a drug situation, people are afraid to testify, and maybe the case will not get off the ground. And maybe that is what he was waiting for in [this] instance." Lomuscio also referenced the unnoticed statement Detective Pepey attributed to Roman and claimed Roman's testimony that his post-arrest protestations of innocence to police were not documented was incredible

because "[t]here was no detective in the New York City Police Department that will pass up the opportunity to take a statement from *a defendant*." She contended that Roman lied about living with Fern Robinson to bolster his alibi, supposedly because his "main residence was with his parents…[and] he knew that the police were at his parents' house [on March 16, 1989], and he was not there." Lomuscio knew or had reason to know that police never visited Roman's residence or that of his mother on the night of the shooting.

185) In a departure from her representations concerning motive in her opening statement, in summation ADA Lomuscio initially claimed the motive for the shooting was drugs but, reconciling the Lane memorandum, then said that "it also may have been over a car…[i]t may be in addition to the disagreement over drugs. Maybe there was a disagreement over a car. They both could have been motives and the reasons for the shooting in this case."

186) Despite being instructed by the Court to refrain from discussing law on at least five (5) occasions, ADA Lomuscio persisted in arguing the law. For example, Lomuscio argued about whether Paul Anderson could have legally been compelled to appear, the gravity of Jomo Kenyatta's prior known felonies, and the grounds for the exclusion of certain evidence.

187) Carlton Roman was found guilty of Murder in the Second Degree, Attempted Murder in the Second Degree, Burglary in the First Degree, Robbery in the First Degree, Assault in the First Degree, and Criminal Possession of a Weapon in the Second Degree.

## Carlton Roman Maintains Innocence at Sentencing

188) At sentencing on November 20, 1990, ADA Lomuscio asked the Court to impose the maximum possible sentence allowed under the law. When asked whether he had anything to say, Roman told the Court, "I [would] just like to say that I am innocent of this crime. Why I am in this position I really don't know. The only thing I do know is a good friend of mine got

killed. When I went to find out what happened I wound up arrested, charged and now convicted of his murder. I know I may not be the first person arrested or convicted innocently and I know I won't be the last either, but I just hope Your Honor can keep in mind that I am innocent."

**ADA Lomuscio is Promoted and Given a Raise**

189) ADA Lomuscio was assigned to the Homicide Trials Bureau from June 1989 through December 1990. In January 1991, two months after Roman was sentenced, Lomuscio was elevated to Deputy Chief of the Special Victims Bureau and given a $7,000.00.

**The People's Case Falls Apart During the Prosecution of Hollis Laylor**

190) Other than Carlton Roman, Hollis Laylor was the only individual to be identified, let alone prosecuted, for the shooting at Paul Anderson's residence. Laylor was also prosecuted by ADA Lomuscio beginning in 1991.

191) In February and May of 1991, ADA Lomuscio responded to motions submitted by Laylor and, *inter alia*, under penalty of perjury: represented that Paul Anderson owned the house at 110-41 168th Street; referred to Jomo Kenyatta as "Anthony Thomas Kenyatta"; claimed that "the description" of Laylor was given to police by Kenyatta; claimed that Laylor was identified through a photo array; and, **denied knowledge of *any* Brady material.**

192) "Anthony Thomas" testified against Laylor, but Lomuscio informed Laylor's attorney that Paul Anderson might not testify. The first attempt to prosecute Laylor ended in a mistrial when Officer Denis Byrne referenced Roman's conviction in front of the jury. Lomuscio made no statement when Paul Rubenfeld, defense counsel for Laylor, represented that he had engaged Spiros Tsimbinos, Lomuscio's former supervisor at the QDA (including during her work on Roman's case), to submit a writ to the Second Department on Laylor's behalf.

## Paul Anderson Stops Cooperating

193) By 1992, Paul Anderson was refusing to return from Jamaica to testify. ADA Lomuscio claimed this was because of threats Anderson had received, allegedly by Laylor or on Laylor's behalf, and applied to admit his grand jury testimony against Laylor. A Sirois/Mastrangelo hearing was held before the second trial on April 7, 1992.

194) Detective Pepey testified that he and Detective Gerard Fiorenza, the latter of whom served as District Attorney Richard Brown's driver, had brought Anderson back from Jamaica to testify at Carlton Roman's trial in 1990. Pepey and Fiorenza were again tasked with bringing Anderson back for Laylor's trial in March 1992. Pepey claimed that Anderson told them he was willing to return to testify but was afraid because he had received several phone calls threatening his life.

195) Detective Pepey testified that on March 20, 1992, the detectives' third day in Jamaica, Anderson told he *and Fiorenza* that he had received three (3) calls, one about three weeks earlier, one in December 1991, and another in January 1992. Each time the caller was a Jamaican male who told Anderson he and his family would be killed if he returned to New York to testify. Anderson reportedly said that Hollis Laylor had friends and relatives in Jamaica who could carry out the threats, but Pepey did not ask him to identify these people. Pepey also did not contact the Jamaican police, ostensibly because Anderson did not trust them, a claim Pepey failed to document. Pepey did not investigate who made the alleged threatening calls to Anderson. According to Pepey, Anderson said his wife was afraid and had hidden his passport. Anderson's mother, who was also supposedly present during this meeting with the detectives, also reportedly expressed fear for her son's life if he returned to New York. Pepey said he composed a two-page written statement detailing Anderson's

claims, but Anderson *refused* to sign it, so Pepey left him with a copy and asked him to sign it and mail it to the QDA. A signed copy of the statement was never received and Pepey was unable to even produce an unsigned copy at the hearing.

196) During Detective Pepey's testimony, ADA Lomuscio told the Court that Jomo Kenyatta had "been threatened in the first trial" and was "under police protection when he comes to court," but that Kenyatta had not been threatened "so far in the second trial."

197) Hollis Laylor's attorney contended that Paul Anderson had a reason to refuse to return to the United States that was unrelated to threats: Anderson had been trafficking narcotics from his residence and was afraid he could be prosecuted. When Pepey was asked if he learned of drug activity at Anderson's residence, he testified that police had only "one or two" indications that *marijuana* was being sold from the residence. Despite arguing that it was critical to tell the jury at Carlton Roman's trial that crack cocaine was allegedly being packaged at Anderson's residence on March 15, 1989, Lomuscio made no attempt to correct this testimony.

198) Pepey admitted that he never checked whether Anderson had convictions in Jamaica and never asked whether he was engaged in narcotics trafficking. Continuing her suppression of Detective Loguercio's role in the investigation, Lomuscio objected when defense counsel asked Pepey whether another detective was assigned to the case before him.

199) Detective Pepey claimed to be unable to recall interviewing Adair Johnson or whether Johnson was the brother of "Lansford Bedford" [sic]. Pepey also claimed to be unable to recall who "Lansford Bedford" was or whether he was one of the shooting victims. After being confronted with his own notes, Pepey acknowledged that he had interviewed Johnson and learned "Lansford Bedford" was Jomo Kenyatta. When defense counsel asked for

Johnson's contact information, ADA Lomuscio opposed on the grounds that Johnson was "not a material element of this case in any way, shape or form, and…on the grounds for the safety of this witness."

200) Following Pepey's testimony, ADA Lomuscio represented that she had no further witnesses but claimed to have spoken with both Anderson and his wife, both of whom allegedly told her Anderson had been threatened. Although, on September 12, 1991, she had written to Anderson and stated that she had tried to contact him "numerous times without success," Lomuscio claimed that Anderson visited her in August 1991 and came to court in November 1991 but stopped cooperating once he began receiving threatening phone calls. On April 9, 1992, the Court granted the People's application to introduce Anderson's Grand Jury testimony.

201) Paul Rubenfeld, counsel for Hollis Laylor, sent his partner, Robert Soshnick, to Jamaica to locate and speak with Paul Anderson.

202) On April 22nd, the hearing was re-opened for Soshnick to testify. Soshnick travelled to Jamaica on April 14th and was able to meet with Anderson on several occasions. Soshnick also obtained a videotaped statement from Anderson, in which Anderson said he was not threatened but was unwilling to return to New York because he had business in Jamaica. The videotape was played for the Court at the hearing. ADA Lomuscio claimed to have spoken with Anderson after his first encounter with Soshnick and claimed Anderson told her he was afraid for his life while with Soshnick. She argued that the defense's ability to locate Anderson demonstrated "they could contact him and they could make good on their threats." After viewing the video and hearing arguments from both sides, the Court reversed its earlier

ruling, *explicitly found that **Anderson was not threatened***, and declined to admit his grand jury testimony. The QDA has reportedly lost their copy of this taped statement.

Jomo Kenyatta Claims a Sudden and Medically Inexplicable Memory Loss

203) The People were unable to convict Hollis Laylor at a second trial. Before a prospective third trial, Jomo Kenyatta supposedly experienced a sudden and marked deterioration in his memory and cognitive functioning. The People sought to have Kenyatta evaluated by a neurologist to assess his capability to testify or the propriety of an application to admit his prior testimony. On July 6, 1993, Dr. Richard Schuster informed an unknown employee of the QDA that he was "99% sure" Kenyatta had "no genuine memory defect." Schuster explained that given Kenyatta's prior ability to recall the shooting, "suddenly forgetting details would be an extraordinarily atypical course of events."

204) The QDA paid Dr. Schuster to evaluate Kenyatta on July 15, 1993. Kenyatta "admitted that after the shooting his memory was satisfactory but now it has deteriorated. When asked if he had reported this alteration to doctors, he just stated he sees many doctors but failed to mention it and no one ever noticed the change." Schuster stated that the results of a memory test performed on Kenyatta were "indicative of either malingering and/or dementia." Given how "inexplicably deteriorated" Kenyatta purported to be despite the absence of any "obvious precipitating cause," Schuster stated that "[w]hether this is a conscious attempt to malinger and/or related to undiagnosed psychiatric variables needs further elucidation."

205) In 2018, the QDA claimed to have no information as to whether further testing was performed on Kenyatta. Upon information and belief, the QDA never even sought to have Kenyatta tested further as Dr. Schuster recommended.

206) In April 1994 the People dismissed all charges against Hollis Laylor.

**ADA Lomuscio is Demoted and Encouraged to Resign**

207) In 1996, ADA Lomuscio was demoted from her position as a Deputy Bureau Chief to a position as a line assistant.

208) In sworn testimony given in November 2022, ADA Lomuscio acknowledged that she was encouraged to resign by former-EADA James Quinn in 1996, but claimed not to know why, although she did resign.

**Adair Johnson is Sentenced to Life in Prison**

In January 2004 Adair Johnson was convicted of several federal charges including Possession with Intent to Distribute Cocaine and Use of a Firearm in Relation to a Drug Trafficking Crime with a Murder and sentenced to life imprisonment in the Southern District of Florida.

**The People Lose Carlton Roman's File**

209) Although Carlton Roman had repeatedly litigated his conviction for years, in 2015 the QDA certified that "after a diligent search" their file for his prosecution could not be found.

210) In or around 2017, Roman received recordings of 911 calls made in response to the shooting at Paul Anderson's residence. The recordings demonstrated a significant disparity between the time of the shooting and police response as established by the 911 calls, and the time of the shooting and police response as testified to by Anderson, Jomo Kenyatta, and police witnesses at Roman's trial.

211) In addition, the existing 911 recordings included callers describing a gunman they observed firing shots *at the same time they observed Anderson running down the street in handcuffs*, callers reporting statements Anderson made to them before the arrival of police, and callers indicating they would speak with police on arrival. Thus, the recordings also contradicted the police account of Anderson having been incoherent upon their arrival,

Anderson's testimony that he remained in the basement until the shooting stopped, *and* his claim that police (and ambulances and news crews) were already present when he reached the street. Anderson's statements to neighbors as reported to 911 contradicted his later account in that he told at least one caller he was handcuffed and *pushed from his residence*.

212) Finally, the recordings established that other witnesses observed and described a gunman, and interacted with the not-incoherent Anderson, but their information was evidently never investigated and they were not asked to identify the gunman they had seen. Notes composed by ADA Alexis Celestin of the CIU indicate that at least two (2) calls are missing from the currently existing recordings.

213) Roman submitted a C.P.L. § 440.10 motion including a claim that the 911 calls were suppressed by the People in violation of their obligations pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

214) During the pendency of his motion Roman learned, for the first time, of Jomo Kenyatta's purported memory loss and the People's efforts to have Kenyatta evaluated. Dr. Schuster's ultimate report was disclosed pursuant to a judicial order, but the earlier notes concerning Schuster's initial opinion were withheld. Upon information and belief, these notes reflected Schuster's unadulterated opinion of Kenyatta's condition before being paid by the QDA. The $1,289.50 bill for Schuster's services, submitted to the QDA on August 17, 1993, by the president of Schuster's company, expressed a "hope that [the company and the QDA] will be able to work together again in the near future." Roman supplemented his motion based on what *was* disclosed concerning Kenyatta.

215) In an April 2018 submission in opposition to Roman's motion, the People derided his claims as "manufactured, unsupported, and logic-defying allegations," and claimed to have

"made efforts to acquire any evidence potentially relevant to the issue of [Roman's] guilt or innocence."

216) These efforts appear to have consisted of telephone contacts by ADA Richard Schaeffer with Kenyatta, Paul Anderson, and Catherine Lomuscio. In addition, Schaeffer and Detective Investigator Bernard Porter visited Kenyatta in-person once. Upon information and belief, Schaeffer's contacts with Anderson and Lomuscio were not disclosed to Roman. Schaeffer's own notes indicate that he questioned the veracity of both civilian witnesses and reflect that Lomuscio admitted Kenyatta was confused and difficult to understand at the time of Roman's trial and that Anderson said he was not threatened.

217) The dubious nature of the People's claimed efforts is evinced by the fact that, in a mere sixteen (16) months during the Covid-19 pandemic, the newly elected District Attorney's CIU conducted an investigation that prompted them to fully exonerate Roman.

Paul Anderson Admits to Falsely Accusing Carlton Roman

218) In 2019, Paul Anderson fully recanted his testimony against Carlton Roman in sworn written and videotaped statements to an investigator at an independent attorney's office.

**The CIU Investigation**

219) In April 2020, the CIU agreed to investigate Carlton Roman's conviction.

220) The CIU spoke with Paul Anderson several times. In January 2021 Anderson recanted on videotape to members of the CIU during a voluntary in-person meeting in Jamaica. Among other things, Anderson stated that:

a) His residence was being used for gambling and drug trafficking activity in which Jomo Kenyatta was the "ringleader";

b) Roman was not present when the shooting occurred but Anthony "Chungy" Chung was;

c) Detective Pepey forced him to implicate Roman and threatened to have his sister's house seized;

d) Pepey "forced" him to return to the United States to testify;

e) ADA Lomuscio purchased a suit for him to wear at Roman's trial and he believed she represented him; and,

f) The primary reason he cooperated with Roman's prosecution was that he believed his sister's house had been under surveillance and there would be consequences for the narcotics activity occurring there.

221) The CIU spoke with Jomo Kenyatta several times during their reinvestigation. His stepfather, Jack Thomas, and "caretaker/common law wife" Sharon Baker, were present during a CIU interview in October 2020. Kenyatta was using the name Anthony Thomas but acknowledged he was also known as "Bob." Although he claimed to be unable to remember details of the shooting such as who shot him or why, he also claimed to know that what he said at the time of trial was the truth because "his mind was fresh at that time." When shown a photograph of Carlton Roman, *Kenyatta had no idea who it was*. He said he did *not* have a brother, a statement "confirmed by his stepfather." After this interview, ADA Celestin of the CIU reported that "[t]hroughout the interview, Bob hit his head multiple times supposedly in an effort to job [sic] his memory. There are clearly cognitive delays as a result of the shooting."

222) Evidently, the CIU was initially convinced by Kenyatta's performance and the statements by Kenyatta and his stepfather. However, after their in-person contact, the CIU subpoenaed recordings of Adair Johnson's phone calls from the Federal Correctional Institute in Jesup. The recordings reflected that, contrary to the statements of Kenyatta and his stepfather, Kenyatta knew that he had a brother. Moreover, in private conversations with his brother, Kenyatta demonstrated that he was far more lucid than he led the CIU to believe. Indeed, the

recordings include Kenyatta and Johnson discussing events from their childhood in detail. Upon information and belief, when members of the CIU realized they had been deceived by Kenyatta, Detective Investigator Pereline Kaalund called to inform him that the Unit had uncovered his ruse and that there could be consequences for his deception. Kenyatta laughed in response.

223) By the time of her interviews with the CIU, Andrea Witter had changed her name to Margaret Hall. Hall said that she paged her husband on March 16, 1989, and someone else returned the call whose voice she did not recognize and who would not identify themselves. About two hours later, the police called and informed her that her husband was shot and killed. Hall acknowledged that her husband and Carlton Roman were friends and contradicted the statement Detective Pepey attributed to Roman. Specifically, she said that when she accused Roman of her husband's murder, he said he did not do it or "it was not me," but *not* "when I got there it was done" as Pepey had claimed. The fact that an unidentified individual was in possession of Lloyd Witter's pager on the night of the shooting was obviously significant. At best, the People and their agents failed to investigate this information or to seriously question Andrea Witter at the time of Roman's trial. More likely, they ignored significant evidence and/or failed to disclose it to Roman.

224) In December 2020, the CIU interviewed Fern Kelly (nee Robinson), Charmaine McKenzie (nee Woodburne), and Glenn McKenzie. Kelly was consistent with her testimony at Roman's trial. She also stated that Bob's brother, "Tiger," called to tell her what happened and accompanied her to the precinct on the night of Roman's arrest. When they arrived, they saw Paul Anderson coming out of the precinct. Charmaine McKenzie corroborated the trial testimony given by Kelly and Roman concerning the evening of March 16, 1989.

225) Glenn McKenzie stated that Bob was also known as "Skunk," and was a violent "known drug dealer" who was "not to be crossed" and who "everyone was scared [of]." Bob's real name was Lasford Beckford, he took the surname of his stepfather, Jack Thomas, and used Jomo Kenyatta as an alias. When Glenn visited Bob in the hospital after the shooting his brother, Adair "Tiger" Johnson, was there.

226) Howard "Zoom" Stewart corroborated Carlton Roman and Ainsley Walker's trial testimony that he (Zoom) reached out to Roman (at Roman's mother's house) by telephone early on the morning of March 17, 1989, to inform him that Lloyd Witter had been shot.

227) In February 2021, the CIU interviewed retired-Detective John Loguercio. Loguercio claimed to be unable to recall Detective Pepey and concluded that Paul Anderson had not identified anyone on the night of the shooting. He did not know why he was not called to testify since he "did all the work [the] night [of the shooting]." Loguercio indicated that information was added to his notes memorializing Anderson's first statements following the shooting. For instance, *the name "Marshall" was added to Anderson's statement some time after he (Loguercio) wrote it.*

228) Also in February 2021, the CIU interviewed Adair "Tiger" Johnson, from the Federal Correctional Institution in Jesup, Georgia, where he is serving a life sentence. Johnson stated, among other things, that:

a) He was interviewed by a detective once. Carlton Roman was in a cell by himself at the time of this interview.

b) He visited his brother, "Bob," while he was hospitalized after the shooting.

c) Paul Anderson's residence was a lucrative location for drug sales. Bob was attempting to take over the location. This was the motive for the shooting.

d) Anderson was not shot because he was not attempting to take over the drug selling operation.

e) Bob was "feared," and Detective Pepey was "notorious."

f) He never heard Bigger and Richie were involved in the shooting.

