

LAW OFFICES OF
# JAMES HENNING
& ASSOCIATES

April 6, 2023

<u>**VIA ECF**</u>
Honorable Cheryl Pollak
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**RE:** <u>Carlton Roman v. City of New York, et al.</u>
22-cv-6681 (NGG)(CLP)

Your Honor:

Plaintiff's October 1990 conviction was vacated following a collaborative reinvestigation involving his counsel and the Conviction Integrity Unit (hereinafter, "CIU") of the Queens County District Attorney's Office (hereinafter, "QDA").

Before the reinvestigation commenced, the QDA and Plaintiff's counsel entered into a cooperation agreement providing that the QDA agreed:

a) "To share and provide copies of materials...uncovered or discovered during the course of the CIU's investigation...provided that such disclosure is not legally prohibited, does not, in the good faith opinion of the CIU, compromise or otherwise potentially interfere with CIU's investigation, or jeopardize the safety of a witness."

b) "To make timely and appropriate disclosures of any exculpatory evidence it discovers as part of the ongoing CIU review and as may be related to any potential post-conviction legal claim..."

The agreement also stated that Plaintiff's counsel and the QDA both agreed, "[t]o handle any court proceedings in a collaborative manner where the CIU has agreed to relief."

In August 2021, Assistant District Attorney (hereinafter, "ADA") Alexis Celestin of the CIU advised Plaintiff's counsel that the QDA agreed Plaintiff's conviction should be vacated. The QDA and Plaintiff's counsel joined in a C.P.L. § 440.10(1)(g) motion to vacate Plaintiff's conviction on grounds of newly discovered evidence. ADA Celestin and Plaintiff's counsel exchanged their proposed Affirmations before filing. ADA Celestin requested that Plaintiff's counsel remove a reference to an admission Detective William Pepey made to the CIU, revealed to counsel by Celestin, that Pepey had paid for a fabricated Visa to facilitate eyewitness Paul Anderson's return to the United States from Jamaica, W.I., to testify at Plaintiff's trial.[1]

---

[1] Detective John Loguercio was originally assigned to investigate the crimes for which Plaintiff was convicted. For reasons that remain unexplained, Detective Pepey was assigned to take over the investigation upon reporting for

On August 9, 2021, Justice Michelle Johnson granted the joint motion vacating Plaintiff's conviction and based on an application by District Attorney Melinda Katz, dismissed the underlying indictment in the interest of justice. ADA Celestin listed the following "new" evidence in her Affirmation in support of the motion:

a) "[E]xtremely detailed descriptions" of four unknown assailants given by Paul Anderson to "Detective John Loguercio, the original case detective who responded to the crime scene on March 16, [1989, and] was the first to interview...Anderson."

b) Information from "Anderson and [Jomo] Kenyatta's high school classmate Glen McKenzie...that paints a very different picture of Anderson's and Kenyatta's characters than the ones that were presented to the jury," including "Kenyatta's violent nature and notoriety as a feared drug dealer both in Jamaica, West Indies and in Queens, NY" and that Anderson's residence "where the shooting occurred," was "a gambling location and a placed used to distribute narcotics. [Which] directly contradicts Anderson's trial testimony denying any personal involvement in drugs or gambling."[2]

c) "[N]ew information that contradicts important evidence used to convict [Plaintiff]," provided to the CIU by Margaret Hall (f/k/a Andrea Witter), the widow of deceased victim Lloyd Witter, who was present at the time of Plaintiff's arrest and "heard [Plaintiff] say he didn't kill her husband, but...did not hear him say 'when I got to the house I saw them there and left' or any version of this statement as recorded by Detective Pepey."[3] Hall also "contradicted an account by Detective Pepey memorializing a statement by [her] shortly after the shooting in which she states that she walked from her home to Anderson's home at 10 p.m. on March 16 and that's how she learned who allegedly killed her husband." Hall "emphatically stated that she did not leave the house at that time and certainly did not walk to Anderson's home as Pepey states," and the CIU deemed her account credible.

d) "New evidence [establishing] that Anderson testified falsely at trial in denying that he had ever been shot," and that Anderson "was shot by deceased victim Witter in November 1988, only four months before the shooting..."

e) "New evidence further undermin[ing] confidence in the testimony of...Kenyatta" who "denied a significant criminal history and presented him as a blameless victim" at Plaintiff's trial. "Kenyatta used six different of [sic] aliases...was wanted for several violent crimes and homicides and arrested under other aliases," and "appeared to be malingering as to his neurological injury" when interviewed by the CIU and "appeared even less coherent" when interviewed by "a senior QCDA senior [sic] staff member in 2013..."[4]

---

duty on March 17, 1989. During his 2022 deposition, Pepey testified that this was the only time in his career that he took over a homicide case that was originally assigned to another detective.

[2] "Jomo Kenyatta" was the only other civilian witness, aside from Paul Anderson, to testify against Plaintiff at trial. Kenyatta testified under the name "Anthony Thomas."

[3] Although the People failed to serve requisite notice of an intent to present this alleged statement, Detective Pepey nevertheless attributed it to Plaintiff during testimony at trial but omitted the exculpatory portion.