229) During his interview with the CIU Adair Johnson conveniently reported, *for the first time ever*, that both Carlton Roman and Hollis Laylor admitted their guilt in the shooting to him. Johnson also claimed that he and his brother were not speaking at the time of the shooting because his brother had asked Roman and Laylor to rob him, but they decided not to and told Johnson what his brother had asked them to do.

230) The notations "Mr. Adair Johnson-brother" and "Mr. Leroy Wilson #25" appear in Detective Pepey's stenographic memo book under the heading "3/17/89." The notation, "Adair Johnson-brother of Beckford Lasford" appears two pages later, also under the heading "3/17/89." Leroy Wilson knew Adair Johnson and Jomo Kenyatta from Jamaica. Johnson and Kenyatta had the same father and different mothers. The brothers wanted Wilson to help them rob his employer in Jamaica and when he didn't, they became upset with him. Unaware that they were upset, Wilson visited them in Brooklyn and *was shot on their orders*. Wilson said that Kenyatta and Johnson had a lot of enemies. Wilson acknowledged that a pair of police officers would come and get information from him. Upon information and belief, Wilson was a confidential informant.

231) In or around March or April of 2021, the CIU revealed that Jomo Kenyatta remains a suspect in the unsolved 1988 Queens County murder of Lascalle Thompson. Upon information and belief, this was known to police and prosecutors at the time of Roman's prosecution but suppressed in violation of Brady and its progeny. Documents pertaining to Thompson's murder reference ADA Lomuscio and Kenyatta's role as a witness against Roman and indicate that Lomuscio was made aware that Kenyatta was a suspect in the

murder. Upon information and belief, at least three (3) separate documents in the possession of the QDA related to Kenyatta being a suspect in Thompson's murder reference Lomuscio and/or Roman. Until 2001, Detective Pepey was assigned to the Queens Cold Case Squad that, upon information and belief, is responsible for the ongoing investigation into Thompson's murder.

232) Catherine Lomuscio told the CIU she never thought Paul Anderson was lying, nor did she know that Jomo Kenyatta was a drug dealer, but that the case against Roman "wasn't a great case because of [the] witnesses." Lomuscio claimed she never knew that Kenyatta was a suspect in the murder of Lascalle Thompson nor that a confidential informant was involved in the investigation into the shooting at Anderson's residence. She acknowledged that in his taped statement to Robert Soshnick, Anderson said he was not afraid, and did not want to return to the United States because of business. Lomuscio told the CIU that Roman had been "fighting for many years" and was "angry because his co-defendant got off."

233) The CIU interviewed Detective William Pepey on at least two occasions. Detective Pepey did not visit the crime scene and said that Lieutenant Lane "must have" wanted him (Pepey) to do the interviews when he came in the day after the shooting. Pepey claimed not to "believe" he had a confidential informant at the time of the investigation and said that Jamaica was not his "specialty." His informants were in relation to the Baisley Park Houses and the Forties Crack Posse, and "his dealings were with local drug dealers." Asked specifically about "Confidential Informant #25," Pepey claimed to be unable to remember them but thought they were a narcotics informant. He said he never registered confidential informants, he just used their information and ran with it.

234) Detective Pepey claimed to have no recollection about why Bigger and Richie were not pursued but said that it might have been because they served as lookouts or the QDA "might have been okay with two shooters." Pepey's memo book evidently listed telephone numbers associated with both men.

235) He also claimed to have no memory of the details of Carlton Roman's arrest or why he first interviewed Paul Anderson after Roman was arrested. He claimed to be unable to remember anything about the gap between Roman's arrest and Anderson's statement. *Pepey admitted paying someone to fabricate a visa to get Anderson back to the United States for Roman's trial.* Pepey stopped working for the NYPD in 2001.

236) The CIU also interviewed Detectives Bernard Porter, Thomas Wray, and Gerard Fiorenza. Detective Porter told the CIU that Detective Pepey was a "scumbag" and "a bad guy" who "could not be trusted to tell the truth." Porter worked with Pepey in the Cold Case Squad and said that he was "a questionable detective" with "questionable methods" who was "famous for getting exceptional clearances on drug related homicides." Porter told his former supervisor in the Cold Case Squad that he did not trust or respect Pepey and would question any case Pepey was involved in "wholeheartedly." Upon information and belief, Porter referenced at least one instance where Pepey closed out an unsolved homicide by an exceptional clearance in the Cold Case Squad that he (Pepey) had originally investigated before joining the Squad.

237) Detective Wray, who also worked with Pepey in the Cold Case Squad, said that Pepey was a "weird and shady guy," and that the QDA would not hire Pepey as a detective investigator.

238) Detective Fiorenza told the CIU that he and Pepey *never* had a conversation with Paul Anderson in which Anderson said he was afraid to return to the United States. When Pepey's memo book entry detailing the supposed conversation where Anderson said he was afraid to return for the Laylor trial was read to him, Fiorenza said the conversation *"never happened."* He remembered the 1992 trip to Jamaica well because it was international, and he had developed a relationship with Anderson after transporting him in 1990 for the Roman trial. Fiorenza said Anderson *never* communicated *anything* about threats. Rather, the detectives told him where to meet them for the return trip and when they got there, he didn't show up, so they left without him.

239) On August 3, 2021, ADA Celestin disclosed the initial written descriptions of four unidentified perpetrators taken by Detective Loguercio from Paul Anderson on March 16, 1989. These handwritten notes by Loguercio were not included in any of the previous disclosures by the QDA after the Office certified that Roman's file was lost.

**Exoneration**

240) On August 9, 2021, the QDA and the undersigned filed a joint C.P.L. § 440.10 motion to vacate Carlton Roman's conviction on grounds of newly discovered evidence and to dismiss the underlying indictment in the interest of justice.

241) The QDA acknowledged that the evidence compiled by the CIU created "a probability that the jury would have ***acquitted*** Mr. Roman" (Emphasis added) and "require[ed] that Roman's conviction be vacated." DA Melinda Katz further stated that, "because the evidence no longer supports a credible case against Mr. Roman, [the QDA would] dismiss the indictment in the interests of justice."

242) ADA Celestin, who lead the CIU investigation, acknowledged the following:

a) The shooting at Paul Anderson's residence occurred at approximately 7:12 pm;

b) Anderson initially gave the police "extremely detailed descriptions" of four unknown assailants, none of which matched Roman;

c) No testimony or evidence at Roman's trial referenced the initial descriptions Anderson gave to police;

d) New evidence "irreparably undermined" the credibility of Anderson and Jomo Kenyatta's testimonies and their identifications of Roman and "paint[ed] a very different picture of [their] characters than the [one] that [was] presented to the jury";

e) In contrast with Anderson's testimony denying involvement in drugs or gambling, his residence was known to be a gambling location and a place used to distribute narcotics;

f) "New evidence also establishes that Anderson testified falsely at trial in denying that he had ever been shot…Medical records and new interviews with witnesses establish that Paul Anderson was shot by deceased victim Witter in November 1988, only four months before the shooting. Anderson has given at least six different statements in this case, many of which are inconsistent with each other and forensic and physical evidence collected in the case";

g) "As opposed to the innocent victim that Kenyatta held himself out to be at trial," the CIU learned that Kenyatta had a "violent nature and notoriety as a feared drug dealer both in Jamaica, West Indies and in Queens, NY";

h) Kenyatta used six different *known* aliases and "was wanted for several violent crimes and homicides and arrested under other aliases";

i) "When interviewed by the CIU, Kenyatta appeared to be malingering as to his neurological injury. Kenyatta claimed that he could not concentrate and recall details and did not recall who shot him…However, Kenyatta speaks clearly and shows no memory or neurological defects in recordings of Kenyatta obtained by the CIU in 2021…the jury was deprived of an accurate view of Kenyatta's background in order to adequately assess the credibility of his testimony and the possible motive of others to commit the crime."; and,

j) Andrea Witter provided the CIU with "new information that contradicts important evidence used to convict Roman…As he was arrested, Andrea heard Roman say he didn't kill her husband, but she did *not* hear him say 'when I got to the house I saw them there and left' or *any* version of this statement as recorded by Detective Pepey. Andrea also contradicted an account by Detective Pepey memorializing a statement made by Andrea shortly after the shooting in which she stated that she walked from her home to Anderson's home at 10 p.m. on March 16 and that's how she learned who allegedly killed her husband…Andrea *emphatically* stated that she did not leave the

house at that time and certainly did not walk to Anderson's home as Pepey states. The CIU finds Andrea's account credible…" (Emphasis added).

243) DA Katz told the Court that **Paul Anderson's recantation was "heavily corroborated" and there "is no longer reliable evidence that would support Mr. Roman's conviction."**

244) Carlton Roman told the Court:

> "[F]or 30 years…all I was asking was a fair investigation and hearing…Everybody expects mistakes to be made. I'm not even angry that a mistake was made, but I'm not very pleased that it took 31 years to fix it… Queens could have been doing way better than that before we got here…I've been in the worst place I know for 31 years… **It's as if people are completely [in]different to whether [you] are actually innocent or guilty**…Queens can do better than that." (Emphasis added).

245) The Court "undoubtedly adopt[ed] the People's and defense recommendation to vacate [Roman's] conviction and sentence," and more than agreed with Roman, stating that, "it's not just Queens who has to do better, we all have to do better. ***Because this shouldn't happen. This shouldn't happen to anyone."*** (Emphasis added).

**Post-Exoneration**

246) In March 2022, the QDA responded to a subpoena requesting the complete file for the instant matter.

247) Notes composed by ADA Celestin indicate the CIU discovered that "Jomo Kenyatta" had at least one open weapons offense in 1988.

248) The CIU also made documented contact with family members of Anthony "Chungy" Chung.

249) In June 2022, retired-Detective John Loguercio gave a sworn deposition to attorneys for Carlton Roman. Loguercio claimed to be only "vaguely familiar" with Detective Pepey. The shooting at Paul Anderson's residence was "just a paperwork case for [him]," and he believed that Anderson was the only witness he had any involvement with. He took a

statement and a description of four unidentified males from Anderson and had not received the names of any alleged perpetrators by the time he typed reports on March 17, 1989. He did not need Anderson's permission to search his residence for contraband and could not recall why he asked for it at 10:30 pm on the 17th. Loguercio said that drugs and weapons would constitute "contraband." Loguercio never permitted a civilian to notify the family of a homicide victim of the victim's death. Loguercio could not recall whether he ever discussed the case with any prosecutor(s).

250) Detective Loguercio was the assigned detective until Detective Pepey took over on the 17th. Pepey was not involved in the investigation on the 16th. To Loguercio's recollection, Pepey did not interview witnesses or participate in the investigation while he (Loguercio) was the assigned detective. **Loguercio did not attempt to arrest anyone for the shooting because he did not have enough information to do so. He would have needed a name to make an arrest.**

251) In August 2022, retired-Detective Gerard Fiorenza gave a sworn deposition to attorneys for Carlton Roman. While employed by the QDA, Fiorenza served as driver and security for DA Richard Brown. While so assigned, Fiorenza was "always with" Brown and would have to tell Brown if he received a different assignment, such as the trip to Jamaica to bring back Paul Anderson.

252) Detective Fiorenza met Detective Pepey for the first time in 1990 when they were assigned to bring Anderson back from Jamaica for Roman's trial. Fiorenza and Pepey "had to take [Anderson] to get his passport of some sort." All three of them went to do this because they had to drive from Montego Bay to Kingston. Neither Anderson nor Pepey said *anything*

about threats *or* Anderson being afraid to testify. Fiorenza never protected Anderson and, to his knowledge, Anderson was never guarded by police or kept in a safe house.

253) Fiorenza said it was possible he and Pepey met with Anderson at his home in Jamaica in 1992 but could not recall meeting with any of Anderson's family members. *Anderson never said anything to Fiorenza or in Fiorenza's presence about threats or fear of testifying, nor did Pepey.* Nor did Anderson or Pepey say anything to Fiorenza or in his presence about not trusting the Jamaican police. Pepey never prepared a statement for Anderson in Fiorenza's presence. Anderson told the detectives he would return with them in 1992 but did not show up to the pickup location. There was no discussion about Anderson not returning because of threats. Fiorenza "might have said" something about Anderson's refusal to return to DA Brown.

254) In November 2022, Catherine Lomuscio gave a sworn deposition to attorneys for Carlton Roman. Before her deposition, Lomuscio was afforded months to review case materials in preparation for her testimony, including the trial transcript and detectives' file. Lomuscio testified that she tried approximately 65-70 cases to verdict before Roman's, and "approximately 74" in total during her career at the QDA, all but 3 of which resulted in convictions. She said that, aside from Roman, two other defendants she prosecuted had their convictions reversed or vacated. She was never reprimanded in relation to either of those cases and could not recall whether either defendant served prison time before the reversal or vacatur of their conviction.

255) Lomuscio said she prepared for Roman's trial by talking to witnesses and police officers and reading police reports. She said she asked Jomo Kenyatta whether he had any criminal convictions before trial, and disclosed Kenyatta's entire criminal record to Roman's counsel

at trial. She claimed to be unable to recall whether Kenyatta told her he had no criminal record aside from a single conviction for reckless driving. While she flatly denied receiving any information that Paul Anderson dealt drugs, in response to *the very next question*, Lomuscio claimed to be *unable to recall* whether she received such information about Kenyatta. Although she was aware Kenyatta had aliases by the time of trial, when asked how she confirmed Jomo Kenyatta was his birth name, Lomuscio said, "I asked him." She claimed to have investigated his aliases by running rap sheets under the names *he gave her*. She did not have a disclosure sheet documenting the discovery in Roman's case and had no personal knowledge concerning what discovery was provided. She said she was unfamiliar with Giglio material or the Giglio decision.

256) Lomuscio claimed to recall that Roman's name was first provided to law enforcement by Paul Anderson. Despite acknowledging that she did not think Detective Pepey worked on the night of the shooting, Lomuscio never asked Anderson why he testified that he gave Pepey the names of all four alleged perpetrators that night. Although she claimed Hyman Greenberg was a good attorney who she respected, Lomuscio testified that she did nothing in response to Greenberg's representation that he had information Anderson had been shot by Lloyd Witter and *never* asked Anderson about it. Lomuscio testified that she knew Anderson's residence belonged to his aunt, but that her knowledge was based solely upon what Anderson told her and she never spoke with the aunt or checked property records. **Lomuscio had information that drugs were being sold at Anderson's residence *before Roman's trial* from Anderson, Jomo Kenyatta, and "a letter from the neighbors."**

257) Lomuscio testified that she specifically recalled that she made no misrepresentations at Roman's trial but admitted that she did *not* interview witnesses who told her that Roman was

a long-time drug dealer. When Lomuscio was asked who she interviewed in relation to Roman's alleged drug dealings, she named *only* Paul Anderson, Jomo Kenyatta, and Detective Pepey. Lomuscio testified that she did not know whether Kenyatta was ever granted immunity.

258) Lomuscio testified that she never made a representation in court about threats to a witness without investigating the threats. When asked what she did to investigate the alleged threat(s) to Jomo Kenyatta, Lomuscio testified, "I spoke to Jomo Kenyatta." Lomuscio testified that she did not know whether the QDA had protocol for when witnesses were threatened in 1989 and 1990 or whether the QDA maintained safe houses for when witnesses were threatened. She claimed to have no recollection of Paul Anderson having been kept in a safe house or under police protection. She claimed that she investigated the threats she alleged Anderson had received and initially testified that she did not think a court made a finding regarding whether Anderson was threatened. However, she then acknowledged that the Sirois/Mastrangelo Court in Hollis Laylor's case found Anderson was not threatened and that Anderson said he was not threatened in the taped statement presented at the hearing.

259) Lomuscio acknowledged that she knew the purpose of alibi notice was to give the People an opportunity to investigate the defendant's alibi. However, she reluctantly admitted that questioning and soliciting statements from alibi witnesses before trial was done to gather impeachment material.

260) Lomuscio would not foreclose the possibility that she put inaccurate information into QDA documents. She acknowledged that, as a prosecutor with the QDA, she was required to draft memoranda following acquittals but not convictions. Lomuscio claimed not to know whether her promotion to Deputy Chief of SVB was related to Roman's conviction. She

acknowledged that she resigned from the QDA in 1996 and had been encouraged to resign by EADA James Quinn. She left the Office in December 1996. Lomuscio is proud of her work on Roman's case and was unhappy when she learned he was exonerated.

## CAUSES OF ACTION

261) With respect to each cause of action, Plaintiff Carlton Roman incorporates by reference each paragraph of this Complaint.

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983. Malicious Prosecution in Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments. Defendants Pepey, Palermo, Loguercio, Fiorenza, O'Brian, Byrne, and Does #1-10.**

262) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

263) Roman's prosecution commenced when Detective Pepey arrested him without probable cause or a warrant.

264) Defendants Pepey, Palermo, Loguercio, Fiorenza, O'Brian, Byrne, and Does #1-10, individually, collectively (referred to as the "Individual Defendants"), acting in concert and aiding and abetting one another, intentionally, knowingly and willfully manufactured, or caused the manufacturing of, false statements and identifications by Andrea Witter, Paul Anderson, and Jomo Kenyatta, which they improperly compelled or induced those individuals to adopt, accusing Roman of the shooting at Anderson's residence, and causing the QDA to commence or continue criminal charges against him.

265) The Individual Defendants knew that the statements and identifications would be relied upon by the QDA and the court as a basis to formally initiate a prosecution against Roman, continue his prosecution, and that the statements and identifications would be introduced into evidence at Roman's trial. Those statements and identifications were forwarded to the QDA, which in turn did in fact introduce some of them during Roman's trial.

266) Defendants, individually and in concert with others, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Roman without probable cause to believe Roman was guilty of any crime or could be successfully prosecuted legitimately, and to deprive him of his liberty, in violation of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

267) Although he was able to make bail, Roman was still required to make repeated court appearances during the period between his release on bail and when he was remanded.

268) The proceedings terminated in Roman's favor when his convictions were vacated pursuant to C.P.L. § 440.10(1)(g), in a manner affirmatively indicating his innocence.

269) The Individual Defendants are liable for their violation of Roman's constitutional rights pursuant to 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983 Evidence Fabrication in Violation of the Fourth, Fifth, Sixth and Fourteenth Amendments. Defendants Pepey, Palermo, Loguercio, Fiorenza, Lane, O'Brian, Byrne, and Does #1-10.**

270) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

271) Defendants Pepey, Palermo, Loguercio, Fiorenza, Lane, O'Brian, Byrne, and Does #1-10, acting individually and in concert, fabricated evidence and concealed material exculpatory and impeachment evidence thereby depriving Roman of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

272) The Individual Defendants fabricated statements and identifications from Paul Anderson and Jomo Kenyatta, attributed false statements to Roman and Andrea Witter, gave false testimony and induced Anderson and Kenyatta to testify falsely, and along with other unnamed coconspirators, created a host of false police reports, documents, and allegations.

273) The Individual Defendants, including Pepey, Palermo, Fiorenza, Lane, Loguercio, and Does #1-10, did not intervene when each other created false evidence.

274) Pepey and the Individual Defendants falsely represented to prosecutors, in the course of charging and indicting Roman, and at trial, that all of the fabricated evidence was accurate, and all of the fabricated evidence factored into the QDA's decision to charge Roman and to continue his prosecution.

275) The identifications of Roman by Anderson and Kenyatta and the false statements attributed to Roman and Andrea Witter by Pepey were introduced against Roman at trial and were a substantial basis for the jury's verdict against him.

276) The Individual Defendants deliberately and recklessly coerced and/or fabricated and created the above evidence. This fabricated evidence was provided to the QDA and would have been likely to influence a jury's decision if presented at a trial.