[4] While ADA Celestin made this representation concerning Kenyatta's presentation in her August 2021 Affirmation, the October 2020 report she composed directly after the CIU's interview with Kenyatta reflected a different

On the record before Justice Johnson, DA Katz maintained that "[w]hen [Plaintiff's] case went to trial...the [QDA] presented evidence implicating [Plaintiff] as it understood it to be," before listing the following "new" evidence in support of the joint motion to vacate his conviction:

a) The "heavily corroborated recantation of" Paul Anderson.

b) "New evidence establishing that" Anderson "also testified falsely at trial denying a previous violent interaction with the deceased victim...[Lloyd] Witter."

c) "Three new witnesses who reveal alternate suspects and initial descriptions of the perpetrators...that do not match and did not match [Plaintiff] at the time."

d) "[A]dditional new evidence that indicates that" Kenyatta, "the only other trial witness to identify [Plaintiff] minimized his criminal history at trial and used various aliases to conceal his criminal activity."

DA Katz stated that "there is no longer reliable evidence that would support [Plaintiff's] conviction," but ADA Celestin added that "[t]o be clear," the QDA was "joining the motion...based only on the new evidence...outlined by DA Katz." A press release by the QDA on the morning of Plaintiff's exoneration quoted DA Katz as stating that "the new evidence creates a probability that the jury would have acquitted [Plaintiff]."

The undersigned respectfully submits that aside from Paul Anderson's recantation, the "new" evidence specified in support of the motion to vacate Plaintiff's conviction was not truly new. Specifically:

a) Anderson's descriptions of four unknown perpetrators were given during his first contact with police, documented by the original assigned detective on March 16, 1989, the night of the crimes, and was known and/or readily available to police and prosecutors well before Plaintiff's conviction.[5]

b) Plaintiff's trial attorney made an application to examine Anderson's leg for evidence of a gunshot wound in 1990, based on information that Anderson had previously been shot. Plaintiff's first C.P.L. § 440.10 motion, submitted in March 1995, was supported by medical records demonstrating that Anderson was admitted to Queens Hospital Center in the company of Lloyd Witter on November 24, 1988, and treated for a gunshot wound to the foot, and the affidavit of Gregory Craig stating that Anderson was shot by Witter. **In written opposition to the 1995 motion, *the QDA* argued that the evidence concerning Anderson's shooting were available at the time of Plaintiff's trial.**

---

conclusion. Specifically, the report stated that "[t]here are clearly cognitive delays as a result of the shooting." The senior QDA staff member in question was ADA Richard Schaffer.

[5] At trial, ADA Lomuscio refused to identify Detective Loguercio to Plaintiff's counsel and permitted Paul Anderson to falsely testify that he identified Plaintiff *to Detective Pepey* on the night of the crimes for which Plaintiff was convicted (hours before Pepey testified he first touched the investigation). During the unsuccessful April 1992 prosecution of co-Defendant Hollis Laylor, Lomuscio objected when Laylor's counsel asked Pepey if another detective was assigned to the case before him. During 2022 deposition testimony, Lomuscio claimed not to know if she *ever* spoke with Loguercio. In sum, Lomuscio clearly took steps to obscure or suppress Loguercio's role in the case.

The QDA has not revealed any new evidence concerning the November 1988 shooting of Anderson.

c) At Plaintiff's trial, ADA Catherine Lomuscio claimed to have provided his counsel with all the information she had on Jomo Kenyatta's criminal history and permitted Kenyatta to testify, under the name "Anthony Thomas," that he had never used the name Antonio Tomas or been arrested for anything other than a 1988 reckless driving offense in Brooklyn. During trial, Plaintiff's counsel revealed that his investigator had learned of four aliases used by Kenyatta, and that Kenyatta had previously been prosecuted for attempted murder *by the QDA under the name Antonio Tomas* and had pled guilty to a felony in that matter in August 1987. Astonishingly, ADA Lomuscio accused *Plaintiff's counsel* of "hiding" this information concerning *her* witness and of failing to exercise due diligence in investigating Kenyatta's background. During the CIU reinvestigation, ADA Celestin revealed that Kenyatta is a suspect in the 1988 unsolved Queens County murder of Lascelles Thompson, and that documents in the Thompson police file reference both Lomuscio and Kenyatta's role as a witness in Plaintiff's prosecution. ADA Celestin also stated that Kenyatta's vehicle was registered to Thompson's residence, where the murder occurred, and that Kenyatta had been selling drugs with DH1.[6] Since Plaintiff's exoneration, the QDA has disclosed a report demonstrating that Kenyatta was arrested in Brooklyn, under the name "Jomo Kenya," on September 20, 1988. The complaint report states that a passenger in Kenyatta's car pointed a gun at the arresting officer, and Kenyatta and his passenger then attempted to flee but were arrested "after a brief struggle."