277) As a result of the Individual Defendants' forwarding of evidence they had fabricated to prosecutors, the QDA initiated a prosecution of Roman, and his liberty was infringed or curtailed.

278) The Individual Defendants' misconduct violated Roman's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

279) Without the fabricated evidence which the Individual Defendants manufactured or knew had been manufactured, there would have been no basis to arrest, indict, or convict Roman for the crimes discussed herein.

280) Alternatively, Defendants Palermo, Fiorenza, Lane, and Loguercio had an affirmative duty to Roman to protect his above-mentioned constitutional rights from infringement by other government officials.[2]

281) Palermo, who was, upon information and belief, Pepey's partner, knew that Roman's constitutional rights would be violated if Anderson's fabricated statement was used as a basis to justify Roman's arrest, as a basis for exhibiting Roman to Anderson, or as evidence at trial.

282) Fiorenza knew that Anderson was not threatened or kept in protective custody and, upon information and belief, that Anderson's testimony at Roman's trial was secured through illegal conduct by Detective Pepey. Alternatively, Fiorenza knew concealed that Anderson

---

[2] A "plaintiff is allowed to plead in the alternative." Breton v. City of New York, 404 F.Supp.3d 799, 814 (S.D.N.Y. 2019)(Koeltl, J), citing Federal Rule of Civil Procedure 8(d).

was unnecessarily held in police custody despite not having been threatened and that Pepey secured Anderson's presence at Roman's trial through illegal conduct.

283) As Pepey's supervisor, Lane knew the facts and circumstances of the crime being investigated and the personnel involved and, thus, that the memorandum composed by Detective Pepey and introduced at Roman's trial was fabricated and misleading.

284) Loguercio knew that Roman's constitutional rights would be violated if another government official caused Anderson to unequivocally identify Roman after he gave Loguercio extremely detailed descriptions of unidentified perpetrators, none of which resembled Roman. Loguercio also knew that Roman's constitutional rights would be violated if the statements he took from Anderson were augmented to conceal the evolution of Anderson's account, or if the fact that police knew or believed contraband was present in Anderson's residence within 4 hours of the shooting was suppressed.

285) Each of them had reasonable opportunities to intervene to prevent such infringement of Roman's constitutional rights.

286) Nevertheless, each of them deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

287) As a result of their failure to intervene, the Individual Defendants caused false evidence to be manufactured and forwarded to prosecutors, the QDA to initiate a prosecution of Roman, and Roman's liberty to be infringed or curtailed.

288) In failing to intervene, the Individual Defendants proximately caused the violation of Roman's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process

and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

289) The above misconduct by the Individual Defendants was outrageous and shocking to the conscience.

290) By virtue of the foregoing, the Individual Defendants are liable to Roman under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION

**42 U.S.C. § 1983 Denial of Due Process, Suppression of Favorable Evidence in Violation of the Fifth, Sixth, and Fourteenth Amendments. Against All Defendants.**

291) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

292) At all relevant times, Roman had a clearly established right, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Brady v. Maryland, 363 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972), to timely disclosure of all information that was favorable to the defense, including evidence that tended to exculpate him or impeach the credibility of the People's witnesses.

293) Without limitation, the Individual Defendants knowingly and deliberately chose not to document and/or disclose to the defense: Paul Anderson's initial statements and descriptions of the perpetrators; that Anderson's residence was used for gambling and narcotics trafficking and that police had reason to request written permission to remove "contraband" from the premises as early as 10:30 pm on the night of the shooting; that Anderson believed his residence, which actually belonged to his sister and not his aunt, could be seized if he

failed to cooperate with Roman's prosecution; that, by trial, Anderson's account had evolved substantially from his initial statements and was contradicted by the 911 recordings; that Detective Pepey received information from a confidential informant; that Pepey considered the shooting might be part of a criminal pattern then-under investigation in Queens (i.e., evidence indicating third-party culpability); that Anderson identified Roman only *after* being interrogated and coerced by Detectives Pepey and/or Palermo while Roman was already in custody; that Anderson was shot by Lloyd Witter shortly before the shooting that left Witter dead but Anderson conspicuously unscathed; that an unidentified individual was in possession of Lloyd Witter's beeper on the night of the shooting and responded to Andrea Witter when she paged her husband; that Mrs. Witter contradicted the information Pepey attributed to her; that Mrs. Witter reportedly told "Mrs. Kenyatta" where "Bigger" and "Richie" were during the shooting; Jomo Kenyatta's criminal record and numerous aliases; that Kenyatta was a violent drug dealer wanted or suspected in outstanding violent crimes, including the Queens County murder of Lascalle Thompson; that both Anderson and Kenyatta were inconsistent in their identifications and various aspects of their accounts; that Kenyatta's identifications and statements were generated through an aberrant procedure with no basis in NYPD protocol; that both Anderson and Kenyatta were inconsistent about the motive for the shooting; and, that Anderson, Kenyatta, and Officers O'Brian and Byrne testified falsely about the timing of the shooting and the police response.

294) The information the Individual Defendants failed to document and/or withheld from the defense was favorable in that it would have contradicted essentially all the People's testimony and evidence at trial and would have shown that:

a. The eyewitnesses were unreliable criminals with clear motives to fabricate;

b. Detective Pepey conducted a shoddy investigation and generated fraudulent, manipulated, and/or otherwise unreliable evidence;

c. There were motives for others to have committed the shooting; and,

d. Anderson initially described unnamed suspects despite knowing Roman and his co-defendant.

295) This information was material to the outcome of the prosecution because Anderson and Kenyatta were the only civilian witnesses to testify against Roman, and Detective Pepey was the only other substantive witness for the People.

296) The Individual Defendants had a constitutional obligation to disclose such information to Roman.

297) In withholding the aforementioned favorable information from Roman, the Individual Defendants acted deliberately, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Roman's constitutional rights to due process and a fair trial or to the effect of such misconduct upon Roman's constitutional rights.

298) But for the Individual Defendants' withholding of favorable information, there is a reasonable likelihood that the charges against Roman would have been dismissed or he would have been acquitted at trial.

299) The Individual Defendants' actions in withholding favorable information were a foreseeable, substantial, and proximate cause of Roman's conviction and subsequent deprivation of liberty and other damages.

300) The Individual Defendants are liable for their violations of Roman's constitutional rights pursuant to 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983 and Monell. Municipal Liability for the Conduct of Prosecutors in the DA's Office. Defendant City of New York.**

301) Plaintiff Carlton Roman repeats and realleges each allegation contained in the paragraphs above as if fully set forth herein.

302) The misconduct of the QDA in Roman's case was not the result of a single bad actor but of office-wide policies and practices that ignored, tolerated, and/or encouraged violations of the constitutional rights of criminal suspects and defendants as a means of securing convictions.[3]

303) These practices routinely deprived criminal defendants of their fair trial rights.

304) These practices were employed in Roman's case and cost him over three decades of his life.

305) Unlawful practices of the QDA significantly contributed to Roman's conviction.

306) District Attorney (hereinafter "DA") John Santucci and his successor, DA Richard Brown, as municipal policymakers for the City, failed to ensure that QDA prosecutors were trained on their prosecutorial obligations, including their obligations concerning Brady, Giglio, and Rosario material.

307) This failure was exacerbated because, under both Santucci and Brown, the QDA maintained a custom and practice of not internally investigating, reprimanding, sanctioning, or disciplining prosecutors for trial and pre-trial misconduct, including but not limited to Brady violations, other discovery violations, summation misconduct and/or the failure to

[3] A "plaintiff is allowed to plead in the alternative." Breton v. City of New York, 404 F.Supp.3d 799, 814 (S.D.N.Y. 2019)(Koeltl, J), citing Federal Rule of Civil Procedure 8(d).

correct false, inaccurate, or misleading testimony and the use of false or improper evidence and argument.

308) From January 1, 1977, to June 1, 1991, John Santucci was the District Attorney for Queens County.

309) Roman was indicted, prosecuted, and convicted during Santucci's tenure.

310) Numerous credible allegations of prosecutorial misconduct, many substantiated in judicial decisions (over 50 of which are listed in **Exhibit A**[4], which is incorporated herein by reference), demonstrate that misconduct at the QDA was rampant during the Santucci administration.

311) Sworn testimony by executive level QDA prosecutors indicates the rampant misconduct went unaddressed during the Santucci administration and continued well into the Brown administration without serious remedial action.

312) In a sworn deposition in November 2019, former Executive Assistant District Attorney ("EADA") Robert Masters testified, "during the Santucci administration, I, frankly, **don't remember *any training at all*.**" (Emphasis added). Masters also testified that formal Brady training at the QDA did not begin until 1992, at least a year after Roman's conviction.

313) In a sworn deposition in February 2020, former EADA James Quinn testified that he did not believe the QDA had *any* written Brady policy during the Santucci administration. He identified a memorandum that was circulated at the QDA in April 1992 which read, "in July 1991, the Training Bureau was created for the purpose of systematizing and formalizing

---

[4] This list was initially compiled by the plaintiff in Shih Wei Su v. City of New York, 2006-CV-687 (E.D.N.Y. 2006), who attached it to his pleadings. Since the time the list was first compiled, additional cases have been added and Roman, whose conviction resulted from the same type of misconduct that was rampant at the QDA during the Santucci and Brown administrations, had his conviction vacated on consent of the QDA, as did *at least* eight (8) other men: Felipe Rodriguez, Jaythan Kendrick, Chad Breland, Samuel Brownridge, George Bell, Gary Johnson, Rohan Bolt, and Shamel Capers.

training in the office and to fill a void which had existed in the office for *at least*, approximately, 14 years." Asked if he was familiar with the "void" referenced in the memorandum, Quinn responded, "I mean, **I was aware that *training was a problem in the office back then*. There was no formalized training program**." (Emphasis added).

314) Quinn was unable to recall any written materials that were distributed to prosecutors at the QDA during the Santucci administration "concerning procedures for investigating or disciplining prosecutors who were alleged to have committed misconduct" and claimed he was unable to think of "very many ADAs who violated the rights of criminal defendants."

315) QDA leadership was aware of training, supervision, and disciplinary deficiencies in the Office that were likely to affect the constitutional rights of criminal suspects and defendants but evinced an apparent disregard to these problems before and at the time of Roman's prosecution and for many years after.

316) After Roman's prosecution, no remedial measures were taken to address the inadequacies of ADAs who began working in the Office when the absence of formalized training was a "problem" at the QDA or to seriously review questionable convictions obtained during that time period. See, Brownridge, *infra*. Quinn testified that he was unable to recall any office-wide training program, once Brown became DA, for ADAs who began working in the Office and were trained and promoted under Santucci. Instead, as detailed *infra*, ADAs who had already advanced in the Office when training was a known "problem" were promoted further and permitted to continue prosecuting cases without remedial training or supervision and were even assigned to train new ADAs.

317) During the tenures of DA's Santucci and Brown, no trial prosecutor was disciplined or sanctioned by the QDA for actions which an appellate court found to be improper or to

constitute misconduct. No prosecutor was disciplined for any Brady violation before Roman's trial notwithstanding that serious Brady violations, including the withholding of impeachment material, had occurred.

318) QDA prosecutors knew they were likely to be rewarded for winning but would suffer no genuine negative personal consequences in the event their misconduct was exposed.

319) Prosecutors were encouraged to win at any cost, including by violating the Constitution. They were aware that the DA, due to his indifference, had not promulgated or published any employee handbook or other office-wide publication setting forth either rules of behavior for prosecutors in handling criminal investigations or prosecutions, or procedures for disciplining prosecutors who violated established rules of behavior.

320) The DA's indifference to compliance with constitutional requirements, especially Brady disclosure obligations, was evinced by the QDA's "Internal Wall" policy, which flagrantly violated constitutional requirements remained in effect after a court directed it be discontinued.

321) Under the "Internal Wall" policy, prosecutors assigned to try criminal cases were kept in the dark, and encouraged not to inquire, about promises or benefits that their cooperating witnesses received from other prosecutorial personnel to induce them to testify favorably for the DA's Office.

322) The predictable result of this policy was that the defense and the jury wouldn't learn about the circumstances known to the DA's Office that potentially affected such witnesses' truthfulness and that false testimony by such witnesses denying receipt of promises and/or benefits would go uncorrected.

323) Prosecutors were trained in this policy under DA Santucci, and DA Brown permitted it to continue long after a trial judge, the Appellate Division, and the Court of Appeals each condemned it as a flagrant violation of the constitutional rights of the accused.

324) At the joint trial of co-defendants Gary Steadman and Raymond Blair in 1990 (the same year Roman was prosecuted), a key prosecution witness testified to certain benefits he had received from the QDA but denied prosecutors had promised him leniency with respect to pending felonies that could result in a lengthy period of imprisonment.

325) Later in the trial, the defense learned that this testimony was false; in fact, a senior prosecutor in the QDA had promised the witness's attorney that, in exchange for favorable testimony, the witness could avoid prison altogether.

326) Steadman and Blair were convicted of manslaughter and related offenses.

327) Ruling on a defense motion based on this late revelation of Brady material, the trial court found that the deal was "deliberately not communicated from the executive level of the [QDA] to the trial attorneys." The court denounced the "Internal Wall" policy and directed that it be discontinued, stating:

> "[T]his court cannot adequately express in words its disgust that the trial was impacted by such a shabbily structured cooperation charade…Any reasonable interpretation of what happened here must conclude that…the executive level of the [QDA] improperly attempted to shield a witness from 'Brady' evidence disclosure…It is hoped that this…will never again be attempted."

328) The court nevertheless denied the defense motion since the jury had eventually learned of the promises to the witness.

329) The Appellate Division "share[d] the trial court's condemnation of the tactics employed" by the QDA but affirmed the conviction for the same reason. People v. Blair, 186 A.D.2d 665, 668 (1992), *rev'd sub nom.* People v. Steadman, 82 N.Y.2d 1 (1993).

330) The Court of Appeals, however, ordered a new trial, ruling that "the scheme employed by the [QDA]," which revealed ***"a determined effort…to avoid" its Brady obligations***, "undermine[d] the purposes of the Brady and [related state] rules" and "cannot be condoned." Steadman, 82 N.Y.2d at 6-7 (Emphasis added).

331) Despite acknowledging the misconduct that occurred in the Blair and Steadman cases was widely known throughout the QDA, James Quinn said he did not know whether DA Santucci conducted any investigation into what happened or whether anyone was disciplined for what happened. Thus, the message sent to the Office at large was that even conduct repeatedly disapproved of by courts would not result in discipline or even be addressed. By contrast, as explained *infra*, promotions were routinely announced to the entire QDA.

332) Two years after the trial court in the Blair and Steadman cases excoriated the QDA for the "Internal Wall" policy and *expressed its expectation that the practice would be halted*, the policy was *still* in effect *after* DA Brown took office.

333) At the attempted murder trial of Shih Wei Su in 1992, a crucial prosecution witness falsely denied, under questioning by the prosecutor, that he had received any leniency in exchange for his testimony. The prosecutor failed to correct the testimony and falsely vouched for the truthfulness of the testimony in summation.

334) The prosecutor later testified under oath that she had been trained in the "Internal Wall" policy. That is, she had been trained to commit misconduct that the QDA was admonished for and directed to discontinue.

335) Years later, over the QDA's vigorous opposition, a judge directed the disclosure of a sealed plea transcript which showed that the witness had received an explicit deal for leniency in a robbery case in exchange for testifying against Su.

336) For years, the QDA resisted Su's efforts to overturn his fraudulently obtained conviction.

337) Finally, after Su had served 12 years in prison, the United States Court of Appeals for the Second Circuit ordered a grant of a federal writ of habeas corpus, overturning Su's conviction and directing his retrial or release.

338) The Court condemned Su's prosecutor, Linda Rosero, for having "knowingly elicited false testimony from a crucial witness," Su v. Filion, 335 F.3d 119, 121 (2003), whose "credibility could not help but be central to the deliberations of any reasonable jury," [Id. at 129], and then "bolster[ing that witness's] credibility" in a false summation. Id. at 125.

339) Subsequently, the QDA, knowing it lacked any witness to testify against Su, threatened him with a retrial and the potential of many more years in prison if he did not plead guilty to a reduced charge.

340) When Su insisted on his right to a new trial, the prosecutor suddenly dismissed the case on the scheduled trial date.

341) Policymakers at the QDA were evidently not the least bit disturbed by Rosero's behavior or the Second Circuit's condemnation of it.

342) After learning of the Second Circuit's opinion, ADA Rosero complained to DA Brown's second-in-command, Chief ADA John Ryan, that no one had warned her of the decision.

343) Ryan told her, "You are *just* going to have a bad day, **that's all**." (Emphasis added).

344) Another high-level prosecutor in the Office told her, "Don't worry, you're a good attorney. Everything will work out." (The discovery obtained in the lawsuit is summarized in Joel B. Rudin's article, "The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Officers or the Bar: Three Case Studies That Prove That Assumption

Wrong," 80 Fordham L. Rev. 537, 559-66 (2011), a copy of which is attached hereto as **Exhibit B** and is incorporated herein by reference.)

345) Petros Bedi was convicted of murder in 2000 after a key alleged eyewitness identified him as the shooter while denying the QDA had paid him any financial benefits in exchange for his testimony.

346) It took 12 years before Bedi finally succeeded in compelling the QDA, through a FOIL lawsuit, and over its resistance, to reveal its witness relocation file for this witness.

347) Contrary to the witness's false testimony, he had received approximately $23,000 in relocation benefits, including numerous cash payments totaling thousands of dollars, even though his identity had not been revealed and there could not possibly have been any threat to his safety.

348) The records showed that, after his identity was revealed at trial and, for the first time, he had a theoretical reason to fear for his safety, the payments stopped—he had literally been secretly bribed.

349) When Bedi then brought a motion to vacate his conviction in August 2012, the QDA resisted. It defended the prosecutor, Debra Pomodore, on the basis that, under the "Internal Wall" policy, she did not have actual possession or knowledge of the documents or the payments.

350) In their papers, the QDA "represent[ed] that their records relating to the Witness Security Program are maintained by Investigators in their office and, ***as a matter of custom*** in the [QDA], these records are not made part of the trial Assistant's litigation file." (Emphasis added).

351) The Court pointed out that this was no defense to Pomodore's violation of the QDA's disclosure obligations and vacated the conviction.

352) According to James Quinn, the reduction of cooperation agreements to writing first became QDA policy in 1991.

353) Recently, in litigation concerning the vacated murder convictions of co-defendants George Bell, Rohan Bolt, and Gary Johnson, QDA prosecutors have acknowledged "information silo" practices were in operation in the Office. Like the "Internal Wall" policy, these practices inhibited the transfer of discoverable information within the Office and resulted in foreseeable constitutional violations.

354) The QDA had no effective mechanism for prosecutors to obtain Brady information known to other prosecutors in their office. This practice made it easy for prosecutors disinterested in satisfying their Brady obligations to claim "plausible deniability" in relation to their knowledge of exculpatory materials.

355) Because the QDA had no effective mechanism for prosecutors to access information known to others in the Office, an ADA attempting to locate materials related to a particular topic or investigation could not easily do so.

356) The QDA provided no training to prosecutors on how to locate Brady material known to other prosecutors in the Office.

357) QDA policies and procedures inhibited prosecutors from learning of favorable information known to others in the Office.

358) Based on information he developed while reinvestigating the convictions of Bell, Bolt, and Johnson, CIU Director Bryce Benjet stated that "significant" Brady evidence of third-

party culpability was "not contained in the files of these defendants [Bell, Bolt and Johnson]."