d) Detective Loguercio's notes demonstrate that as early as 10:30 PM on the night of the crimes for which Plaintiff was convicted, Anderson was prompted to give police written permission "to remove contraband" from his residence. A letter allegedly written by "concerned citizens," included in the police file, and referenced at Plaintiff's trial, listed a series of license plates belonging to "traffickers" who had been observed "carrying packages in and out of" Anderson's residence at all hours of the day. The letter was dated March 2, 1989, and written to assist police with the "war on drugs." Most, if not all, of the license plates were evidently investigated by Detective Pepey before Plaintiff's trial. **A Homicide Analysis Report composed by Detective Pepey and dated March 16, 1989, identified Anderson's residence as a "drug smuggling location."** Both Anderson and Kenyatta denied any involvement with drugs at Plaintiff's trial and Anderson denied that his residence was used for gambling or drug sales. However, in summation, ADA Lomuscio told the jury she would not insult their intelligence and submitted that "every witness minimized what they saw, what they did and heard with respect to drugs..." In 2022 deposition testimony, **Lomuscio admitted she had information before Plaintiff's trial that drugs were being sold at Anderson's house** and that her sources were "Paul Anderson and Jomo Kenyatta and a letter from the neighbors." Before the second trial of co-Defendant Hollis Laylor in April 1992, a Sirois/Mastrangelo hearing was held because Anderson refused to return to the United States to testify. While ADA Lomuscio contended that Anderson's refusal was because of threats he had received, Laylor's counsel

---

[6] In the absence of any affirmative acknowledgement or proof that DH1 was engaged in drug sales, counsel has elected to redact his name herein pursuant to Fed. R. Civ. P. Rule 5.2 (g).

argued that Anderson feared prosecution because of the drug trafficking at his residence. During the hearing, Lomuscio objected to an inquiry of Pepey about Kenyatta's aliases. The Court ultimately found that Anderson was not threatened.[7] At the ensuing trial, Laylor's attorney explicitly asked Kenyatta whether he had murdered Lascelles Thompson.

e)  According to Detective Pepey's testimony at Plaintiff's trial, a telephone call from Andrea Witter was his first contact with the case after being assigned on March 17, 1989. Pepey testified that Witter called and reported that the man who shot her husband was outside of her home and he immediately responded to the home. *Pepey testified* that when he arrived, Witter pointed to Plaintiff, said he was the man who killed her husband, and asked why he had done it, to which *Pepey claimed* Plaintiff replied only, "[w]hen I got there it was done." Pepey arrested Plaintiff based on Witter's accusation and interviewed her at the precinct, memorializing her alleged statement(s), including the information Witter contradicted during her interview(s) with the CIU, in a DD5 that was admitted into evidence at Plaintiff's trial. Although ADA Lomuscio served belated notice that Pepey and Witter would both testify as alibi rebuttal witnesses, for which she claimed there was good cause because the information they would testify to was ostensibly "just recently learned," Witter was never called. At April 1992 proceedings during the prosecution of co-Defendant Laylor, Pepey testified that he spoke with Witter once at the beginning of his investigation. During her 2022 deposition, Lomuscio claimed to be unable to recall whether she spoke with Witter at all before trial.

It should be noted that Glen McKenzie (now deceased) was the brother of Fern Kelly (nee Robinson) Plaintiff's fiancé at the time of trial and the mother of his child.[8] McKenzie's wife, Charmaine McKenzie (nee Woodburne), was noticed as a potential alibi witness at Plaintiff's trial, referenced in testimony by both Plaintiff and Fern Robinson (and in a pretrial statement Robinson gave to the QDA in October 1989), and was the subject of a missing witness charge application by ADA Lomuscio. She was also a sworn affiant in support of Plaintiff's 1995 C.P.L. § 440.10 motion and the subject of specific written opposition by the QDA.

Upon information and belief, information discovered during the CIU reinvestigation, but not disclosed to Plaintiff or acknowledged as grounds for vacatur by the QDA, contributed to DA Katz's recognition that Plaintiff's conviction was based on unreliable evidence and should be vacated. In 2015, the QDA certified that their entire file for Plaintiff's 1989-1990 prosecution had been lost despite repeated litigation since his conviction. Curiously, their file for the prosecution of co-Defendant Hollis Laylor, which terminated without further litigation in April 1994, apparently remains intact. On March 6, 2022, ADA Celestin tragically passed away.

Since Plaintiff's exoneration, he has discovered the following:

a)  After Plaintiff's exoneration, his counsel obtained a copy of former Executive Assistant District Attorney (hereinafter, "EADA") Robert Masters's November 2019 deposition in the matter of <u>Ricardo Benitez v. City of New York</u>. When Masters was asked whether any QDA

---

[7] Hollis Laylor was the only alleged accomplice to Plaintiff to be identified, let alone prosecuted. All charges against Laylor were dismissed by the QDA in April 1994 after several unsuccessful attempts to prosecute him.
[8] For reasons that have not been explained, Glen McKenzie's criminal history was apparently investigated by the CIU.

prosecutor other than Claude Stuart was disciplined by the Office before 2012, the only one he named was Catherine Lomuscio, whose name he claimed to be unable to spell, and who he said was demoted from a Bureau Chief to a line assistant in the "[m]id '90's. Maybe '96" for reasons he was unable to recall. When deposed in 2022, Lomuscio acknowledged that she had been demoted but claimed to be unable to recall when, why, or by whom.[9] She also acknowledged that she was encouraged to resign from the QDA by former EADA James Quinn and did in fact resign, although she claimed not to know when or why EADA Quinn encouraged her to. Lomuscio did recall that she tried "approximately 74" cases before leaving the QDA in December 1996, all but three of which resulted in convictions. Lomuscio testified that, aside from Plaintiff, two other Defendants she prosecuted had their convictions reversed or vacated. One of them was Albert Nelu, who had his conviction vacated by the Second Department in January 1990 (approximately 8 months *before* Plaintiff's trial) based, *inter alia*, on Lomuscio's summation misconduct, violation of the Rosario rule, and invasion of attorney-client privilege on cross-examination. See, People v. Nelu, 157 A.D.2d 864 (1990). Lomuscio was unable to recall the other Defendant's name. Documents received from Alice Vachss (see below) indicate that in June 1991, Lomuscio appeared in the matter of People v. Shim. In August 1995, the Second Department reversed Benjamin Shim's November 1991 Queens County conviction for manslaughter and other charges based on a Rosario violation. See, People v. Shim, 218 A.D.2d 757 (1995). Lomuscio testified that she was unable to recall whether she prosecuted Shim.