359) This finding was confirmed by ADA Charles Testagrossa, who co-prosecuted George Bell at trial.

360) Testagrossa has stated that all the material in question, including his own handwritten notes referring to an alternate suspect, were in a separate file with a separate ADA in a separate bureau.

361) The evidence of third-party culpability was housed in the Major Crimes and Career Criminal Bureaus where the alternate perpetrators were being investigated for crimes similar to those for which Bell, Bolt and Johnson were convicted.

362) The Bell, Bolt and Johnson files were in the Homicide Bureau.

363) As a result, ADA Brad Leventhal, who tried the case against Bell with ADA Testagrossa, and the cases against Johnson and Bolt alone, could falsely claim that the QDA did not have exculpatory evidence of third-party culpability.

364) As ADAs Gary Fidel, Ira Dorfman, and Neal Morse have admitted, this *office-wide practice* of isolating information to each case's particular bureau with no policies or procedures to share information between bureaus was in violation of the requirements of Brady and its progeny.

365) In response to an October 1997 discovery motion filed by Bell, ADA Fidel had falsely affirmed, unequivocally, that "[t]here [was] no evidence pointing to any uncharged person as being involved in the crimes charged." People v. Bell, 71 Misc.3d 646, 654 (2021).

366) ADA Testagrossa stated that the failure to produce these exculpatory files in Bell's case was a "law office failure" that occurred as a result of "silo procedures" engaged in by the QDA.

367) Testagrossa stated that because of these "silo" procedures, there was minimal sharing of information among the various bureaus and divisions. He explained that these various bureaus were located in different buildings and thus were "not physically available to prosecutors outside of those bureaus and their contents were not shared."

368) ADA Leventhal also called the failure to produce Brady material a "law office failure" by which "material, known to be gathered by others was not made available to [the ADAs trying the case]."

369) Leventhal similarly described the QDA's practice of isolating information within bureaus and admitted that "information silos developed that on occasion failed to ensure that necessary information sharing [sic] resulting in rare failures to meet all discovery obligations."

370) Leventhal stated that the failure to turn over exculpatory material "was the result of the organization's [referring to the QDA] architecture during the last millennium, which created an environment in which *significant possibilities for the failure to share critical information existed.*" (Emphasis added).

371) Leventhal acknowledged that when Bell, Bolt and Johnson were prosecuted in 1999-2000, these information sharing policies were sufficiently inadequate that the QDA had to later develop procedures to "ensure that those [prosecutors] assigned to matters were adequately advised of information necessary to meet all statutory and constitutional discovery, Brady and Giglio, obligations."

372) The QDA could have developed such procedures at the time Bell, Bolt and Johnson were prosecuted, or a decade earlier, when Roman was prosecuted, but did not. ADA Leventhal stated that the "blame" for failing to produce the exculpatory material in the Bell, Bolt and Johnson cases should not be placed on "the last prosecutors in the long line of those who were tasked with assignments in this matter, but, rather…[on] the organization as an entity."

373) In essence, Leventhal says, "don't blame me, blame the practices of the QDA."

374) QDA records indicate that on the day of Bolt's sentencing, the last of the three co-defendants, ADA Leventhal was promoted to Deputy Chief of the Career Criminal Major Crimes Bureau and given a substantial raise.

375) The QDA encouraged a "look only within your own bureau" approach to discovery. ADA Dorfman stated that the QDA "fail[ed] to adequately train junior ADA's" like himself and that *he has no recollection of* ***ever*** *being trained on his Brady obligations* ***at all.***

376) In short, the QDA both deliberately siloed information within each bureau, thus walling off discoverable information, and then did not train its prosecutors on their discovery obligations.

377) As a result, individual prosecutors could falsely deny that the QDA had exculpatory material the Office did in fact have, because it was not in the prosecutor's personal possession.

378) Because the third-party culpability evidence in the Bell, Bolt and Johnson cases was not properly stored and/or not sufficiently accessible, ADA Benjet concluded that the trial prosecutors' denials of the existence of such material were made "in good faith."

379) However, in vacating the convictions of Bell, Bolt and Johnson, in 2021, Justice Joseph Zayas disagreed and specifically recognized that no affirmations from the ADAs involved in

the defendants' prosecution had been submitted "so there is *no explanation* for why this information was not disclosed, let alone an explanation that would support the conclusion that the nondisclosure was fairly attributable to negligence, inadvertence, *or anything else short of deliberate suppression.*" Bell, 71 Misc. 3d at 664. (Emphasis added) Justice Zayas was left with "the distinct impression" that the suppression of the third-party culpability evidence in the Bell, Bolt and Johnson cases "was *not an isolated instance of misconduct*, but *part of a larger pattern of behavior* that was ***calculated*** *to deprive the defendants of fair trials*…" Id. at 665. (Emphasis added).

380) Indeed, it seems that when it came to protecting the constitutional rights of criminal suspects and defendants, the QDA's policy was to do the bare minimum, if anything. For instance, the QDA long maintained the position that a prosecutor's duty to investigate the criminal history of their witnesses was satisfied by merely asking the witness, accepting their answer(s), and conducting no further investigation regardless of the circumstances of the crime or what they learned about the witness. The prosecutorial misconduct in Turner v. Schriver, 327 F. Supp.2d 174 (2004), which resembles misconduct committed by the trial prosecutor in Roman's case, and the continuing conduct of the QDA in defending Roman's fraudulently obtained conviction, is demonstrative on this point.

381) Clinton Turner was convicted of robbery in 1988 after complaining witness William Clarke claimed Turner robbed him after a confrontation outside of a topless bar in the early morning of October 17, 1987. Notwithstanding his presence at a bar at 4:45 am, Clarke claimed he did not drink. Queens ADA Jesse Sligh permitted Clarke to testify that he was never arrested or convicted of a crime.

382) Turner testified and acknowledged his own criminal record but denied robbing Clarke. He testified that Clarke was one of several people he sold drugs to in order to satisfy his own habit, but that Clarke had failed to compensate him several times and he (Turner) had begun giving Clarke fake drugs as a result.

383) In summation, ADA Sligh argued that Clarke's having been at a topless bar at 4:45 am was irrelevant, and emphasized that Clarke did not drink, smoke, or have a criminal record. Sligh also repeatedly referenced Turner's criminal history. Turner was convicted following a single day of deliberations.

384) In October 1993, Turner submitted a C.P.L. § 440.10 motion supported by an affidavit from Clarke admitting that: (1) he had a serious cocaine and crack addiction at the time of the alleged robbery as well as a serious alcohol dependency; (2) he lied about his criminal record and had been arrested and/or convicted of numerous crimes; and (3) Turner's testimony concerning the altercation about fake drugs and that the robbery never occurred was truthful. The QDA opposed Turner's motion in papers supported by an affirmation from ADA Sligh but declined to run a rap sheet on Clarke. Turner's motion was denied without a hearing.

385) Turner filed a second C.P.L. § 440.10 motion claiming that ADA Sligh knew or should have known of Clarke's record. The QDA responded with the same affirmation from Sligh but *again* declined to run a rap sheet on Clarke. Turner's motion was denied without a hearing. The Court credited Sligh's statement that Clarke told him he had never been arrested or convicted of a crime and held that "there was no Brady violation because the District Attorney was under no obligation under New York Law to check the possible criminal record of any witness '*absent a belief that the witness has a record* ***or that the witness has been***

***untruthful in telling the prosecutor that he has never been convicted.***'" Turner v. Schriver, 327 F. Supp. 2d 174 (2004)(Emphasis added).

386) Turner filed a *pro se* petition for a writ of habeas corpus and was granted a hearing in April 2003. ADA Sligh testified that: (1) he knew before trial that Turner's defense was a drug deal gone wrong; (2) no response was made to a request in Turner's pre-trial omnibus motion seeking the criminal backgrounds of witnesses or, alternatively, the names and addresses of witnesses in the event the prosecution was unwilling to inquire into their criminal backgrounds so the defense could investigate; (3) other than asking Clarke, he made no other inquiries to find out if Clarke had a criminal record before trial, nor in response to either of Turner's C.P.L. § 440.10 motions; (4) he could have asked a paralegal to run a rap sheet on Clarke using only his name; (5) he had requested rap sheets on other witnesses if he had information that led him to believe they had criminal records; and (6) Clarke's record showed he had at least six arrests in Queens before Turner's trial, and this information was kept in docket books at the QDA. Schriver, 327 F. Supp. at 182.

387) The Eastern District found that: (1) Turner had specifically requested the criminal records of the People's witnesses; (2) the circumstances of the alleged crime and ADA Sligh's knowledge of Turner's defense "pointed to the need to check Mr. Clarke's record before offering him as a witness, and indeed offering him as a witness *without a record*"; (3) Clarke's criminal history "was readily available to the prosecution had it made the most modest effort"; and (4) under the circumstances, where credibility was the central issue and a focal point of Sligh's questioning and arguments, his statements to defense counsel and the jury that Clarke had no record violated due process. Id. at 184-85 (Emphasis in original).

388) The Court stated that if ADA Sligh had "fulfilled his Brady obligation, he not only would have known that Mr. Clarke had a record, he also would have known that Mr. Clarke had lied to him about his record. Therefore, there is a Brady violation not only for the failure to turn over material impeachment evidence, but also for eliciting testimony that the prosecutor knew or should have known to be false." Id. at 186. Accordingly, the Court vacated Turner's conviction over fifteen years after it was obtained and after several successful attempts by the QDA to defend it.

389) While Clinton Turner remained incarcerated and then lived on parole as a convicted felon, ADA Sligh continued to prosper at the QDA. Within three years of Turner's conviction, Sligh was given a substantial raise and promoted to an executive position in the Office, which he held through the vacatur of Turner's conviction and until his retirement in 2020.

390) Further leading to the manufacturing and use of coerced or unreliable evidence was the QDA practice of using improperly or unlawfully obtained identification evidence in criminal proceedings.

391) James Quinn testified that QDA prosecutors ***knew*** show-up procedures were improper. When asked whether "it is ever appropriate for the police to take an eyewitness bring that witness to the precinct and then have the eyewitness view a suspect [who is] in a holding cell at the precinct," (precisely how Roman was exhibited to Anderson) Quinn claimed that "[t]he ADAs know show-ups are bad, don't do them."

392) During the 1994 lineup involving a murder suspect, Kareem Bellamy, an eyewitness failed to positively identify Bellamy.

393) A Queens ADA, Stephen Antignani, was present to supervise the lineup and, in theory, to ensure it was conducted fairly.

394) Knowing that, without a positive identification, there would be an insufficient basis to obtain an indictment, Antignani permitted a detective to take the witness into a private room, where the two talked privately.

395) After the witness emerged from the room, he suddenly claimed to be able to positively identify Bellamy.

396) ADA Antignani used this manufactured "identification" in the grand jury to obtain an indictment.

397) He did so, as did an unknown prosecutor in Roman's case, by misleading the grand jury into believing the eyewitness had made a reliable positive identification without revealing information that called the reliability of that identification into serious question.

398) Bellamy was convicted and spent 14 years in prison before his conviction was overturned based upon newly discovered evidence of innocence.

399) Similarly, in the Ricardo Benitez case in 2009, Linda Grillo, a prosecutor attending a lineup to ensure its fairness, knew the lineup was grossly suggestive but allowed it to go forward.

400) While the suspect was in his 50's and appeared gaunt, sickly, and disheveled, the fillers were all clean-cut, lighter-skinned policemen who were about 15-20 years younger.

401) Even though the QDA records described the lineup as "terrible," a prosecutor still used it to obtain an indictment.

402) The grand jury was informed only of the identification, not of the extraordinarily suggestive circumstances by which it was obtained.

403) Thereafter, a prosecutor misled a hearing judge into allowing an in-court identification at trial by introducing false testimony from the witness that her initial observation of the suspect lasted five minutes, when a surveillance video established it had really lasted mere seconds.

404) Benitez was convicted and spent almost six years in prison before his conviction was reversed and he was acquitted at a retrial.

405) Upon information and belief, employees of the QDA caused numerous additional false arrests, prosecutions, and convictions by improperly influencing identifications and knowingly using improperly obtained identification "evidence" in criminal proceedings.

406) Further contributing to the anything-goes atmosphere at the QDA was the knowledge among prosecutors that the Office would personally attack judges who made unfavorable decisions, try to get them transferred out of criminal court, or try to block their reappointment rather than discipline ADAs who were found by a court to have engaged in misconduct.

407) For instance, in Matter of Brown v. Blumenfeld, 89 A.D.3d 94 (2011), DA Brown sought to prohibit Justice Joel Blumenfeld from, among other things, *even considering* whether QDA prosecutors had violated the Rules of Professional Conduct and the former Code of Professional Responsibility.

408) The leadership of the QDA knew that even a single instance of prosecutorial misconduct, if it was not met with disciplinary action, could poison the atmosphere of the entire office, as Acting District Attorney John Ryan acknowledged during a sworn deposition in Bellamy v. City of New York, 12 CV 1025 (AMD) (PK) (E.D.N.Y.). Ryan also acknowledged the dire consequences inflicted on those who were wrongfully convicted and agreed that "such dire consequences to others justify dire consequences to prosecutors who act unethically."

409) During civil discovery in Bellamy, the City disclosed a handwritten note from DA Brown to then-Chief Assistant Ryan.

410) The note was attached to the appellate decision in People v. Walters, 251 A.D.2d 433 (1998), which characterized Queens ADA Claude Stuart's suppression of Brady material and intentional use of misleading arguments as "egregious," "improper" and "an abrogation of [his] responsibility as a prosecutor." Brown wrote to Ryan, "Let's discuss how to handle—***I think we've been getting away with this kind of stuff for a long time***." (Emphasis added).

411) Richard Brown served as a justice of the Appellate Division, Second Department, from March 1981 until June 1, 1991, when he became the District Attorney for Queens County. Brown served as District Attorney until his death in May 2019.

412) There were numerous decisions by the Second Department during the period preceding his initial term as DA, when Brown was a justice of the same court, excoriating Queens ADAs for violating the constitutional rights of criminal defendants.

413) Over 50 such decisions, from the period 1981 through 1990, are listed in **Exhibit A**, which is incorporated herein by reference.

414) These decisions were so numerous and strongly worded that they suggested the existence of an anything-goes culture and practice aimed at obtaining convictions no matter the cost to criminal defendants' constitutional rights.

415) Nevertheless, upon becoming DA himself in 1991, Brown, through his deliberate indifference, permitted this culture to continue.

416) He did so by failing to conduct internal disciplinary investigations or discipline prosecutors who were known to commit such violations, failing to refer such individuals for

possible discipline by the Appellate Division's Disciplinary or Grievance Committees, and failing to ensure they were properly trained or supervised.

417) Instead of disciplining prosecutors who were found to have violated the constitutional rights of criminal defendants, the QDA policy, custom, or practice under DA's Santucci and Brown was to give the prosecutors raises, promotions, and commendations, based in part on their record of winning at trial and extracting guilty pleas, even in weak cases, while ignoring or discounting judicial findings of misconduct by these prosecutors.

418) Before Santucci left office in June 1991, Eugene Kelly and Catherine Lomuscio received substantial raises, as did Debra Pomodore and Jesse Sligh, who prosecuted Petros Bedi and Clinton Turner, respectively, and Elizabeth Loconsolo. Lomuscio replaced Loconsolo as Deputy Chief of the Special Victims Bureau in January 1991, when Santucci promoted Loconsolo to Chief of the Organized Crime Bureau. In January 1992, the Second Department reversed the conviction of the defendant in <u>People v. Baba Ali</u>, 179 A.D.2d 725 (1992), in part because of the prosecutor's "inexcusable" failure to disclose medical records that "tended to exonerate the defendant" and which a court had ordered her to disclose. Loconsolo prosecuted the case.

419) As a justice of the Appellate Division during much of John Santucci's tenure as Queens District Attorney, Richard Brown was acutely aware of the training, supervision, and disciplinary shortcomings at the QDA, and the rampant culture of misconduct evinced by numerous judicial decisions. Nevertheless, upon succeeding Santucci as Queens DA, Brown displayed an inexplicable apathy to these ongoing problems. During Brown's tenure as DA, the QDA fought doggedly to preserve Roman's conviction, rewarded the prosecutors who fraudulently obtained it and kept it in place, and withheld, ignored, or mismanaged evidence

bearing on Roman's persistent claims of innocence. As with Shih Wei Su, Petros Bedi, Clinton Turner, and numerous other wrongfully convicted defendants, the QDA steadfastly and arbitrarily opposed Roman's attempts to overturn, or even litigate, his fraudulent conviction, despite the knowledge that it was obtained by a prosecutor with a record of misconduct and during a period in which QDA executives knew there was a training "problem" and no disciplinary policy.

420) During DA Brown's tenure, the QDA created the Eugene J. Kelly, Jr. award for outstanding ADA of the year, signifying approval and commendation of a prosecutor who, during Roman's prosecution, brazenly misled the Court, concealed evidence, and affected violations of Roman's constitutional rights.

421) The creation and name of the award communicated the QDA's position that ADA Kelly was a model prosecutor whose conduct other ADAs in the Office should seek to emulate—which is what they evidently did. For instance, in 2012, the Second Department found that ADA Rachel Buchter engaged in improper conduct in summation at two separate trials in 2010. In 2016, the Second Department again found that ADA Buchter made improper comments in summation at a 2011 trial. A year later, in 2017, Buchter was awarded the Kelly award for outstanding ADA of the year. In January 2019, the Second Department vacated Diamonte Alexander's 2016 murder conviction because the trial court failed to determine whether Buchter provided sufficient non-pretextual, race-neutral explanations for her challenge to a prospective black juror. Upon information and belief, Buchter has repeatedly been the subject of complaints or judicial statements concerning summation misconduct, but continues to occupy a supervisory role at the QDA.

422) Following Roman's wrongful conviction and incarceration, the ADAs named herein, along with and in addition to other prosecutors, continued to suppress, manipulate, mismanage, and/or denigrate evidence that undermined the credibility of the evidence used to convict Roman and supported his claims of innocence, despite his repeated efforts to obtain it, and consistently resisted Roman's efforts to challenge his wrongful conviction.

423) Roman's first C.P.L. § 440.10 motion, submitted in April 1995, was supported by evidence demonstrating that, just as defense counsel contended at trial, Paul Anderson had been shot by Lloyd Witter months before Witter was murdered at Anderson's residence during a shootout where Anderson was inexplicably left unscathed. The QDA's pattern of indifference to innocence and constitutional violations was clearly displayed. As with Clinton Turner's motions, the QDA opposed Roman's motion without investigating the evidence in question. Without submitting an affirmation from Catherine Lomuscio or even disputing the authenticity of the evidence that Witter shot Anderson, the QDA argued that the evidence was "merely impeaching" and the motion should be summarily denied without a hearing, which is what happened. Over two decades later, Justice Johnson found the evidence that Anderson had been shot by Witter to be the most persuasive proof in support of the motion to vacate Roman's conviction.

424) In early 1996, the executive leadership of the QDA compiled a Prosecutorial Misconduct Survey ("The Survey").

425) As the City confirmed in a Fed. R. Civ. P. 30(b)(6) deposition in December 2020 in another matter, the Survey found that, in *at least* 39 cases, either an appellate court held that the QDA committed misconduct (22 cases), or the QDA admitted misconduct absent such a finding (17 cases).

426) The prosecutorial misconduct in the Survey included numerous types of misconduct resulting in constitutional violations, including Brady and related discovery violations, summation misconduct, improper reliance on false evidence, and prejudicial degradation of criminal defendants.