b) In 2022, Plaintiff's counsel made contact with Alice Vachss, former Chief of the QDA's Special Victims Bureau and ADA Lomuscio's supervisor from January 1991 through approximately November 1991. Documents provided by Vachss establish that she advised both District Attorneys John Santucci and Richard Brown, as well as EADA Spiros Tsimbinos, of Lomuscio's unsuitability for prosecutorial work and referred to Lomuscio as "a supervisory nightmare."[10]

c) In February 2023, Detective-Investigator Perelene Kaalund of the CIU testified, *inter alia*, to the following information:

1. ADA Richard Schaffer was never a member of the CIU and she (Kaalund) believed Schaffer presented Plaintiff's case to the Grand Jury in 1989 based on a conversation with ADA Celestin, the latter of whom questioned Schaffer alone during the reinvestigation.

2. "[A] lot of" people referenced in the file for the 1988 Queens County murder of Lascelles Thompson and Plaintiff's case "overlapped." One such individual was DH2,[11]

---

[9] Depositions related to Plaintiff's pending Court of Claims action have been confined in scope. Plaintiff's ability to inquire about police and prosecutorial misconduct in his own prosecution or others has been restricted thus far.

[10] Notably, during 1992 proceedings concerning co-Defendant Laylor, counsel for Laylor represented that he had retained Spiros Tsimbinos to submit a writ to the Second Department on Laylor's behalf. ADA Lomuscio, who was present and had previously been a subordinate of Tsimbinos's at the QDA during both Plaintiff's and Laylor's prosecutions, said nothing.

[11] Please note that pursuant to documentary evidence obtained by QDA in March 2023 and a recent deposition, Plaintiff has been able to confirm the status of DH2 as a confidential informant. Accordingly, Plaintiff has now redacted his name pursuant to Fed. R. Civ. P. Rule 5.2 (g).

who was identified as a confidential informant in the Thompson file and whom Kaalund believed had named Jomo Kenyatta to police as the perpetrator of Thompson's murder. Kaalund also believed that Detective Frank DeRosalia, whose assistance Detective Pepey sought during the investigation that resulted in Plaintiff's conviction, investigated Thompson's murder.

3. A confidential informant provided information during the investigation that resulted in Plaintiff's conviction.

4. ADA Celestin interviewed Lieutenant Frank Torres during the CIU reinvestigation of Plaintiff's conviction. During one interview with Torres at which Kaalund was present, Torres revealed that Detective Pepey had forged his signature in relation to some type of identification, although Kaalund was unable to recall the specifics.

d) On March 13, 2023, the undersigned and his investigator contacted Lieutenant Torres who revealed that he spoke repeatedly with ADA Celestin during the CIU reinvestigation of Plaintiff's conviction. Torres revealed to Celestin that, after he retired from the NYPD and joined the QDA, he was contacted by Corporation Counsel and learned that Detective Pepey fabricated his signature and tax identification number in support of a lineup identification. Torres also spoke about Pepey's reputation for closing an inordinate amount of cases and use of questionable investigative methods.

On January 26, 2023, Judge David Weinstein held a conference concerning a subpoena served on the QDA by Plaintiff's counsel in connection with his pending Court of Claims action seeking materials withheld by the QDA as privileged and/or irrelevant. During the conference, ADA Anastasia Spanakos claimed the QDA had disclosed all notes composed during witness interviews conducted during the CIU reinvestigation and refused to consent to disclosure or even in-camera review of the CIU report. On January 31, 2023, the QDA served a revised privilege log with previously unlisted materials and new grounds for non-disclosure.

On March 20, 2023, the QDA submitted written opposition to Plaintiff's motion to compel that included the following:

- For the first time, an apparent acknowledgement that a previously undisclosed confidential informant provided information during the investigation that resulted in Plaintiff's conviction and that this information was considered by the CIU and DA Katz in determining that Plaintiff's conviction should be vacated.

- Representations that Plaintiff "has all the factual material and evidence that lead [sic] to the DA agreeing to vacatur" and "all the documents and evidence which formed a basis for the District Attorney's decision..."

- Representations that the CIU report is, "a useful tool where ADA Celestin could summarize her findings and analysis and opinions and present it to the ultimate decision maker on whether [Plaintiff's] conviction would be vacated, the District Attorney of Queens County," and that the "sole purpose" of the materials obtained or generated by the CIU "is to assist the District Attorney in making her ultimate decision..."