427) The misconduct covered by the Survey constituted only a fraction of the total instances of misconduct the QDA had committed between 1988 and 1995 and also did not include numerous additional incidences between 1985 and 1988, when DA Brown was a justice of the Appellate Division and became aware of the pervasiveness of prosecutorial misconduct in the QDA.

428) Despite the serial misconduct the Survey revealed, the City has admitted that the QDA essentially failed to take any remedial action in response to the revelations.

429) DA Brown took no action at all in response to the Survey.

430) Chief ADA Barry Schwartz was Brown's second-in-command at the time of the Survey and was delegated responsibility, *inter alia*, for discipline, promotions, and other supervision and personnel matters.

431) Schwartz has stated in sworn testimony that he has no memory of the QDA "taking any kind of action in response" to the Survey.

432) As damning as the Survey was, it contained a woefully incomplete summary of QDA prosecutorial misconduct in the early 1990's (and before).

433) A number of prosecutors apparently failed to respond to the Survey, and the Survey missed recent misconduct by a number of prosecutors who had recently left the QDA.

434) In 1996 Catherine Lomuscio was demoted from Deputy Bureau Chief to a line assistant position. In the same year, James Quinn encouraged Lomuscio to resign, and she did, and

with her law license intact, became a clerk for Judge Knopf. Neither the fact that Lomuscio was demoted, nor the fact that she was encouraged to resign, nor the basis for either, was *ever* disclosed to Roman by the QDA.[5] Instead, the QDA continued to disingenuously defend Lomuscio's conduct and Roman's conviction for at least another quarter of a century.

435) Upon information and belief, despite knowledge of prior judicial decisions referencing misconduct by Lomuscio, and the fact that she was demoted and encouraged to resign in the same year, the QDA never conducted a review of the cases she prosecuted.

436) After demoting the prosecutor that obtained Roman's conviction and encouraging her to resign, the QDA opposed Roman's direct appeal, petitions for writs of habeas corpus and error coram nobis, and two C.P.L. § 440.10 motions.

437) Despite acknowledging, over a decade earlier, that the QDA had been "getting away with" misconduct for a long time, DA Brown first enacted a "Committee on Professional Standards" ("COPS") in 2012, more than two decades after Roman was convicted. According to John Ryan, the QDA had no previous written disciplinary policy for prosecutors who committed misconduct.

438) The QDA's mismanagement included the purported loss of the Office's entire file for Roman's prosecution in or around 2015. This mismanagement had the effect of violating Roman's constitutional rights by infringing upon his fundamental liberty interest in demonstrating his innocence with new evidence. See, Newton v. City of New York, 779 F.3d 140 (2015). Roman's file serendipitously went missing although he had repeatedly litigated his conviction since trial. By contrast, all charges against Roman's co-defendant, Hollis

---

[5] The fact that Catherine Lomuscio was demoted and encouraged to resign after Roman's trial was never disclosed by the QDA. This information was discovered independently after Roman's exoneration through review of civil deposition testimony concerning other Queens wrongful convictions and testimony elicited from Lomuscio in relation to Roman's currently pending Unjust Conviction and Imprisonment claim.

Laylor, were dismissed in April 1994 and, upon information and belief, there was no further litigation concerning Laylor's case. Nevertheless, the QDA file for Laylor's prosecution apparently remains intact. Moreover, materials that were central to the QDA's determination that Roman was wrongfully convicted, including the handwritten descriptions taken from Paul Anderson by Detective Loguercio, were not included in the police file provided by the CIU but disclosed after the Office's certification that Roman's file was lost. Accordingly, there are reasons to question the veracity of the Office's certification of a lost file.

439) In his 2020 decision vacating Samuel Brownridge's 1995 conviction for murder, Justice Joseph Zayas wrote that:

> "Before District Attorney Katz took office, the Queens County District Attorney's Office did not have a conviction integrity unit. Instead, senior assistant district attorneys were assigned to review colorable claims involving wrongful convictions. The relative dispatch with which DA Katz's conviction integrity unit has reinvestigated this matter and determined that Brownridge's conviction should be vacated perhaps calls into question the wisdom of that earlier approach." People v. Brownridge, 68 Misc.3d 583, FN 4 (2020).

440) Upon information and belief, the QDA was the last prosecutorial office in New York City to form a Conviction Integrity Unit. Under DA Brown's administration, the Office would assign Queens ADAs, molded according to QDA practices and procedures and operating according to Office priorities at their discretion and leisure, to investigate claims of wrongful conviction. The predictable result was that Queens ADAs would find, in reviewing the conduct of fellow Queens ADAs, that their colleagues had done nothing wrong and, instead, suppress evidence and seek to preserve and/or justify convictions.

441) For instance, under the QDA's former model, ADA Richard Schaeffer was assigned to reinvestigate the conviction of the defendant in Brownridge, *supra*, in 2018, after he had successfully defended the conviction at a 2004 C.P.L. § 440.10 hearing. No determination

had been made as a result of Schaeffer's efforts as of January 2020, when Melinda Katz took office as Queens District Attorney and assigned the defendant's case to her newly-formed CIU. In just a few months, the CIU investigated and determined the defendant was actually innocent.

442) ADA Schaeffer was also assigned to investigate Roman's claim of innocence under DA Brown's administration from approximately 2013-2018. In that time, Schaeffer allegedly failed to obtain the evidence that DA Katz's CIU compiled in just 16 months, which prompted the QDA to agree to vacate Roman's conviction and dismiss the underlying indictment.

443) Although Catherine Lomuscio evidently told ADA Schaeffer in 2013 that Jomo Kenyatta was "confused" and "hard to understand" at the time of Roman's trial, and that Paul Anderson admitted he wasn't threatened. This was not disclosed to Roman until after his exoneration. Schaeffer's conversation(s) with Lomuscio were memorialized in a single page of handwritten notes.

444) Also in 2013, ADA Schaeffer spoke with Paul Anderson about the evidence that Anderson was shot by Lloyd Witter. As with Lomuscio, Schaeffer's conversation(s) with Anderson were memorialized in a single page of handwritten notes. Anderson acknowledged that the identifying information on the hospital records was accurate but claimed the date of birth listed was not correct and that the records did not pertain to him. When Schaeffer pointed out that the same date of birth appeared on Anderson's March 17, 1989, statement to Detective Pepey, Anderson responded that Pepey must have heard him wrong. Anderson's statements to Schaeffer were not disclosed until after Roman's exoneration.

445) Although ADA Schaeffer spoke with Jomo Kenyatta by telephone and visited him in-person in Florida along with Detective Investigator Bernard Porter, only a single page of notes memorializing Schaeffer's conversation(s) with Kenyatta were disclosed to Roman. Schaeffer's notes reflect that when he called Kenyatta in 2014, Kenyatta inexplicably claimed to believe that Schaeffer—a white male Assistant District Attorney from New York City—was the long-deceased Jamaican native Lloyd Witter "although [his] voice had changed."

446) In or around 2017, following a FOIL request, Roman received recordings of 911 calls that established a significant disparity between the timing of the shooting and police response as established by the 911 recordings, and the timing as claimed during witness testimony at Roman's trial. They also contradicted Anderson's trial testimony.

447) Roman submitted a C.P.L. § 440.10 motion based on Brady violations and newly discovered evidence.

448) After Roman's initial motion was submitted in 2017, a meeting was held at the QDA to discuss the evidence and whether the Office would consent to vacate Roman's conviction. ADAs Robert Masters, Richard Schaeffer, and Christopher Blira-Koessler were in attendance. ADA Schaeffer revealed Jomo Kenyatta's alleged mental deterioration and (to some degree) the QDA's efforts to have Kenyatta evaluated, acknowledged the existence of a neurological report in the QDA's possession concerning Kenyatta, and referred to the report as Brady material.

449) Subsequently, Roman submitted a letter to the hearing court requesting disclosure of materials concerning Kenyatta. In response, the QDA disclosed the ultimate report drafted by Dr. Schuster, *but not* the earlier notes documenting Schuster's initial statements. Nor did the

Office disclose anything related to Kenyatta's criminal history. The partial disclosure of Dr. Schuster's statements was especially egregious where the result was an incomplete picture concerning Kenyatta's purported mental deterioration.

450) In their April 2018 opposition to Roman's motion, the QDA derided his claims as "manufactured, unsupported, and logic-defying allegations" and claimed to have "made efforts to acquire any evidence potentially relevant to the issue of [Roman's] guilt or innocence." The People wrote that "any rational view of [Roman's] claims, in conjunction with the trial record, will result in the inescapable conclusion that no such Brady violations occurred and that the relevant materials were all available to [Roman] and counsel throughout his trial."

451) In June 2019, ADA Masters was quoted as saying, in relation to Roman's discovery based claims, that there was "no document that [the QDA had] ever sought, that has ever been requested, that [the QDA had not] been able to find" and that Roman's claims concerning nondisclosure "defie[d] all sorts of logic" and would have been made earlier if they were valid.

452) Despite ***knowing*** the Second Department found that Catherine Lomuscio had committed misconduct *including discovery violations* that warranted reversal of another defendant's conviction *before* Roman's trial, the QDA disingenuously framed his discovery-based claims as "manufactured" and "logic-defying."

453) Moreover, ADA Masters indisputably knew that Lomuscio had been demoted but declined to disclose this information despite signing off on the People's opposition as Bureau Chief and making an extensive record in court arguing for the denial of Roman's motion without a hearing, which is what occurred.

454) Despite his active role in the QDA's opposition to Roman's third C.P.L. § 440.10 motion, during which Catherine Lomuscio was referenced *ad nauseum*, in November 2019 ADA Masters inexplicably claimed to be unable to recall Lomuscio's name, when she was demoted, or why she was demoted. Masters also failed to mention that Lomuscio was encouraged to resign or that she did.

455) As evinced by well over a hundred decisions listed in **Exhibit A**, throughout the tenures of both District Attorneys Santucci and Brown, courts repeatedly assailed the QDA for prosecutorial misconduct, yet there were no genuine adverse consequences to the prosecutors who were responsible and no change in office policy, practice, or procedure to prevent further instances of misconduct.

456) This misconduct included Rosario and Brady violations, suborning perjury, and improper opening statements and summations.

457) Instead of disciplining such prosecutors, the DA's policy, custom, or practice was to give them raises, promotions, positive evaluations, and commendations, based in part on their record of winning at trial and their productivity in trying a lot of cases and extracting guilty pleas even in weak cases.

458) The Office used evaluation forms, approved by the District Attorney or his Chief Assistant, with which bureau chiefs and other supervisors rated prosecutors in numerous categories of performance, but which nowhere asked for comment on their respect for or compliance with due process or fair trial rights of criminal defendants.

459) The evaluations were shown to the prosecutors who were evaluated in part for the purpose of communicating to them how successful they were being in implementing the goals of the QDA and the types of behavior the Office approved of and wished to encourage.

460) The completed evaluation forms would not reference court findings of misconduct or complaints by criminal defendants or their attorneys, no matter how egregious the misconduct.

461) The message to the prosecutors was that the Office only cared about how aggressive and successful they were in prosecuting and winning cases, not whether, in doing so, they violated the constitutional rights of the individuals they were prosecuting.

462) The Office kept no records of negative court decisions or of complaints against individual prosecutors so that it could identify prosecutors who repeatedly were the subject of such decisions or complaints and who required greater training, supervision, or discipline.

463) Thus, when a court found that a prosecutor had committed misconduct, it had no database or records from which to determine whether the same prosecutor had a history of engaging in similar or other misconduct.

464) The QDA kept no record of, and did not investigate, the failure of bureau chiefs and other supervisors to properly supervise staff attorneys to ensure that they complied with the due process and fair trial rights of criminal defendants.

465) Although supervisors were supposed to monitor members of their bureau closely enough to ensure that constitutional violations did not occur, executives in the office would not follow up with supervisors to find out why Brady violations, summation improprieties, or other misconduct found by a court had been possible or allowed to occur. Alternatively, complaints or concerns about rogue prosecutors in the Office were disregarded or suppressed by QDA leadership.

466) Prosecutors were incentivized to violate the constitutional rights of criminal defendants, since they knew that they were likely to be rewarded for winning but would suffer no

genuine negative consequences in the unlikely event their misconduct was exposed. Indeed, while defendants who were unjustly convicted through the misconduct of Queens prosecutors languished in prison for years, as Chief ADA Ryan told ADA Rosero after the decision in Su, the most a Queens prosecutor could anticipate after their misconduct was exposed was a bad day, **that's all.**

467) Some additional examples illustrate how the QDA created and maintained an office culture where prosecutorial misconduct was ignored, condoned, and/or rewarded.

### Prosecutor A[6]

468) In 1990, QDA prosecutor A. prosecuted Robin Tellier and (1) failed to disclose Rosario and Giglio material; (2) misrepresented to defense counsel that all such material had been disclosed; (3) misrepresented to the court whether federal prosecutors who had debriefed a prosecution witness were observing the trial; and (4) allowed a prosecution witness to claim a loss of memory concerning prior crimes, when information concerning those crimes was contained in debriefing notes A. had failed to disclose.

469) The Grievance Committee for the Ninth Judicial District later admonished A. for concealing the notes, for a "misrepresentation" to the court, and for engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation."

470) On October 1, 1991, the QDA nevertheless gave A. an "excellent" evaluation, noting: "This Assistant likes to win and fights towards that end."

471) On May 1, 1992, the QDA gave A. a "very good" evaluation, stating that A. "is a true warrior in that he never backs down or is intimidated."

[6] With one exception, prosecutors here are identified by the first initial of their last name.

472) Neither evaluation mentioned the Tellier case or A.'s unethical and illegal conduct in that case.

473) On March 29, 1993, the Second Department found in People v. Kane that A. improperly "impl[ied] the defendant's guilt of an unrelated burglary" in opening and closing statements.

474) On September 1, 1993, Dan Saunders, then Chief of Homicide Trials at the QDA, gave A. an "outstanding" evaluation, noting that "[h]is judgment, temperament and advocacy skills are all outstanding."

475) Saunders' evaluation failed to mention either the Tellier or Kane cases, or A.'s improper conduct in those cases.

476) On February 2, 1995, the Queens County Supreme Court granted a motion to vacate the defendant's conviction in People v. Moustakis, a decision later affirmed by the Second Department. A. prosecuted the case. The courts found that A. "fail[ed] to turn over 16 pages of notes of detailed admissions by a prosecution witness concerning his prior criminal history," details of which the witness "forgot" on the stand.

477) On August 28, 1995, a few months after the first Moustakis decision, Chief ADA Schwartz announced to "the entire staff" A.'s promotion to Deputy Chief of the Supreme Court Long Island City Bureau. In that capacity, A. supervised 10-11 prosecutors.

478) Per his regular practice at the QDA, Schwartz promoted A. "in consultation with the district attorney."

479) About two weeks later, on September 15, 1995, following a March 31, 1995, argument, the Second Department reversed the conviction of the defendant in People v. Spinelli. A. prosecuted the case. The Court found that A. improperly cross-examined an officer about the

defendant's pre-trial silence, engaged in summation misconduct, and held that A.'s "conduct was fundamentally unfair."

480) Upon information and belief, the decision in Spinelli also had no effect on A.'s promotion or career trajectory at the QDA, and A. continues to occupy a supervisory position within the Office.

**Prosecutor B**

481) On December 13, 1993, DA Brown promoted prosecutor B. to Deputy Chief of the QDA's Supreme Court Kew Gardens Bureau.

482) On August 22, 1994, the Second Department reversed the conviction of the defendant in People v. Elder. B. prosecuted the case. The Court found that B. engaged in "flagrant" instances of "prosecutorial misconduct," and, in particular, summation misconduct which "substantially prejudiced [the] defendant's case."

483) Notwithstanding B.'s flagrant misconduct, B. did not receive any discipline, any adverse consequence, or any new training.

484) To the contrary, on April 27, 1995, Schwartz announced to "the entire staff" B.'s promotion to Chief of the Intake Bureau. In that capacity, B. supervised the intake for the entire QDA.

**Prosecutor D**

485) On September 26, 1994, the Second Department held that the prosecutor "exceeded the bounds of a proper summation" in People v. Fanfan. D. prosecuted the case.

486) On May 15, 1995, the Second Department reversed the defendant's conviction in People v. Moss. D. prosecuted the case. The Court found that D. (1) compared the defendant to Hannibal Lecter in the film "The Silence of the Lambs" during cross-examination of the

defendant; (2) asked the jury in summation to "place themselves in the position of victims being threatened by the defendant"; (3) disregarded the Court's Sandoval ruling; and (4) waved a knife during summation.

487) On August 25, 1996, Schwartz announced to "the entire staff" that D. had been promoted to Supervisor of the Training Bureau. In that capacity, D. taught prosecutors at the QDA how to prepare and try cases. D. received no discipline or further training as a result of the Fanfan or Moss cases.

**Prosecutor K**

488) On June 10, 1991, the Second Department reversed the defendant's conviction in People v. Stevens. K. prosecuted the case. The Court found that K. improperly stated in summation that, "if this defendant wasn't charged with sodomy…he should have been," although the defendant had not been charged with sodomy and the complainant had not testified that an act of sodomy occurred.

489) In July 1991, Chief of Training Andrew Zwerling and Schwartz made K. a co-supervisor of the new QDA Training Bureau. In that capacity, K. trained prosecutors in all aspects of trial practice.

490) On August 31, 1992, the Second Department reversed the defendant's conviction in People v. Clausell. K. prosecuted the case. The Court found that K. (1) failed to produce Brady material; (2) before opening statements, misrepresented to the trial court and defense counsel that the Brady material did not exist; (3) after an officer's testimony, again misrepresented to the trial court that Brady material did not exist; and (4) again failed to produce the Brady material. The defense subpoenaed the Brady material from the police department and received it nine days after the defendant's conviction.

491) After K.'s misconduct in Clausell, and notwithstanding that K. was a supervisor in the Training Bureau, the QDA did not discipline her, give her any additional training, place a note in her evaluation or personnel file, or apparently take any other remedial action.

492) To the contrary, the QDA gave K. twelve raises and three bonuses, and in 1997, promoted her, again, to a Bureau Chief position.

**Prosecutor L**

493) On February 29, 1988, the Second Department reversed the defendant's conviction in People v. Romain. L. prosecuted the case. The Court found that L. engaged in "gross distortion" in summation, "the magnitude of which was highly prejudicial."

494) In May 1994, in the case of People v. Moore, L. questioned several witnesses about prohibited evidence (pending and other prior crimes), then compounded the misconduct by summing up on the prohibited evidence.

495) On May 15, 1996, a QDA executive (John Ryan) wrote Chief of Appeals Steven Chananie, Schwartz, and Andrew Zwerling a memorandum acknowledging that L. "did engage in misconduct," which "we did not defend in our [appellate] brief." Ryan also wrote that the Second Department "***once again***, expressed their own concerns about the issue" of the QDA's "prosecutorial misconduct." The memorandum also noted DA Brown's "continuing concern about prosecutorial misconduct" at the QDA. (Emphasis added).

496) Nevertheless, after this memorandum, the QDA gave L. five raises, one bonus, and a promotion to Intake Supervisor.

**Prosecutor C**

497) On January 29, 1990, the Second Department reversed the defendant's conviction in People v. Nelu, "on the law and as a matter of discretion in the interest of justice." C.

prosecuted the case. The Court found that C. (1) violated the Rosario rule; (2) violated the defendant's attorney-client privilege in her cross-examination; and (3) "not[ed] with disapproval those remarks made by [C.] in summation which concerned the notice of alibi." The Court also directed that "upon remittitur, the People shall be precluded from using the defendant's notice of alibi to impeach him or his alibi witness, as [C.] did in the first trial."