- ADA Spanakos's claim that she could "specifically recall" an undated conversation with ADA Celestin "regarding the notes she took when she spoke to former-ADA Richard Schaffer," during which Celestin "stated that she viewed her conversations with [Schaffer] as a consultation with a colleague, not as an interview with a fact witness, because he had re-investigated [Plaintiff's] conviction years earlier."[12]

Detective Investigators Ralph Maher and Perelene Kaalund assisted ADA Celestin in the CIU reinvestigation of Plaintiff's conviction. No reference to any notes composed by either detective was made in either of the privilege logs served by the QDA. Appended to the QDA's opposition to Plaintiff's motion to compel was a letter purportedly sent to Plaintiff's attorneys by ADA Spanakos via email on November 30, 2022. According to ADA Spanakos's letter, at some unspecified point following a July 2022 meet and confer, she consulted with "the detective investigators who worked with ADA Celestin and learned that" Detective Maher "had 28 pages of handwritten notes which were not included in the CIU records." ADA Spanakos's letter represented that the QDA had withheld fourteen (14) pages of Maher's previously unreferenced notes but appended the remaining fourteen pages to the letter in redacted form. Neither Spanakos's letter, nor the supposedly appended notes composed by Maher, were received by Plaintiff's attorneys via email or any other medium. Nor was their supposed disclosure referenced during the conferences concerning Plaintiff's subpoena and motion to compel.

Although ADA Celestin acknowledged that Jomo Kenyatta remains a suspect in Lascelles Thompson's unsolved murder, and represented in her August 2021 Affirmation that Kenyatta was wanted for *homicides* (plural), ADA Spanakos was "not comfortable making any pronouncements as to who the police considered or did not consider in this 1988 homicide." By contrast, although Detective Pepey's name appeared in the case file, Spanakos *was* purportedly able to determine that Pepey was *not* involved in the investigation of Thompson's murder. Spanakos further represented that records concerning the Thompson murder were irrelevant to Plaintiff's case. Although the QDA remained steadfast in their refusal to consent to even in-camera review of CIU report, they were willing to provide the Thompson homicide file for in-camera review.

While DA Katz represented that three new witnesses revealed alternate suspects, no such information has been disclosed to Plaintiff. The importance of such information is evident in Justice Johnson's statement that she was "most particularly persuaded" to vacate Plaintiff's conviction by the fact that Paul Anderson had previously been shot by Lloyd Witter, and thus had "motive and opportunity" to commit the shootings for which Plaintiff was convicted. DA Katz's statement concerning evidence of third-party culpability indicates that she was made privy to material exculpatory information that was not revealed to Plaintiff. Significantly, in a case preceding Plaintiff's in which the CIU reinvestigated and recommended that three co-Defendants have their convictions vacated based on undisclosed evidence of third-party culpability, the Court explicitly called into question the representations made by the QDA concerning the conduct of prosecutors. See, People v. Bell, 71 Misc.3d 646, 663-64 (2021). Here,

---

[12] Notably, ADA Spanakos's claim concerning this conversation with ADA Celestin she "specifically recall[ed]" was made only *after* Plaintiff's counsel voiced the unconfirmed suspicion that ADA Schaffer presented Plaintiff's case to the Grand Jury during a conference with Judge Weinstein, at which Spanakos appeared.

DA Katz also made an inexplicable defense of the conduct of QDA prosecutors in proceeding with the case against Plaintiff.

Although Paul Anderson denied having been shot by Lloyd Witter during his interview with the CIU, both DA Katz and ADA Celestin represented that *new* evidence "established" that Anderson was shot by Witter in November 1988. As stated, Justice Johnson found this to be the most persuasive evidence in support of the motion to vacate Plaintiff's conviction. Absolutely no new evidence establishing that this shooting occurred as the QDA represented has been revealed to Plaintiff.

Following the CIU in-person interview of Anderson, ADA Celestin informed the undersigned both that the interview was "very good" for Plaintiff, and that Anderson's allegations concerning Detective Pepey were "not surprising." Among other things, Anderson told the CIU that: Pepey gave him Plaintiff's name and forced him to implicate Plaintiff; Pepey knew Anderson's residence was under surveillance and threatened that it could be seized if he did not cooperate; and Pepey kept him in a hotel.[13] Anderson also admitted that Anthony Chung. (a/k/a "Chungy") was present during the shootings at his residence. For reasons that remain unexplained, within four days of the shootings, Pepey ran a license plate belonging to Chung's wife and, within a month of being assigned to the case, contacted Chung himself, on the same date he sought the assistance of Detective Frank DeRosalia. CIU materials and the questions posed to Anderson indicate that Chung and his wife were both subjects of CIU reinvestigation efforts and that the Unit apparently learned Chung had been deported. In their recent opposition to Plaintiff's motion to compel, the QDA has implied that Pepey's credibility was called into question based only on information from a single detective, Bernard Porter. The undersigned respectfully submits the revelation that Pepey falsified the signature and tax identification of Frank Torres, a QDA employee, in support of a fraudulent identification, undoubtedly contributed both to ADA Celestin's lack of surprise at Anderson's statements and DA Katz's agreement that there was no reliable evidence of Plaintiff's guilt. Plaintiff's conviction was based entirely on two identifications elicited by Detective Pepey from witnesses he cultivated and his own testimony.