498) In May 1989, C. was given a raise. In June 1989, a year after C. obtained the conviction of the defendant in Nelu, she was promoted to the Homicide Trials Bureau.

499) In September 1990, 7 months after the Second Department's decision in Nelu, *supra*, a Queens County Justice found that C. with withheld valuable information during a homicide trial after she represented that a witness had no criminal record although the witness was previously convicted of a felony by the QDA.

500) In January 1991, C. was promoted to Deputy Chief of the QDA's Special Victims Bureau ("SVB") although, upon information and belief, she had no previous experience prosecuting sex crimes or crimes against children or the elderly.

501) As early as April 1991, Alice Vachss, then Chief of the SVB, explicitly asked DA Santucci to transfer C., even if it were to leave the Bureau without a Deputy Chief and referred to C. as "a supervisory nightmare."

502) In May 1991, Vachss again asked Santucci to transfer C. before he left office and wrote, "I am asking you not to leave behind this unsolved problem." (Emphasis in original). In the same month, Vachss wrote EADA Spiros Tsimbinos that she was "growing increasingly uncomfortable signing off on" C.'s time sheets and requested that Tsimbinos assume that responsibility.

503) On May 13, 1991, Tsimbinos acknowledged in writing Vachss' concerns that C. was "lazy and not qualified for her position" but averred that "the District Attorney would not have appointed [C.]...if she was not qualified for the job," that Vachss had "failed to use [C.'s] talents properly," and that if she could not accept the DA's choice of C. as her deputy, ***she*** should "consider resigning or asking for a transfer to other duties."

504) In a memorandum to Tsimbinos dated May 20, 1991, Vachss wrote that "[C.] has stated, and you have endorsed, that *I have no supervisory control over her of any kind.* (Nor am I afforded the opportunity to evaluate her)...since you claim [C.] is perfectly well qualified already, you cannot now claim that her court watching is training her. You've already deemed such training unnecessary..." (Emphasis added)

505) In June 1991, DA Santucci gave C. a raise that increased her salary by more than 10%.

506) In late June 1991, C. was appearing for the QDA in the matter of People v. Shim.[7] In August 1995, Benjamin Shim's November 1991 conviction for manslaughter was reversed by the Second Department, because of the prosecution's failure to disclose Rosario material. People v. Shim, 218 A.D.2d 757 (1995).

507) When Richard Brown took Office, Vachss again requested that C. be transferred. Brown reportedly told Vachss, "I know what you're saying about [C.]. She doesn't belong there, but she's politically connected and I can't afford to make any moves before the primary." Instead of taking action concerning C., Brown terminated Vachss without explanation as part of his "talent restructuring program" and made C. Chief of the SVB.

508) C. has given sworn testimony that she was never reprimanded for her conduct in the prosecution of *at least* three defendants whose convictions have been reversed or vacated.

[7] During recent sworn testimony, C. has claimed an inability to recall whether she prosecuted Benjamin Shim.

509) QDA prosecutors A., B., C., D., K., and L. are merely a few examples of QDA prosecutors who violated the constitution in the years leading to Roman's conviction and following it, faced no adverse action, received no further training or supervision, and continued to thrive and progress in the Office.

510) Indeed, "Prosecutor C." was Catherine Lomuscio, who prosecuted Roman and his co-defendant, Hollis Laylor.

511) Roman's prosecution commenced with a false arrest by Detective Pepey, which Pepey quickly sought to bolster by prompting an unreliable and suggestive show-up identification.

512) Although former-EADA Quinn testified that Queens ADAs "knew" that show-ups are "bad" and not to be done, the first identification of Roman was manufactured through an unsupervised show-up procedure conducted by Detective Pepey with Paul Anderson to justify Roman's warrantless arrest. Pepey exhibited Roman to Anderson in this inherently suggestive procedure before even questioning Anderson. If Pepey reviewed the statement or descriptions Anderson had given to Detective Loguercio, he ignored them.

513) Queens ADAs including Eugene Kelly and Catherine Lomuscio made no effort to remedy the use of a procedure they "knew" was "bad" to generate *half* of the People's fraudulent evidence against Roman. Instead, as ADA Fidel did in George Bell's case, through misrepresentation, omission, and the suppression of specifically requested information, ADA Kelly misled a court into depriving Roman of an opportunity to evaluate the People's unreliable evidence. Kelly completely concealed the unreliable identifications reportedly made by Jomo Kenyatta, implied that Anderson had been the lone witness to identify Roman or provide an account of the shooting, and erroneously argued that there was no reason to evaluate the circumstances of Anderson's identification or statement(s).

514) ADA Kelly did this despite (or perhaps because of) the fact that Kenyatta had reportedly made inconsistent identifications to Detective Pepey that were elicited through aberrant procedures with no basis in NYPD protocol.

515) In March 1989, an unknown ADA presented misleading, inaccurate, and fabricated evidence to the grand jury to secure an unjust indictment against Roman. This presentation included false testimony by Detective Pepey, Officers Byrne and O'Brian, and Paul Anderson, and the suppression of exculpatory evidence demonstrating that the People's witnesses were unreliable. As ADA Antignani did in Kareem Bellamy's case, an unknown ADA used Anderson's manufactured identification to obtain an unjust indictment against Roman, while suppressing the initial descriptions and statement offered by Anderson and declining to present testimony from the detective that elicited them, to erroneously lead the grand jury to believe Anderson's account was consistent and reliable. ADA Lomuscio did the same at Roman's trial, by arguing that Anderson had given a consistent account to the police, taking affirmative steps to suppress Detective Loguercio's identity and role in the investigation, and arguing in summation that there were no issues with the identifications.

516) Although Roman had an alibi, which the QDA demanded and received notice of, the People made no good-faith effort to investigate his alibi. Instead, ADA Francesco Catarisano, in his investigative capacity, interrogated civilians including a teenager and a young mother, asked questions that invaded privilege and constitutional protections, and inaccurately memorialized pre-trial statements the Office solicited from Roman's witnesses, intentionally and/or negligently creating unreliable, false impeachment material. In November 2022, ADA Lomuscio acknowledged that the purpose of alibi notice was to provide the prosecution an opportunity to investigate the alibi but indicated that she understood pre-trial statements of

the sort taken from Roman's witnesses were solicited to generate impeachment material. Lomuscio claimed not to know if the QDA had a policy to secure such statements from alibi witnesses in 1989 or 1990.

517) ADA Lomuscio repeatedly made unsupported allegations of threats to both civilian witnesses on the record during Roman's prosecution, in addition to claiming that Paul Anderson was under constant police supervision in a safe house, and that Jomo Kenyatta was under police protection. However, the fact that records concerning the Witness Security Program were, as a matter of QDA custom, not made part of the trial assistant's file at the time of Roman's prosecution, further indicates that Lomuscio's representations concerning alleged threats to witnesses and the measures purportedly taken in response were baseless and/or fabricated.

518) In November 2022, ADA Lomuscio testified that she did not know whether the QDA had protocol, in 1989 or 1990, for responding to alleged threats to witnesses or whether the Office maintained safe houses for witnesses who were threatened. She also claimed not to know whether Paul Anderson was kept in a safe house or placed under police protection, and to be unable to recall who told her Anderson was threatened. Asked how she investigated the alleged threats to Jomo Kenyatta, Lomuscio said she spoke to Kenyatta, but couldn't recall when or the substance of their conversation. Nor did she give any indication that she had spoken to his fiancé, as she claimed on the record at Roman's trial. Lomuscio acknowledged that no one was ever identified as having made threats to either Anderson or Kenyatta or charged with having done so. Furthermore, she acknowledged that Anderson denied having been threatened.

519) It seems apparent that both Paul Anderson and Jomo Kenyatta believed or had reason to believe that they were afforded some degree of immunity or leniency in relation to their own criminal activities. Both men had indisputably engaged in conduct that exposed them to criminal prosecution, at least some of which was known to ADA Lomuscio. Both were also obviously unconcerned with the potential consequences of perjury or lying to Lomuscio. Indeed, both Anderson and Kenyatta dismissed attorneys the Trial Court appointed for them and agreed to answer questions about material issues they then lied about under oath, and Lomuscio falsely represented that Anderson had done nothing wrong on the record. Anderson has since indicated that he believed his sister's house would be seized if he did not cooperate with Roman's prosecution. Significantly, Roman's trial occurred before the QDA implemented a policy of reducing cooperation agreements to writing. In November 2022, Lomuscio claimed that Kenyatta was not granted immunity in Roman's case, but that she didn't know if he was ever granted immunity in any other. Lomuscio testified that Anderson would "drop by" the QDA unannounced, usually when she was in court.

520) Both the "Internal Wall" policy exposed in Steadman/Blair, and the information silo practices exposed in the Bell, Bolt, and Johnson cases, were in effect at the QDA at the time Roman was prosecuted. As a result, ADA Lomuscio was able to maintain "plausible deniability" about the readily ascertainable issues with her only civilian witnesses and falsely represent first that Jomo Kenyatta had no record whatsoever, and then that he was never been convicted of anything other than reckless driving. Even after it was conclusively proven that Kenyatta had been prosecuted for a violent felony by the QDA under an alias he denied under oath and pled guilty, demonstrating indisputably that he had lied to Lomuscio about his record, Lomuscio declined to make further inquiry. Thus, she committed the same type of

Brady violations as ADA Sligh in Turner v. Schriver, *supra*, because she was on notice that Kenyatta had lied to her about his criminal record and failed to even attempt to uncover the extent of his deception or to disclose his full record to Roman.

521) The QDA has since revealed that Kenyatta had been arrested under other aliases and was wanted for several violent crimes, including homicides, when he testified at Roman's trial. None of this information was disclosed at trial although materials revealed by the CIU concerning the Queens County murder of Lascalle Thompson that Kenyatta was a suspect in reference both ADA Lomuscio and Kenyatta's roles in Roman's prosecution.

522) Throughout Roman's prosecution, ADA Lomuscio made repeated representations about her knowledge of her prosecutorial obligations, or her having fulfilled those obligations. However, the record demonstrates that Lomuscio engaged in the same types of misconduct that repeatedly occurred at the QDA under DA's Santucci and Brown, including, *inter alia*:

a. Making misrepresentations to gain favorable rulings or a strategic advantage (for instance, regarding the pre-trial identifications and statements, alleged motives, and her own "strategically" worded Sandoval statement) and to the jury in summation (in numerous instances and in relation to numerous subjects);

   - During her November 2022 deposition, ADA Lomuscio acknowledged that: a prosecutor should avoid omitting information and be accurate when making a Sandoval representation; she made no statement when the Court said a Sandoval hearing was not necessary for Roman; and, it would have been appropriate for her to make a statement if she felt otherwise.

b. Failing to investigate the backgrounds of her witnesses despite clear reason to do so;

c. Making herself an unsworn witness and placing her own credibility at issue;

d. Permitting false or misleading testimony and evidence to go uncorrected;

e. Committing discovery violations including the failure to disclose Brady and Rosario material in a timely manner or at all (including evidence of third-party culpability that called into obvious question the merits of the allegations against Roman from their inception);

f. Failing to respond to what effectively amounted to specific requests for Brady material;

g. Disregarding court rulings and evidentiary procedure;

h. Failing to investigate Roman's alibi and denigrating the defense evidence (such as the outrageous and inflammatory suggestion that Roman did not have a "real alibi" or the statement that Professor Cohen's testimony was "worthless" and "a waste of everyone's time";

i. Engaging in burden shifting including in relation to Roman's post-arrest silence and alibi defense, and violating other fundamental rules of conduct intended to ensure the fairness of the trial; and,

j. Persistent and egregious summation misconduct, including burden shifting, vouching for witnesses, urging speculation, and appealing to sympathy and emotion.

523) Indeed, some of ADA Lomuscio's conduct in Roman's trial resembled conduct the Second Department disapproved of in reversing the defendant's conviction in Nelu, *supra*, eight months earlier. In both cases Lomuscio made improper attempts to impeach the defendant's alibi, committed Rosario violations, and made improper remarks in summation.

524) During her 2022 deposition, ADA Lomuscio acknowledged that the case against Roman was based solely on witness testimony. In summation at trial she argued, "I think the basic premise of this case boils down to two sides of witnesses, the People's witnesses, and the defense's witnesses." Accordingly, as in Schriver, *supra*, credibility was a paramount concern, and the prosecutor was aware of this. The record also makes clear that here, as in Schriver, *supra*, Lomuscio was made aware of Roman's defense. Similarly, here, as in Schriver, *supra*, the circumstances of the crime and the witnesses pointed to the need to check into the witnesses' records further before offering them, and especially before offering them as witnesses without records. Certainly, once the revelation of Kenyatta's prior felony prosecution made clear that he had lied to her *and* his own assigned counsel about his criminal record and aliases, Lomuscio was obligated to do more than blindly accept his word.

525) By the time of Roman's trial, the Court of Appeals' May 1990 decision in People v. Vilardi, 76 N.Y.2d 67 (1990), dictated that a specific request elevated a prosecutor's Brady obligation in relation to the material sought. In 2022, ADA Lomuscio testified that she thought Hyman Greenberg was a good attorney and respected him. Lomuscio also testified that **she *had information before trial* that drugs were being sold from Paul Anderson's residence from Anderson, Jomo Kenyatta, *and* a letter from Anderson's neighbors**. Lomuscio claimed that, before trial, she reviewed the detectives' file, which included a Homicide Analysis Report by Detective Pepey referring to Anderson's residence as a known drug location, and the permission slip Anderson signed permitting the police to search the residence for "contraband" on the night of the shooting. Finally, Lomuscio knew or had reason to know, based on the disparity between the testimony of Pepey and Anderson, that material aspects of Anderson's testimony concerning what he told the police and when were false. Just as in Schriver, *supra*, the circumstances of the crime and Anderson's development as a witness provided reason for Lomuscio to look further when Greenberg made a representation concerning the prior shooting of Anderson and an application that was akin to a specific request for Brady purposes. Lomuscio admitted that she did nothing in response to Greenberg's inquiry and application and could not even recall what a specific request was.

526) ADA Lomuscio knew or had reason to know of all the "new" evidence Justice Johnson relied upon in vacating Roman's conviction, because the evidence wasn't truly new, it was merely ignored or suppressed because of the QDA's policies, practices, and deliberate indifference to constitutional rights and innocence and, thus, merely "new" insofar as it was finally acknowledged and/or considered on the merits. This evidence, which emanated from the original assigned detective, the first person interviewed by Detective Pepey (Andrea

Witter), and other sources known and available to the police and prosecution for over a year before Roman's trial was, like the evidence ignored in Schriver, *supra*, "readily available to the prosecution had it made the most modest effort."

527) Based on the information compiled while reinvestigating Roman's case, the QDA acknowledged that "new evidence…irreparably undermined" the credibility of both Paul Anderson and Jomo Kenyatta and their identifications of Roman. This evidence included that Anderson's residence was "a gambling location and a place used to distribute narcotics," that Anderson was shot by Lloyd Witter in November 1988, and that at the time of Roman's trial, "Kenyatta was wanted for several violent crimes and homicides and arrested under other aliases."

528) In summation at Roman's trial, ADA Lomuscio told the jury she would not insult their intelligence by arguing that Anderson and Kenyatta told them everything about the drug dealing at Anderson's house. That is, she *knew* her only two eyewitnesses had not testified truthfully and allowed them to. In November 2022, Lomuscio testified that she did not know whether Anderson and Kenyatta testified truthfully about drug dealing but admitted **she *was informed* that drugs were being dealt from Anderson's residence *before* Roman's trial from sources that included her only substantive witnesses**. Although Lomuscio responded in the negative when asked if she had information that Anderson dealt drugs, she testified that she was unable to recall whether she had information that Kenyatta dealt drugs. Notably, Anderson was transferred to the precinct for questioning at 8 pm on the night of the shooting and documentary evidence demonstrates that, by 10:30 pm, Detective Loguercio already had reason to request written permission to remove "contraband" from Anderson's residence.

529) ADA Celestin acknowledged that at Roman's trial Kenyatta "denied a significant criminal history and presented himself as a blameless victim," only to be "confronted with a plea to a lesser charge in an attempted murder case involving a shooting" in Queens County. However, she averred that, "[t]his conviction was not easily discovered because Kenyatta used six different aliases…" However, Mr. Greenberg's investigator was able to uncover at least four (4) of Kenyatta's aliases during trial without the resources available to ADA Lomuscio. See, People v. Maynard, 80 Misc.2d 279, 287 (1974)("It is well recognized that the prosecution has a great advantage over the defendant in the fact-gathering process due to his superior manpower and access to other law enforcement facilities."). In reality, the failure to learn of, or disclose, this evidence to Roman at trial was the result of information sharing deficiencies and a deliberate indifference to constitutional obligations at the QDA.

530) In November 2022, ADA Lomuscio testified that she asked Jomo Kenyatta if he had prior convictions before Roman's trial but was unable to recall whether he told her he had only been arrested for reckless driving or whether she asked him if he was involved in narcotics or wanted for any crimes. Lomuscio acknowledged reviewing the detectives' file, which included repeated references to Kenyatta's aliases "Lansford Beckford" and "Lasford Beckford." She clearly knew that Kenyatta used the name Anthony Thomas—which he testified under—and was made aware that he used the name Antonio Tomas when it was revealed he had been prosecuted under that name by *her* office.

531) ADA Celestin also stated that "[n]o testimony or evidence offered at trial by either party referenced [the] initial statement by Anderson" to Detective Loguercio, in which Anderson gave extremely detailed descriptions of four unknown perpetrators, none of which resembled Roman.

532) In November 2022, ADA Lomuscio testified that she usually spoke to the assigned detective in a case before proceeding to trial if she could reach them but claimed not to recall if she spoke to Detective Loguercio before Roman's trial. She also claimed to be unable to recall if Loguercio was the assigned detective at any point, when and if she disclosed the statements and descriptions Paul Anderson gave to Loguercio, or how many statements Anderson gave to police.

533) At Roman's trial, ADA Lomuscio refused to identify Detective Loguercio at the request of defense counsel when specifically asked and, in her opening, told the jurors they would hear from "the" assigned detective.

534) Margaret Hall (formerly Andrea Witter) told the CIU that Roman never made the unnoticed statement Detective Pepey attributed to him and credibly denied the account, attributed to her in Pepey's DD5, of Anderson visiting her home on the night of the shooting.

535) During her 2022 deposition, ADA Lomuscio claimed to be unable to recall whether she even spoke to Hall, despite having noticed her as an alibi rebuttal witness. Moreover, Lomuscio claimed not to know if Hall agreed that Roman made the statement Detective Pepey attributed to him or, indeed, whether she even asked her.

536) Justice Zayas recognized the dubious nature of the QDA's contention that the exculpatory material in Bell, *supra*, was inadvertently or negligently suppressed, especially in the absence of an explanation that would support such a conclusion such as an affirmation from the trial prosecutors. Similarly, here, there has been no explanation from ADA Lomuscio *or anyone else* as to how descriptions and statements given to the initial assigned detective, information reportedly from the witness whose allegation served as the basis for Roman's arrest,

information known to the QDA and addressed by Roman's counsel at trial, and other readily accessible material could have been unknown or unknowable to ADA Lomuscio.

537) Catherine Lomuscio acknowledged that QDA prosecutors were required to draft memoranda after acquittals but not after convictions (why, she claimed not to know); that she was *never reprimanded* in relation to the two convictions (other than Roman's) she obtained that were reversed or vacated; and that she continues to believe the defendants in those cases, as well as Roman, are guilty of the crimes she prosecuted them for.