The QDA has withheld notes reflecting interviews of ADA Schaffer by ADA Celestin on the basis that they "merely highlight a conversation between colleagues, one of whom conducted his own prior investigation of [Plaintiff's] case, conveying thoughts and analysis based on their legal expertise and familiarity with [Plaintiff's] case and the subsequent re-investigations." However, Detective Kaalund, who assisted Celestin in the CIU reinvestigation, testified that Schaffer was not a member of the CIU, that Celestin questioned him alone, and that she (Kaalund) learned Schaffer presented Plaintiff's case to the Grand Jury through a conversation with Celestin. Furthermore, while ADA Spanakos—who is also not a member of the CIU—has cited an undated conversation with ADA Celestin for the proposition that Celestin considered her conversations with Schaffer to be "a consultation with a colleague, not...an interview with a fact witness," Detective Kaalund—who *is* a member of the CIU—testified that she was unaware whether Schaffer was interviewed as a fact witness.

---

[13] Plaintiff respectfully submits that Anderson's statement about being confined to a hotel by Pepey indicates that Anderson may have been held as a material witness. No information concerning Anderson having been kept in a hotel or as a material witness has been acknowledged despite DA Katz's statement that Anderson's recantation was heavily corroborated.

The QDA has only recently acknowledged, in March 2023 written opposition seeking to preclude Plaintiff from access to evidence, that a confidential informant was utilized in his case in 1989-1990 and, thus, that material evidence was illegally suppressed at his trial. Both Detective Pepey and Catherine Lomuscio denied any knowledge of a confidential informant in Plaintiff's case during their 2022 depositions. However, Pepey's notebook and testimony demonstrate that the informant in question, DH2, provided the very first information Pepey documented during the investigation, information Pepey failed to transfer into a formal report and lied about at Plaintiff's trial when he testified that the first information he received came from Andrea Witter. In contrast with Lomuscio and Pepey, Detective Kaalund testified that she *knew* a confidential informant provided information in Plaintiff's case. Kaalund learned of the confidential informant after obtaining the Lascelles Thompson homicide file from the Cold Case Squad, a unit to which Pepey was assigned from 1996-2001. DH2 was one of "a lot" of people mentioned in both the Thompson file and Plaintiff's case and, Kaalund believed, the witness who named Jomo Kenyatta as the perpetrator of Thompson's murder. The CIU evidently found DH2 significant enough that they travelled to Florida solely to meet with him in person three months before the QDA joined a motion to vacate Plaintiff's conviction.

According to Detective Kaalund, Detective Pepey told the CIU that he believed the C.I. used in Plaintiff's case was "a narcotics CI." According to Pepey his reported reputation for closing many drug related homicides by exceptional clearance was based on the fact that he had informants within the infamous narcotics organization "The Supreme Team," including the gang's "hit man" Ernesto Piniella.[14] Kaalund testified that she did not document Pepey's statements concerning informants and The Supreme Team but was "sure" the information was documented somewhere. Pepey first denied, then when confronted with documentary evidence could not explain, why he sought the assistance of Detective DeRosalia in Plaintiff's case in April 1989, but could recall that Detective DeRosalia worked on the investigation into Kenneth McGriff and The Supreme Team.

Plaintiff first learned that Catherine Lomuscio was demoted when he obtained Robert Masters's 2019 deposition after his exoneration. Masters never revealed this information to Plaintiff's counsel despite co-signing written opposition to Plaintiff's 2017-18 C.P.L. § 440.10 motion, based largely on claims concerning prosecutorial misconduct, and making a lengthy record in opposition to the motion before Judge Ira Margulies in September 2018. The undersigned submits that Masters's purported inability in 2019 to recall the spelling of Lomuscio's name, or the date and basis for her demotion, is exceedingly dubious given Lomuscio's prominence in the 2018 motion papers he edited and appeared in opposition to. Moreover, Plaintiff first learned

---

[14] "The Supreme Team" was a narcotics trafficking organization based in South Jamaica, Queens, and led by Kenneth "Supreme" McGriff and Gerald "Prince" Miller. The organization was founded in the mid-1980's and peaked in 1987, when McGriff and Miller were both jailed, but enjoyed a resurgence in the Spring of 1989, when Miller was released from prison and "began to rebuild" the organization by taking over drug spots. See, United States v. Miller, 116 F.3d 641, 652-54 (1997). Detective Frank DeRosalia, whose assistance Detective Pepey sought within a month of being assigned to the investigation that resulted in Plaintiff's conviction (despite their being assigned to different commands and only later, by the time Plaintiff was prosecuted, becoming partners), was involved in the investigation that resulted in McGriff's 1987 incarceration, including vouching for the reliability of an informant. See, United States v. McGriff, 678 F. Supp. 1010, 1012 (1988). Ernesto Piniella was stylized the organization's "Chief of Security" and was found to have used corrupt law enforcement officers to assist in carrying out murders. See, Miller, 116 F.3d at 652-54.

that Lomuscio was *encouraged to resign* more than twenty-five (25) years after the fact, when Lomuscio was deposed after his exoneration. This was also when Plaintiff first learned that *multiple* Defendants prosecuted by Lomuscio had their convictions reversed or vacated. It is inconceivable that Lomuscio's history of prosecutorial misconduct, and the fact that the QDA demoted her and encouraged her to resign, played no role in the Office's recognition that Plaintiff's conviction should be vacated. Notably, all charges against Plaintiff's lone co-Defendant, Hollis Laylor, were dismissed on motion of the QDA in April 1994. By that time, Lomuscio had been removed from the case for unexplained reasons after several failed attempts to prosecute Laylor. Like the basis for demoting Lomuscio or encouraging her to resign, it seems the QDA has failed to elaborate on the reasoning behind the decision to dismiss all charges against the sole alleged accomplice to Plaintiff to ever be identified, let alone prosecuted. Accordingly, there has been no opportunity for Plaintiff to investigate whether the demotion or push for Lomuscio to resign, and the dismissal of the charges against Laylor, were at all connected.