538) Lomuscio claimed not to know or recall whether the other two defendants she prosecuted to conviction who had their convictions vacated or reversed served prison time or how she feels about having prosecuted at least three defendants who had their convictions vacated or reversed.

539) Leadership at the QDA was aware, before Roman's trial, that there was a longstanding training deficiency in the Office, at the time Catherine Lomuscio and other prosecutors responsible for securing Roman's indictment and conviction were hired and trained. They were also made aware, at least as early as the Second Department's decision in Nelu, *supra*, eight (8) months before Roman's trial, that Lomuscio had committed misconduct that was disapproved of by an appellate court. Instead of disciplining or re-training her, the Office promoted Lomuscio to the Homicide Trials Bureau, where she prosecuted and convicted Roman in a trial marked by similar misconduct as in Nelu, *supra*. Immediately after Roman's conviction, Lomuscio was rewarded with a raise and a promotion to Deputy Bureau Chief and, upon information and belief, began prosecuting Benjamin Shim, another defendant who would have his conviction reversed because of prosecutorial misconduct.

540) Although Lomuscio claimed not to know whether her promotion was related to Roman's conviction, or why QDA prosecutors were required to draft memoranda after acquittals but not convictions, the message from the QDA was clear: win and you advance regardless of the tactics used—only when you lose do you have to explain yourself or endure anything remotely resembling discipline.

541) The QDA continued to defend ADA Lomuscio despite complaints by her supervisor, ADA Vachss, who referred to Lomuscio as "a supervisory nightmare." Ironically, when Vachss did what other supervisors at the QDA would not and raised red flags about a problematic prosecutor in her bureau, *she* was the one encouraged to resign by EADA Tsimbinos and ultimately fired from the Office, only to be replaced by Lomuscio, who was promoted *again*. When the meager safeguards the QDA kept in place raised an alarm, that alarm was ignored, suppressed, or the source reprimanded. Indeed, Vachss, despite being in a plainly supervisory position, was apparently not permitted to exercise supervisory control over Lomuscio or to evaluate her.

542) While ADA Lomuscio testified that she was never reprimanded for her work on either of the convictions she acknowledged obtaining (other than Roman's), that were vacated or reversed, within five years of when ADA Vachss repeatedly advised both DA's Santucci and Brown of Lomuscio's ineptitude, Lomuscio was demoted and secretly encouraged to resign.

543) Instead of sending a message to the Office about discipline, the QDA declined to terminate Lomuscio and instead quietly asked her to resign. As with other practices the QDA engaged in, this allowed them to maintain plausible deniability. Lomuscio was permitted to retain her law license and move on to other legal employment *with a criminal court judge*,

and the QDA was permitted to continue to disingenuously defend her work as a prosecutor, including Roman's conviction.

544) This was not an appropriate remedy. There is no reason to conclude Lomuscio would have been fired had she ignored James Quinn when he encouraged her to resign. Indeed, Quinn gave sworn testimony claiming that he did not know of very many ADAs who committed misconduct, and Robert Masters claimed not to know why Lomuscio was demoted (and declined to even mention that she was encouraged to resign). QDA executives hid their knowledge of this rogue prosecutor while defending her work in Roman's conviction and, upon information and belief, declined to review her dozens of other convictions to see how much damage she had truly done.

545) Lomuscio was demoted and encouraged to resign two years before DA Brown privately acknowledged that the QDA had been "getting away with" prosecutorial misconduct for "a long time." **Carlton Roman's case was an instance in which the QDA got away with misconduct.** Roman was convicted by a prosecutor who had already been identified for misconduct by the Second Department before his trial. He remained in prison for more than a quarter of a century after that prosecutor was demoted and encouraged to resign, and for more than two decades after Brown's admission. At no point in that time did anyone from the QDA reveal Lomuscio's other reversed or vacated convictions, her prior misconduct, her demotion, or that she was encouraged to—and did—resign, to Roman.

546) Policymakers at the QDA created a culture where winning mattered more than following the Constitution. They acted with deliberate indifference to constitutional violations generally, based on policy and practice, including those that injured Roman, and failed to

take any steps to protect against constitutional harms certain to occur without policies, practices, or procedures in place to prevent, address, or punish prosecutorial misconduct.[8]

547) To the contrary, the deliberate indifference, policies, and practices of the QDA policymakers, including the District Attorney and his designees, created a culture of prosecutorial misconduct that they knew was likely to cause further violations and which, in fact, did so in numerous cases including Roman's.

548) These policies and practices which condoned and encouraged the suppression of Brady material in the name of securing and preserving convictions (and, at minimum, ensured there would be no genuine repercussions for prosecutors who did so) were a proximate cause of the constitutional violations by ADAs Catarisano, Kelly, Lomuscio, Schaeffer, and Masters set forth *supra*, which caused Roman's conviction and unjust continued incarceration.

549) These prosecutors knew that the QDA valued winning over following the Constitution, which caused Roman's wrongful conviction and impermissibly extended his unjust incarceration. Instead, while wrongfully convicted defendants languished in prison, the prosecutors who convicted them could anticipate at most, as Chief ADA Ryan told ADA Rosero after the Su decision, "a bad day, **that's all**." (Emphasis added).

550) Misconduct at the QDA was permitted and/or encouraged for so long that it became a recognized hallmark of the Office. At oral argument concerning a Queens conviction in 2014, Justice Robert Miller of the Second Department stated:

> "I could read this summation and without knowing what office it is from would say it is from Queens. That's the reputation that your office is building with this court. Because this [summation misconduct] happens repeatedly."

[8] *Accord* Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong*, 80 Fordham L. Rev. 537, 559-66 (2011).

551) At another oral argument in the same year concerning a different Queens conviction, Justice Leonard Austin, also of the Second Department, stated the following:

> "I feel like a broken record because I address this every time. *Almost every time the Queens DA is before us*…When do we say to your office, enough is enough?…I've got to tell you, it distresses me to no end, the line that you consistently cross. Consistently!…You always agree [that these remarks are improper] when you're here [in the Appellate Division]. *But you keep doing it and you keep doing it*…I've heard somebody from your office standing there every time I've been here saying the same exact thing [agreeing remarks were improper]. And I'm here 9 years this week. It's 9 years of the same thing." (Emphasis added).

552) After Justice Austin's remarks, Justice John Leventhal suggested that the QDA Appeals Bureau train the Office's trial prosecutors about summation misconduct.

553) The QDA's policy, practice, and procedure of allowing prosecutors to commit misconduct in dozens of cases, without consequence, made it foreseeable to the City that any ADA, especially a known offender like ADA Lomuscio, would commit misconduct in Roman's case, including the withholding of Brady and Rosario material and summation misconduct. These unlawful policies, practices, and customs of the City were a substantial factor in causing the violations of Roman's rights under the Constitution and the laws of the United States and in causing his wrongful conviction, imprisonment, and related damages.

554) Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final managerial responsibility for instructing, supervising and disciplining attorneys and other employees of his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," not to abuse judicial process, to make timely disclosure of exculpatory evidence or Brady material to the defense, including post-trial, and to refrain from offering, and to correct, false,

misleading, or prejudicial evidence, testimony, and argument during pre-trial, trial, and post-trial proceedings.

555) DA's Santucci and Brown who were, during their respective tenures, the highest-ranking New York City officials responsible for setting and enforcing policy with respect to managing QDA personnel and the functions of the Office, had final policymaking authority in all such areas.

556) DA's Santucci and Brown personally and/or through their authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline, with respect to their Office's performance of its duties.

557) DA's Santucci and Brown at all relevant times were elected officers of Queens County, one of the constituent counties of the City, and the Office was and is funded out of the City's budget.

558) Furthermore, Santucci and Brown, as District Attorneys, were designated "local officers," rather than "state officers," under the New York Public Officer's Law (§ 2) and federal Monell jurisprudence, Bellamy v. City of New York, 914 F.3d 727 (2019); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including Queens County), and hence the City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

559) DA's Santucci and Brown, personally and/or through their authorized delegates, at all relevant times had final authority, and constituted City policymakers for whom the City is liable, with respect to the above-mentioned areas.

560) During all times relevant to this Complaint, the City, through its policymakers, owed a duty to the public at large and to Roman, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and other members of the public.

561) ADA Lomuscio, who prosecuted Roman and his codefendant, acted in accordance with these QDA practices, policies, and customs when, among other things, she repeatedly, without fear of reprisal, withheld valuable Brady and Rosario material (and, at times, failed to respond to specific requests by defense counsel) that eviscerated the credibility of the witnesses against Roman, made numerous false statements in open court about the existence of evidence or witnesses, made baseless claims about uncharged crimes and threats to witnesses, denigrated the defense, and made improper, false, and prejudicial statements in opening and summation.

562) By virtue of the foregoing, the City is liable for having substantially caused the foregoing violations of Roman's constitutional rights and his resultant injuries.

563) The foregoing violations of Roman's constitutional rights, and his resultant injuries, were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the City, amounting to deliberate indifference to the constitutional rights of persons, including Roman, subject to prosecution by the QDA, namely:

a. The institution and implementation by the District Attorney of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

i. The duty not to use false, misleading or unreliable evidence, testimony, statements or arguments during criminal proceedings;

ii. The obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred;

iii. The obligation not to make false, prejudicial, or inflammatory summation arguments;

iv. The continuing obligation to timely and fully disclose material, in the possession, custody or control of the District Attorney's Office or of the police, that is favorable to the defense within the meaning of Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 450 U.S. 150 (1972), and their progeny; and,

b. The District Attorney's deliberate indifference to the need, and his failure, to adequately investigate, supervise, discipline, and/or rectify his employees' conduct with respect to such matters.

564) The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs, including the failure to properly investigate, supervise, discipline, and/or rectify employees' conduct with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the District Attorney of Queens County and his delegates, who knew:

a. To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b. That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult or will incentivize correct choices;

c. That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury; and,

d. That employees of the QDA had a longstanding and demonstrable history of making wrong choices in such matters.

565) The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraphs, based upon:

a. Numerous credible allegations, many substantiated in judicial decisions as demonstrated above and listed in **Exhibit A**, that Queens County ADAs had repeatedly:

   i. Participated in the manufacturing of false testimony or evidence, including identification evidence;

   ii. Presented or failed to correct false or misleading testimony and argument;

   iii. Failed to disclose on a timely basis, or at all, information favorable to the defense that was required to be disclosed by the Constitutions and the laws of the United States and of the State of New York;

   iv. Made arguments at trial that were so false, misleading, inflammatory, or otherwise improper that they deprived the defendant of due process and a fair trial; and,

b. The inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the pressure that the QDA applied to prosecutors to obtain convictions.

566) By virtue of the foregoing, the City is liable for having substantially caused the foregoing violations of Roman's constitutional rights and his resultant injuries.

## FIFTH CAUSE OF ACTION

**42 U.S.C. § 1983 and Monell. Municipal Liability for the Conduct of NYPD Officers.**

**Defendant City of New York.**

567) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

568) All the acts by the police defendants described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant City and its agency, the New York City Police Department ("NYPD").

569) Before Roman's arrest, policy-making officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting, and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

a. The use of excessive promises of rewards and unduly coercive interrogation techniques in relation to vulnerable potential witnesses, including individuals fearing prosecution and imprisonment for their own criminal behavior;

b. The determination of probable cause to make an arrest; and,

c. The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (Brady material) favorable to a person suspected, accused, or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that a prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witness has a motive, bias, or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under Brady.

570) Defendant City and the NYPD, by their policy-making agents, servants, and employees, authorized, sanctioned, and/or ratified the police defendants' wrongful acts; and/or failed to prevent or stop these acts; and/or allowed or encouraged these acts to continue.

571) The actions of the police defendants resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of the City, which are implemented by police officers, to prosecute and continue to prosecute persons through fabricated and manipulated allegations without adequate basis in fact and/or despite exculpatory evidence known to them and withheld from accused persons, and to substantially interfere with the accused's right to due process by impermissible means such as intimidation

and coercion of witnesses, fabrication of evidence including police reports and testimony, and other abuses of authority.

572) The existence of such unlawful *de facto* policies and/or well-settled and widespread customs and practices was known to supervisory and policy-making officers and officials of the NYPD and the City before Roman's arrest and prosecution.

573) Despite knowledge of such unlawful *de facto* policies and practices, these supervisory and policy-making officers and officials of the NYPD and the City and their predecessors in interest did not take steps to terminate these policies and practices, did not discipline individuals who engaged in such practices, or otherwise properly train police officers with regard to constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, customs, and practices through their deliberate indifference to or reckless disregard of the effect of said policies, customs, and practices upon the constitutional rights of persons in the City of New York.

574) The City's policies and practices in existence at the time of the conduct complained of herein, which caused or substantially contributed to Roman's injuries herein include, *inter alia*, the following:

a. The failure to properly supervise, train, instruct, and discipline police officers regarding:

    1. Proper conduct and investigation at and in relation to a crime scene;
    2. The preparation of truthful accusatory instruments;
    3. Adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;
    4. The exercise of their authority, including, without limitation, with regard to the disclosure of exculpatory evidence; and,

5. Proper methods of conducting interviews of witnesses and/or accused persons, and to discipline police officers who use improper methods to coerce and/or elicit false statements.

b. The tacit acceptance and encouragement of a code of silence wherein police officers regularly cover up police misconduct by refusing to report other officers' misconduct or by telling false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the Civilian Complaint Review Board ("CCRB") and the Internal Affairs Bureau, and in public statements designed to cover for and/or falsely exonerate accused police officers; and,

c. Encouraging and/or failing to discipline officers for "testilying" and/or fabricating false evidence to bring about the police officers' preconceived perceptions or determinations of guilt.

575) The City's policies, practices, and customs in existence at the time of Roman's prosecution of failing to supervise, train, instruct, and discipline police officers and encouraging their misconduct are further evinced, *inter alia*, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission"), **dated July 7, 1994**, which states:

> "[A] new and often more invidious form of corruption has infected parts of this City, *especially in high-crime precincts with an active narcotics trade*...To cover up their corruption, officers created even more: they falsified official reports and perjured themselves to conceal their misdeeds...In the face of this problem of corruption, the Department allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than rooting it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputation tainted—especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there was strong institutional incentive to allow corruption efforts to fray and lose priority—which is exactly what this Commission uncovered. *This reluctance manifested itself in every component of the department's corruption controls* from command accountability and supervision, to investigations, police culture, training and recruitment.
>
> *For at least the past decade*, the system designed to protect the Department from corruption minimized the likelihood of uncovering it."

Mollen Commission Report, Pgs. 2-3 (Emphasis added).

b. In 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system:

> "Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is *widely tolerated by corrupt and honest officers alike, as well as their supervisors*. Corrupt and honest officers alike told us that *their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them*...What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful...When officers genuinely believe that nothing is wrong with fabricating the basis of an arrest, a search, or other police action and that *civil rights are merely an obstacle to aggressive law enforcement*, the Department's top commanders must share the blame...We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch."
> Mollen Commission Report, Pgs. 36, 40-41 (Emphasis added).

d. Since *at least 1984*, Defendant City and the NYPD have been on notice of inadequate training and supervision and a culture of misconduct and abuse of authority. Indeed, Mayor Koch commissioned a special mayoral committee *in May 1985* after a series of cases of police misconduct raised questions about the management of the NYPD, and a final report was issued *in February 1987* recommending extensive changes in the way the Department recruited, trained, promoted, and managed its officers. *See*, *e.g.*, Mayor's Advisory Committee on Police Management and Personnel Policy, Final Report, February 24, 1987.

e. The City of New York Office of the Comptroller, in an unpublished report, found that the police often conduct inadequate investigations.

f. Before July 1993, the CCRB, which is responsible for receiving and investigating complaints of police misconduct made by citizens against members of the NYPD, operated as an agency of the NYPD rather than an independent, unbiased entity.

g. During the 1980's and 1990's, the CCRB received numerous complaints of police misconduct, but failed to fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously miniscule number of cases.

h. On average, in 1990-1992, the CCRB conducted complete investigations of only 36 percent of the complaints received, closed 40 percent of the total cases without completing full investigations, and substantiated a mere 3.3 percent of the total complaints received.

i. The CCRB has also failed to recommend disciplinary action in the vast majority of its cases.

j. On average, in 1990-1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed cases.

k. Moreover, most of the complaints that are substantiated by the CCRB do not result in any kind of meaningful discipline. For instance, as of November 14, 1991, of the 80 officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90-day suspension.

l. Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, because of out-of-court settlements or judgments in civil actions. Meanwhile, on average, only about 107 complaints were substantiated annually by the CCRB in 1988-1992.

m. The money paid out by the City in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994.

n. More than $82 million was paid in damages to victims of police misconduct in 1,352 cases between 1992 and 1995.

o. In most police misconduct cases that result in verdicts or substantial settlements for victims, *Defendant City imposes no discipline*, either before or after resolution in court, almost never reopens an investigation previously conducted after such resolution, and sometimes promotes the abusive officer to a position of greater authority despite the judicial resolution.

p. In 1991, a year after Roman's conviction, Robert Daley, former Deputy Commissioner of the NYPD, wrote that the "blue wall of solidarity with its macho more and prejudices, its cover-ups and silence, is reinforced every day in every way."

576) Upon information and belief, NYPD officers receive no training regarding how to conduct interviews or interrogations in a manner that will prevent false or unreliable statements and, in fact, are indoctrinated in the use of false promises, threats, and intimidation.

577) Upon information and belief, Defendant City and its agency, the NYPD, failed to effectively screen, hire, train, supervise, and discipline their police officers, including the defendant officers herein, for lack of truthfulness, and for their failure to protect citizens from the unconstitutional conduct of other police officers, thereby permitting and allowing defendant police officers to be in a position to elicit false testimony from witnesses and fabricate evidence sufficient to secure convictions in violation of constitutional rights, and/or to permit these actions to take place with those officers' knowledge or consent.

578) Defendant City, and its agency, the NYPD, were aware of the existence of a *de facto* policy based on a widespread and evident practice of permitting, ignoring, and/or incentivizing unconstitutional investigative techniques and widespread corruption throughout the ranks of the NYPD before, during, and after Roman's prosecution. Injuries to Roman or other criminal suspects or defendants were a foreseeable result of their deliberate indifference to the obvious need for better training, supervision, and discipline of NYPD personnel.

579) For instance, before Detective Pepey's involvement in Roman's arrest and prosecution, Defendant City was on notice or had reason to know that Pepey should not have been employed as a police officer.

580) Detective Pepey's Central Personnel Index reflects more than one allegation that he accepted money from gamblers during his police career and before his role in Roman's arrest and prosecution.

581) In 1976, Pepey disobeyed a superior officer's order and, as a result, compromised an organized crime investigation. Instead of being disciplined or terminated from the NYPD, or even made to undergo additional training, Pepey was merely transferred to another

command. By 1987, Pepey was promoted to detective and, within two years, falsely arrested Roman and fabricated evidence against him.

582) In August 1989, well before he testified at Roman's trial, Pepey was accused of participating in an abduction. By the time of Roman's trial, there was substantial basis to conclude that Pepey was unsuited for police work in general and particularly unsuited to lead the investigation into an offense committed at a location known or suspected for organized criminal activity such as Paul Anderson's residence. Pepey's Central Personnel Index reflects other indications that he did not appreciate the sanctity of his position and should not have been permitted to remain an officer of the law. In 1975 the NYPD received information that Pepey had attempted to remove complaints from his record. In 1979, Pepey was investigated for failing to acknowledge assignments, "frequently" abandoning his patrol vehicle before the end of his tour and leaving assigned areas to visit females. In 1992, Pepey's spouse apparently reported that he illegally entered her residence and took property and that he illegally obtained information from the DMV for personal use.