There has also been no explanation as to how the CIU determined that DH1, and Jomo Kenyatta were in the drug business together. During his interview with the CIU, Kenyatta claimed an inability to recall *anything*, and no interview notes or CIU reports reflecting facts that would support the conclusion that Kenyatta sold drugs with DH1 have been disclosed. Although CIU documents that were disclosed indicate that ADA Celestin asked ADA Lomuscio about the Thompson murder and Kenyatta's status as a suspect and, indeed, provided her materials from the case file referencing her name to refresh her recollection, Lomuscio flatly denied that Celestin ever spoke to her about the case. Moreover, while ADA Celestin represented that Kenyatta was wanted for several violent crimes and homicides (plural) at the time of Plaintiff's trial, the only homicide Kenyatta was *a suspect in* that the QDA has revealed is Thompson's murder, and they have seemingly not disclosed information about the other violent crimes Kenyatta was *wanted for*. Notably, in a written submission composed closer in time than ADA Celestin's Affirmation, ADA Spanakos was unwilling to represent that Kenyatta was even a suspect in Thompson's murder, much less wanted for the crime.

Finally, during Detective Kaalund's deposition she testified that the CIU "found out" that Jomo Kenyatta "had shot at the police...[and] did robberies..." It is unclear whether Kaalund was referring to the September 1988 arrest where Kenyatta's passenger pulled a gun on an officer and, thus, whether the QDA continues to conceal evidence concerning Kenyatta's background despite basing its agreement to join a motion to vacate Plaintiff's conviction based in part on the concealment of such information. Furthermore, if the incident in question was the reckless driving arrest Lomuscio did admit knowing about at the time of Plaintiff's trial, then it is even more apparent that Lomuscio failed to investigate the background of her witnesses or, alternatively, to disclose <u>Brady</u> material to Plaintiff.[15]

The QDA has refused to disclose the ultimate CIU report or other materials compiled by the Unit detailing the information presented for DA Katz's consideration that led to her "ultimate

---

[15] In addition, ADA Celestin's representation that Jomo Kenyatta used six (6) different aliases and was arrested under *others* seems to imply that *at least* seven (7) aliases for Kenyatta were learned. Assuming *arguendo* that Jomo Kenyatta was his real name, as ADA Lomuscio represented in summation at Plaintiff's trial, only six (6) aliases have been revealed to Plaintiff: (1) Anthony Thomas; (2) Antonio Tomas; (3) Lansford Beckford; (4) Jomo Kenya; (5) "Bob"; and (6) "Skunk."

decision" that Plaintiff's conviction was based on unreliable evidence and should be vacated. ADA Celestin, who was responsible for the CIU reinvestigation and for composing the ultimate report, is unfortunately unavailable to Plaintiff. The QDA contends that in the absence of ADA Celestin and the CIU report, Plaintiff can depose Detectives Kaalund and Maher, who were present during "most" of the interviews Celestin conducted, regarding "some" information. Similarly, they opine that ADA Bryce Benjet, the director of the CIU and Celestin's supervisor "may" provide an avenue to offer or clarify "some" information. However, the deposition of Detective Kaalund has demonstrated the insufficiency of this remedy where certain investigative steps, including steps concerning unexplained and/or undisclosed evidence, were apparently conducted by Celestin alone.

The undersigned submits there are obvious reasons to conclude that the QDA has not revealed all the evidence considered by the CIU and DA Katz that led the DA to determine that there was no reliable evidence of Plaintiff's guilt and that he would probably be acquitted if he were retried. The undersigned further submits that the disparity between ADA Celestin's initial documented conclusions concerning Jomo Kenyatta's cognitive state and the substance of her later Affirmation, as well as her request that the undersigned omit a reference in his Affirmation to Detective Pepey's misconduct indicate that here, as in Bell, *supra*, the QDA contoured the evidence in its favor in agreeing to vacate a problematic conviction following a CIU reinvestigation. It is apparent that the Office has declined to disclose or acknowledge a substantial amount of relevant evidence uncovered by the CIU but suppressed in favor of relying on the "new" evidence referenced on the record. Plaintiff has been denied an opportunity to investigate what was truly new, and to examine what the DA considered before agreeing that his conviction should be vacated, because of this apparent continued suppression. This is especially so given the age of this case, the unavailability of critical witnesses, the fact that witnesses deposed thus far have been unwilling or unable to complete the evidentiary picture and, perhaps most significantly, that Plaintiff bears the ultimate burden to substantiate his claims.