583) Defendant City of New York was on notice or had reason to know of Detective Pepey's unsuitability for employment with the NYPD through his colleagues. Indeed, it appears that of the police officers interviewed by the CIU who remembered Pepey, *none* had positive information to convey about him. Detective Thomas Wray, who worked with Pepey in the Cold Case Squad, told the CIU that the QDA would not hire Pepey as a Detective Investigator. Detective Bernard Porter, who the QDA *did* hire as a Detective Investigator, told the CIU that Pepey was a "scumbag" known for his use of questionable methods and that he (Porter) had personally informed a superior officer that he did not trust Pepey and would question any case he participated in. Upon information and belief, Porter told the CIU that

Pepey was caught fabricating evidence during his time with the Cold Case Squad, after his work in Roman's case.

584) Upon further information and belief, Pepey acknowledged to the CIU that superior officers and/or the QDA learned that he fabricated a travel visa, in violation of federal law, to facilitate Paul Anderson's return to the United States to testify at Roman's trial. In his interview with the CIU and in deposition testimony, Detective Gerard Fiorenza contradicted material claims made by Pepey during sworn testimony concerning the shooting at Anderson's residence.

585) While Detective Pepey's former colleague John Loguercio claimed to be unable to remember him, convicted murderer and narcotics trafficker Adair Johnson said Pepey was "notorious," and Pepey acknowledged that he had "dealings" with "local drug dealers."

586) The New York City Municipal Code dictates that the NYPD Commissioner is in control of the discipline of the department and the police force. The NYPD Commissioner, or his designee, constitutes a final policymaker and decisions by the NYPD or his designee, related to discipline or employee terminations are considered "policy."

587) The NYPD Commissioner, or his designee, exhibited deliberate indifference to a risk of the violation of Roman's, and others', constitutional rights, when put on notice no later than 1976 of Detective Pepey's willingness to disregard directives and engage in misconduct but nevertheless declined to take any remedial action. Instead, the NYPD Commissioner, or his designee, merely transferred Pepey to a different command where he continued to pose a risk to the public at large, including Roman.

588) Because the decisions not to supervise, train, or discipline Pepey and to retain him on active duty were made by the NYPD Commissioner or his designee, as a final policymaker, the City of New York is directly liable for them.

589) Those decisions by the NYPD Commissioner, or his designee, to retain Detective Pepey as a police officer on active duty despite knowing or having reason to know that Pepey clearly lacked the character and integrity to serve in such a capacity, which should have been readily apparent no later than 1976 and certainly before Roman's arrest and prosecution, were made with deliberate indifference to the safety of Roman and the public at large. Knowing or having good reason to know that Pepey was dishonest and willing to disregard departmental rules, directives from superiors and, indeed, the law, it was or should have been readily apparent to the NYPD Commissioner or his designee that Pepey was unfit to serve as an active-duty police officer and, if he was permitted to do so, the injuries to Roman (or a person like him) were readily foreseeable.

590) The Defendant City caused or permitted Detective Pepey to violate Roman's constitutional rights by, among other things:

a. Arresting Roman without probable cause, searching his vehicle, and exhibiting him to a witness based solely on a conclusory statement by Andrea Witter, someone with no personal knowledge of who perpetrated her husband's murder;

b. Attributing fabricated statements to Roman, Anderson, and Mrs. Witter to support the warrantless arrest;

c. Giving false testimony to secure Roman's wrongful indictment and conviction;

d. Failing to document statements by witnesses (such as Adair Johnson and "Mrs. Kenyatta") according to departmental protocol;

e. Failing to preserve evidence or establish a meaningful chain of custody (for instance, failing to preserve materials used to elicit an identification from Jomo Kenyatta) and, as a result, depriving Roman of due process and a meaningful opportunity to challenge unreliable fabricated evidence on constitutional grounds;

f. Failing to conduct identification procedures in a fair and non-suggestive manner so as to produce reliable evidence (for instance, by exhibiting Roman to Paul Anderson in a show-up procedure when Roman was already in custody and fabricating police paperwork and his own testimony to conceal the fact that Anderson was not questioned until after the identification; by utilizing an aberrant procedure with no basis in departmental protocol to elicit identification(s) from Kenyatta; and by repeatedly showing single photographs of suspects to witnesses who had already supposedly identified them to reinforce fabricated identifications);

g. Violating the law to secure the presentation of fabricated evidence against Roman at trial (by paying for a fake visa to secure Paul Anderson's presence at trial and forcing Anderson's attendance and cooperating); and,

h. Fabricating a memorandum to his superior officer to buttress the product of his flawed investigation and mislead the Trial Court and jury concerning the consistency of the People's evidence.

591) In addition to the aforementioned, Detective Pepey, individually or along with the other named and unnamed defendants, coerced and/or manipulated Paul Anderson and Jomo Kenyatta into making false identifications and giving false testimony.

592) Detectives Loguercio, Palermo, and Fiorenza assisted Detective Pepey in the fabrication and/or manipulation of evidence. Alternatively, Loguercio, Palermo, and Fiorenza ignored, permitted, and/or failed to intercede despite knowledge of the harm Pepey's misconduct would cause to Roman's constitutional rights and an opportunity to take reasonable steps to prevent that harm.

593) Detective Pepey, Officers O'Brian and Byrne, and Lieutenant Lane each also gave false, inaccurate, and/or misleading testimony themselves in the grand jury and/or at Roman's trial.

594) Upon information and belief, the defendant police officers herein were the subject of prior civilian and departmental complaints of misconduct that gave notice to or should have given notice to Defendant City and its agency, the NYPD, that the defendant officers herein

were likely to engage in conduct that would violate the civil and constitutional rights of the public, such as the conduct complained of by Roman herein.

595) As a result of the foregoing conscious policies, practices, customs and/or usages, Defendant City and its agency, the NYPD, permitted and allowed the employment and retention of individuals as police officers whose individual circumstances placed the public or segments thereof at substantial risk of being the victims of preconceived determinations of guilt.

596) Roman's injuries were a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein and in existence at the time of the incidents complained of herein and of the knowledge and repeated failure of the Defendant City and the NYPD to properly supervise, train, and discipline their police officers.

597) Defendant City knew or should have known that the acts alleged herein would deprive Roman of his rights, in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, § 1 and 6 of the New York State Constitution, including, without limitation, Roman's deprivation of freedom and liberty without due process of law.

598) Defendant City is directly liable and responsible for the acts of the individual police officer defendants for State law claims under the doctrine of *respondeat superior*.

599) As a result of the decisions made by the Defendant City of New York, Roman was deprived of his constitutional rights and suffered injuries set forth below.

## SIXTH CAUSE OF ACTION

**42 U.S.C. § 1983 Civil Conspiracy; All Individual Defendants.**

600) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

601) Defendants Lomuscio, Catarisano, Pepey, Loguercio, Fiorenza, Palermo, Lane, O'Brian, Byrne, and Does #1-10, along with non-City employees such as Kenyatta, Anderson, and others, all explicitly and/or implicitly corruptly agreed to commit with each other and/or other unnamed conspirators, the wrongs detailed herein, and to ultimately have Roman falsely arrested, prosecuted, and convicted, without knowledge of exculpatory evidence, and to preserve his wrongful conviction and cover-up each other's misconduct.

602) The named defendant co-conspirators are or were employees or agents of the NYPD or the QDA.

603) Specific evidence, as detailed above, proves that each named defendant became aware of information that undermined any probable cause to arrest and prosecute Roman.

604) Each named defendant, throughout Roman's arrest and prosecution, either came into contact with one another or at least had reason to know of each other's existence.

605) Each defendant then committed overt acts, as detailed above, to accomplish the goal of the conspiracy, including, but not limited to (a) framing and falsely arresting and prosecuting Roman for murder, and (b) covering up those actions and suppressing Brady/Giglio/Rosario material that undermined the case against Roman.

606) By virtue of the foregoing, defendants are liable for conspiring to fabricate evidence and to deprive Roman of his constitutional rights to:

a. Not be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence,"

including the statements and testimony of witnesses who had been improperly influenced, coerced, manipulated, or incentivized to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Zahrey v. Coffey, 221 F.3d 342, 349 (2000)(recognizing the "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity");

b. Not to be deprived of his liberty absent probable cause to believe he had committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and,

c. Timely disclosure of all material evidence favorable to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

607) Each of the conspirators committed the foregoing violations of Roman's constitutional rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to them, or to the effect of such misconduct upon them.

608) By reason of the foregoing, those defendants are liable to Roman pursuant to 42 U.S.C. § 1983, for compensatory and punitive damages.

## SEVENTH CAUSE OF ACTION

### False Arrest Under 42 U.S.C. § 1983. Against Defendant Pepey and Does #1-10.

609) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

610) Defendant Pepey intended to arrest Roman and caused him to be confined.

611) Roman was aware of his confinement and did not consent to it.

612) The arrest and confinement of Roman was not supported by probable cause. Pepey arrested Roman solely on the basis of an unsupported, hearsay allegation by Andrea Witter. Mrs. Witter was not, and never claimed to have been, a witness to her husband's murder. Her

unfounded allegation was made without personal knowledge and did not provide a reasonable basis for Pepey to believe Roman had committed a crime.

613) The arrest and confinement of Roman was not otherwise privileged.

614) The indictment of Roman was secured through perjury and fraud committed by Defendant Pepey and an unknown ADA, who suborned false and materially incomplete testimony in the grand jury and withheld exculpatory information from the grand jurors' review, including, *inter alia*, the initial statements and descriptions by Paul Anderson, the testimony of Detective Loguercio, and information bearing upon the credibility and criminality of Anderson and Jomo Kenyatta.

615) Roman suffered substantial damage from the false arrest as set forth below.

## EIGHTH CAUSE OF ACTION

**False Arrest Under State Law. Against Defendant Pepey, Does #1-10, and the City of New York.**

616) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

617) Defendant Pepey intended to arrest Roman and caused him to be confined.

618) Roman was aware of his confinement and did not consent to it.

619) The arrest and confinement of Roman was not supported by probable cause. Pepey arrested Roman solely on the basis of an allegation by Andrea Witter. Mrs. Witter was not, and never claimed to have been, a witness to her husband's murder. Her unfounded allegation was made without personal knowledge and did not provide reasonable basis for Pepey to believe Roman had committed a crime.

620) The arrest and confinement of Roman was not otherwise privileged.

621) The indictment of Roman was secured through perjury and fraud committed by Defendant Pepey and an unknown ADA, who suborned false and materially incomplete testimony in the grand jury and withheld exculpatory information from the grand jurors' review, including, *inter alia*, the initial statements and descriptions by Paul Anderson, the testimony of Detective Loguercio, and information bearing upon the credibility and criminality of Anderson and Jomo Kenyatta.

622) The City of New York is liable for the false arrest of Roman under a theory of *respondeat superior*, as at all times Defendant Pepey was acting within the scope of his employment, for the City's benefit and under its control. This does not preclude Roman from pleading in the alternative, as otherwise specified.

623) Roman suffered substantial damage from the false arrest as set forth below.

## NINTH CAUSE OF ACTION

**State Law Malicious Prosecution. Defendants Pepey, Palermo, Loguercio, Lane, Fiorenza, Byrne, O'Brien, and Does #1-10.**

624) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

625) Defendants, individually and in concert with others, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or continue criminal proceedings against Roman without probable cause.

626) The Individual Defendants intentionally manufactured false evidence and coerced or otherwise incentivized witnesses to mislead prosecutors, the grand jury, the Trial Court, and the trial jury.

627) The criminal proceedings terminated in Roman's favor when his convictions were vacated and the underlying indictment against him was dismissed. As a direct and proximate result of the Individual Defendants' actions, Roman was wrongfully prosecuted, convicted, and imprisoned for nearly thirty-one (31) years, and suffered other grievous and continuing injuries set forth below.

628) The Defendant City is liable for Roman's malicious prosecution under the principle of *respondeat superior*.

## TENTH CAUSE OF ACTION

**State Law False Imprisonment. Against All Defendants.**

629) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

630) Defendants intended to confine Roman and, lacking probable cause or any other privilege, curtailed his liberty by arresting him and taking steps to ensure he was imprisoned on the basis of false evidence and without legal justification.

631) Roman was conscious of the confinement and did not consent to it.

632) As a direct and proximate result of the Defendants' actions, Roman was wrongfully arrested and falsely imprisoned, and suffered damages and injuries, during the time he was in jail before and during trial, from his arrest on March 17, 1989 until March 23, 1989, at the earliest (when his bail was paid), and then from September 26, 1990, when he was remanded

during the pendency of trial on the motion of ADA Lomuscio, until August 9, 2021, when he was finally released.

## ELEVENTH CAUSE OF ACTION

**State Law Negligent Infliction of Emotional Distress. Against All Defendants.**

633) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

634) The Individual Defendants negligently and grossly negligently, and in breach of their duties to Roman to refrain from fabricating evidence, coercing witnesses, withholding favorable evidence, and otherwise acting to deny Roman due process of law, directly and proximately caused Roman, who was innocent, to be falsely arrested, maliciously prosecuted, and wrongfully imprisoned for nearly thirty-one (31) years.

635) The actions of the Individual Defendants were extreme and outrageous and caused Roman to suffer mental and emotional harm, to fear for his safety, and actually caused his safety to be in jeopardy, throughout his incarceration.

636) Roman's cause of action for negligent infliction of intentional emotional distress by Defendants was unavailable to him until August 9, 2021, when the criminal proceedings against him were terminated in his favor. Furthermore, this claim is tolled as the Defendants concealed from Roman, and continue to conceal, their conduct giving rise to this cause of action.

## TWELFTH CAUSE OF ACTION

**State Law Negligent Hiring, Training, and Supervision. Against Defendant City of New York Based on Misconduct by Employees of the DA's Office.**

637) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

638) Roman permissibly pleads in the alternative, for the purposes of this cause of action, that QDA employees committed misconduct that fell outside the scope of their employment. Said misconduct including, but not limited to, ADA Lomuscio making herself a witness by representing materially false allegations of Anderson and Kenyatta being threatened and falsely claiming to have personally received information concerning criminal activities and transactions allegedly engaged in by Roman, withholding exculpatory evidence, and permitting witnesses to commit perjury while testifying.

639) Roman permissibly pleads in the alternative, for the purposes of this cause of action, that these acts were committed wholly for personal reasons, such as, but not limited to, obtaining promotions and raises.

640) During all times material to this Complaint, Defendant City of New York, through its policymakers, owed a duty to the public at large and to Roman, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and other members of the public.

641) Defendant City of New York is liable to Roman because of its negligent failure to adequately hire, train, supervise, and discipline agents, servants, and/or employees of the

DA's Office regarding the aforementioned duties, and because such negligence was a substantial and foreseeable cause of the injuries Roman suffered.

## THIRTEENTH CAUSE OF ACTION

**State Law Negligent Hiring, Training, and Supervision. Against Defendant City of New York Based on Misconduct by Employees of the NYPD.**

642) Plaintiff Carlton Roman repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

643) Roman permissibly pleads in the alternative, for the purposes of this cause of action, that named NYPD employees committed egregious misconduct that fell outside the scope of their employment. Said misconduct included, but is not limited to, Detective Pepey violating the law and paying for a fake visa to force Anderson to return to the United States to testify, falsifying official police documents such as memoranda, DD5's, and memo book entries in an attempt to cover up his own illegal conduct, forcing Anderson to implicate Roman by threatening to seize his sister's house, and having Kenyatta falsely identify Roman by using a letterboard. This "letterboard identification" is not an official police practice, as it has no basis in NYPD protocol. Indeed, Roman submits this procedure was something entirely concocted by Detective Pepey.

644) Roman permissibly pleads in the alternative, for the purposes of this cause of action, that these acts were committed wholly for personal reasons, such promotions, raises, and commendations, and perpetuating Detective Pepey's ability to use unregistered informants, make exceptional clearances in open cases, maintain relationships with local drug dealers, and cover up his own violation of the law.

645) During all times material to this Complaint, Defendant City of New York, through its policymakers, owed a duty to the public at large and to Roman, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

646) Defendant City of New York is liable to Roman because of its negligent failure to adequately hire, train, supervise, and discipline agents, servants and/or employees of the NYPD regarding their aforementioned duties, and because such negligence was a substantial and foreseeable cause of the injuries Roman suffered.

## DEMAND FOR DAMAGES

647) Plaintiff Carlton Roman spent over three decades in prison, well over half of his life, confined far from his home, family, and friends.

648) Roman was 26 years old at the time of his incarceration and was released in 2021 at the age of 59.

649) At the time of Roman's arrest, he was a college graduate with an Associate's Degree in Business Management, and was making arrangements to open his own business and/or further his studies. Roman was also an active musician who performed publicly and an avid runner and athlete.

650) Roman was a member of an honor's society in college and maintained steady employment throughout college and afterward.

651) Given Roman's work ethic, intelligence, and remarkable perseverance, he undoubtedly would have led a successful career had he not been wrongfully incarcerated.

652) During his wrongful imprisonment, Roman was deprived of an opportunity to have a close relationship with his daughter (his only child), who was only 2 years old at the time of his arrest. As a result of Roman's wrongful incarceration, his relationship with the mother of his only child understandably deteriorated and ultimately ended.

653) As a result of Roman's wrongful arrest, prosecution, and conviction, which was caused by Defendants, Roman suffered lost wages and benefits and permanent diminution of his earning potential.

654) Roman also incurred legal fees for investigation, production of documents, and retention of trial and appellate counsel to defend against the false charges and challenge his wrongful conviction and incarceration.

655) As a result of his wrongful prosecution, conviction, and imprisonment, Roman suffered, among other things, severe mental anguish, including the witnessing of brutality in prison; the loss of virtually all privacy and autonomy; constant humiliation, indignities, and degradation; severe restrictions on his personal liberty and freedom, including but not limited to diet, sleep, personal contact, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment and expression.

656) Upon information and belief, as a result of Roman's sentence, he was denied educational opportunities while wrongfully incarcerated.

657) Roman's wrongful prosecution, conviction, and incarceration caused him mental and emotional suffering, and permanent mental and emotional harm that continues to this day, including but not limited to stress, anxiety, depression, sleep deprivation, and distrust and fear of police and the legal system.

658) **WHEREFORE**, Plaintiff Carlton Roman demands judgment against the Defendants as follows:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages in an amount to be determined at trial;

c. Damages for lost past and future income and benefits in an amount to be determined at trial;

d. Damages for legal fees in an amount to be determined at trial;

e. Reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

f. Pre-judgment interest as allowed by law; and,

g. Such other and further relief as this Court may deem to be just and proper.

Dated: December 16, 2022
Brooklyn, New York

Law Offices of James Henning & Associates, PLLC
86 Livingston Street
Brooklyn, NY 11201
Attorneys for Carlton Roman

By: ____________________
James D. Henning
jhenning@jhenninglaw.com
(718) 717-2454

VERIFICATION

CARLTON ROMAN, being duly sworn, hereby states the following is true:

I am the Plaintiff herein and have read the foregoing Amended Complaint. The statements herein are true according to my knowledge, except as to matters stated therein to be made upon information and belief, which I believe to be true.

Sworn to Before me this 19 day of December, 2022

Carlton Roman

Notary Public

DANIEL A. LEVINE
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01LE6154152
Qualified in Queens County
Commission Expires October 23rd, 2026