At the March 1, 2023, appearance before Judge Garaufis, the Court asked counsels for the Defendants, "[w]hat makes this case different from all these other cases...where...everybody falls on their sword and settles the case. Why is this different...why are we going to have extensive litigation here rather than...trying to reach a settlement...how is this different from all of those other cases...I sincerely don't understand how this is different from other cases that appear to be exoneration cases." Even after being afforded an opportunity to confer, neither attorney for the Defendants could respond with any substance but offered that, "...it's not that we're not willing to explore settlement. At this stage, we're seeking...to narrow down the claims..." The undersigned respectfully submits that counsel's inability to explain was based in part on the failure of the QDA to fully acknowledge or disclose the egregious law enforcement misconduct including longstanding and, indeed, continued suppression of evidence. The undersigned further submits that a body of evidence demonstrating that misconduct has grown even through depositions confined in scope by the Court of Claims, which will only expand through further discovery concerning his claims before this Court. Plaintiff should not be prohibited from seeking to lay the groundwork for further expansion of that evidence to the extent he is able, especially while certain discovery is held in abeyance, merely because counsel for Defendants seeks to "narrow" his claims before making any effort to settle them. For instance, while Plaintiff will seek to depose Catherine Lomuscio and William Pepey without the restrictions imposed by

the Court of Claims, further documentary discovery is necessary before he will be able to depose them thoroughly and efficiently.

Accordingly, pursuant to Judge Garaufis's Order of March 1st, and this Court's Order of March 29, 2023, Plaintiff seeks to depose the following witnesses for the reasons detailed herein, and to assess the existence and recognition of information and evidence in support of his claims and in the interest of an efficient discovery process and judicial economy.

1) Lieutenant Frank Torres
   - Lieutenant Torres is apparently on the verge of retirement after more than five decades of public service with the NYPD and QDA. As such, it will soon become more burdensome for Plaintiff and Torres alike to take his deposition. To this point, the QDA has failed to acknowledge that Torres *was even a source* of information during the CIU reinvestigation, let alone that he revealed misconduct by Detective Pepey that obviously bears upon the evidence used to unjustly convict Plaintiff. Plaintiff seeks to depose Torres concerning what information he provided to the CIU, what he learned about Pepey's misconduct, when he learned it, who conveyed it to him and, in turn, who he conveyed it to at the QDA and when. This deposition can seemingly be taken without further documentary evidence but would serve as a basis to guide Plaintiff in seeking further relevant documentary discovery.

2) District Attorney Melinda Katz
   - In the apparent absence of full disclosure of the information and evidence obtained by CIU and the Unit's report, as well as the unavailability of ADA Celestin, DA Katz is the only source that can reliably and thoroughly explain what was known and/or considered in making the ultimate determination that Plaintiff's conviction and the underlying indictment should be vacated. **This is according to the QDA's own representations.** It is imperative that Plaintiff be afforded an opportunity to fully learn and investigate what was known and/or considered by DA Katz in making this determination to establish a groundwork for efficient discovery of relevant evidence moving forward. Indeed, DA Katz's deposition may well establish that other depositions or sources of documentary evidence considered by Plaintiff are irrelevant (or that sources not considered by Plaintiff are relevant) and, thus, promote an efficient discovery process moving forward in the interest of judicial economy. See, Gibson v. Carmody, 1991 U.S. Dist. LEXIS 11225 (granting moving party permission to depose former NYPD Commissioner Benjamin Ward, based on Ward's participation in proceedings relating to or stemming from the investigation of the underlying facts of the case.).

3) Alice Vachss, Esq.
   - In granting Plaintiff leave to conduct depositions during the stay of broad discovery, Judge Garaufis explicitly recognized that in a case of this age, witnesses may pass away (something that has already happened) and obtaining their testimony may prove burdensome based on distance, age, illness, or other factors. Judge Garaufis stated that he did not "want to lose witnesses who might testify at a trial or might be important in reaching a settlement," and that Plaintiff "has a right to have these people deposed...so

that their testimony is recorded...in case we need to have a trial." Here, Alice Vachss is an elderly attorney who resides on the other side of the country. Plaintiff attempted to depose her in relation to his pending Court of Claims action but was prohibited on relevancy grounds. Plaintiff seeks to depose her at her earliest possible convenience to elicit material testimony that executives at the QDA were made aware of issues with his trial prosecutor's conduct and lack of training by a supervisory prosecutor but those issues were ignored. As with Lieutenant Torres, there is no outstanding documentary discovery Plaintiff believes he will need before Vachss' deposition but her testimony could serve as a useful guide in seeking further relevant documentary discovery.

4) James Quinn, Esq.
- Former EADA Quinn was, according to Catherine Lomuscio, the QDA executive who encouraged her to resign from the Office after Plaintiff's conviction. However, no disclosure whatsoever concerning this subject has been made by the QDA. Moreover, Lomuscio claims not to know when or why Quinn encouraged her resignation. Plaintiff respectfully submits that Quinn could establish a baseline to seek material evidence that has otherwise never been acknowledged by the QDA for unexplained reasons. Plaintiff would hold any inquires unrelated to Quinn's knowledge regarding Lomuscio in abeyance until full discovery resumed.

For the aforementioned reasons, Plaintiff respectfully requests this Court grant him leave to depose Lieutenant Frank Torres, District Attorney Melinda Katz, Alice Vachss, and/or James Quinn at the earliest possible convenient opportunity in furtherance of moving his claims toward settlement or obtaining relevant evidence to substantiate them in the event a trial is held.

Respectfully submitted,

JAMES HENNING
Law Offices of James Henning & Associates
Attorneys for Plaintiff
(718) 717-2454
jhenning@jhenninglaw.com

86 Livingston Street Brooklyn, New York 11201    (718) 717-2454